PITTA & DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 652-3890
*Attorneys for Defendants*
*New York Hotel and Motel Trades Council, AFL-CIO*

Barry N. Saltzman (BS 6533)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

| | |
|---|---|
| TRAN DINH TRUONG, individually and of Behalf of ALPHONSE HOTEL CORP. d/b/a HOTEL CARTER, | : : : |
| Plaintiff, | : : : |
| -against- | : Case No. 1:07-Civ-11383 (RJH) |
| NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO, and THE OFFICE OF THE IMPARTIAL CHAIRMAN and PETER WARD, | : **AFFIRMATION OF BARRY N.** : **SALTZMAN IN SUPPORT OF** : **THE UNION'S MOTION FOR** : **SANCTIONS PURSUANT TO FRCP 11** |
| Defendants. | : : |

– – – – – – – – – – – – – – – – – – – – – – – – – – X

STATE OF NEW YORK      )
                                              ss:
COUNTY OF NEW YORK   )

     I, BARRY N. SALTZMAN, hereby affirm under penalty of perjury as follows;

    1. I am an attorney admitted to practice before this Court and the courts of the State of New

York, and a partner in the law firm of Pitta & Dreier, LLP, attorneys of record for the New York

Hotel & Motel Trades Council, AFL-CIO and Peter Ward (collectively the "Union"), defendants

in this action. I make this affirmation upon my personal knowledge, the pleadings in this case

and the records of the Union, in support of the Union's motion for sanctions against plaintiffs

Tran Dinh Truong and Alphonse Hotel Corp. d/b/a Hotel Carter ("Plaintiffs") and Calabro &

Associates, P.C. ("Calabro") pursuant to Rule 11 of the Federal Rules of Civil Procedure ("FRCP") and 28 U.S.C. § 1927.

2.  This Affirmation and the accompanying Memorandum of Law refer to the following pleadings: Plaintiffs complaint dated November 21, 2007 (the "Complaint"), Exhibit 1 hereto; the Union's Answer and Counterclaims ("Answer/Counterclaims"), Exhibit 2 hereto; and Plaintiffs' Reply to Counterclaims ("Reply to Counterclaims"), Exhibit 3 hereto. Reference is also made to the submissions included with Union's motion for judgment on the pleadings served and filed on March 31, 2008. *See* docket entries 29, 30 and 31. The facts of the litigation are set forth in the Union's motion submissions to which the Union respectfully refers the Court in lieu of further background if desired.

### General Background

3.  The Union is a labor organization within the meaning of federal labor law with over 20,000 members. At all relevant times, Peter Ward has served as the Union's President. (Complaint ¶12, 14; Answer/Counterclaims ¶¶12, 14, 40; Reply to Counterclaims ¶1).

4.  Plaintiff Alphonse Hotel d/b/a The Carter Hotel is an "employer" in interstate commerce within the meaning of federal labor law, including 29 U.S.C. §185, §301 of th LMRA (Complaint ¶6; Answer/Counterclaim ¶ 41; Reply to Counterclaim ¶ 2). Mr. Tran Dinh Truong ("Tran") owns the Alphonse Hotel. Plaintiffs own and operate a hotel business at 250 West 43rd Street, New York, N.Y. 10036 (the "Hotel"). (Id.)

5.  The terms and conditions of employment for employees represented by the Union appear in the Industry-Wide Agreement ("IWA") between the Union and the Hotel Association of New York City, Inc. ("Hotel Ass'n"), either directly for a hotel member of the Hotel Ass'n or indirectly by a "Me Too" Agreement which binds an individual hotel to the IWA's terms. A

copy of the IWA is attached as Exhibit 2(E).  (See Complaint 2(l); Answer/Counterclaim ¶42; Reply to Counterclaims ¶3).

6.  Since at least 1995, the Union and the Hotel have been bound to the IWA by successor Me Too Agreements.  Plaintiffs signed the most recent such Me Too Agreement, dated March 16, 2006, binding them and the Union to the IWA from July 1, 2006 to and including June 30, 2012.  (Answer/Counterclaim ¶44; Reply ¶5).  A copy of the 2006 Me Too Agreement is attached as Exhibit 2(G).

7.  Among other terms, the IWA establishes wage rates and hours of work (Sections 8, 11-16, 28-32, 51, 54, Schedule A), hiring (Section 21) circumstances of discharge (Sections 24,25, 27)) and the Union's right to enter hotel premises to pursue Union business (Section 42). Section 25 of the IWA forbids all forms of national origin discrimination as follows:

> "The opportunity to give and obtain employment without discrimination because of ...national origin...or any other factor illegal under federal, state or local law is hereby recognized by the parties to this Agreement."

8.  The Me Too Agreement expressly incorporates the broad IWA arbitration provisions in full.  (Exhibit 2(G)).  Article 26 of the IWA provides, in relevant part:

> All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto.

(Complaint ¶13; Answer ¶ 42; Reply ¶3).

### Grievance and Arbitrations

9.  Pursuant to the 2001-2006 IWA, the Union had commenced a number of grievances against the Hotel upon the complaints of various employees alleging mistreatment, failure to pay

wages, intimidation and wrongful discharge. (Complaint ¶¶ 2(a)-(c), (h). See ¶¶9 and 10 infra).
Citing the Union's prosecution of these grievances, Plaintiffs attempted and failed to rescind
their pre-2006 Me Too Agreement. The Hon. Denny Chin, USDJ, rejected Plaintiffs' attempt in
*Alphonse Hotel Corp. v. New York Hotel v. & Motel Trades Council, AFL-CIO*, 2004 WL
414836 (SDNY) *aff'd without opinion*, No. 04-1757 (2d. Cir. 4/06/04), copy attached as Exhibit
4 hereto. *See also, Alphonse Hotel Corp. v. New York Hotel & Motel Trades Counsel, AFL-
CIO,* 2001 WL 959005 (SDNY) (Hotel enjoined from evicting Union member from residence in
retaliation for wage claims), copy attached as Exhibit 5 hereto.

10. In or about December 20, 2006, the Union commenced three grievances against the
Hotel alleging that the Hotel and Tran had intimidated and discharged housekeeping employees
Ana Penna, Elizabeth Santiago and Glennys Castillo because of their demands for wages due
them and support for the Union. (Complaint ¶¶2(d), (g),(i),(j), (k); Answer ¶¶ 45, 53 and 61;
Reply to Counterclaims ¶¶6, 14,22).

11. Following hearings before the OIC from March through August 2007, at which all
parties appeared by counsel, presented arguments, witnesses and evidence, and cross-examined
witnesses under oath, the OIC rendered Awards No. 2007-26 (3/14/07), No. 2007-38 (6/27/07)
and No. 2007-59 (8/14/07) (the "Awards"), sustaining the Union's grievances and ordering
reinstatement with back-pay to the employees against the Hotel. Copies of the Awards are
attached as Exhibits 2(A)-(C) hereto. See also citations to ¶13, supra.

### Rule 11 Conduct

12. Plaintiffs filed their Complaint on or about November 21, 2007, copy attached as Exhibit
1. The Union timely removed to this Court December 19, 2007 without challenge.

13. The Union filed its Answer and Counterclaims with exhibits on December 26, 2007,

denying the elements of Plaintiffs' claims and any alleged wrongful conduct, copy attached as Exhibit 2 hereto. Plaintiffs filed their Reply to Counterclaims on or about January 18, 2008, copy attached as Exhibit 3 hereto.

14. Contemporaneous with the Union's filing of a pre-motion letter seeking leave to move for judgment on the pleadings, the Union served Plaintiffs, through Calabro, with a "Rule 11 letter" on January 25, 2008, detailing the Complaint's fatal defects and requesting the withdrawal of the frivolous and harassing Complaint, copy attached as Exhibit 7 hereto..

15. Plaintiffs failed to discontinue this action and on March 31, 2008 the Union served and filed its motion for judgment on the pleadings. *See* docket entries 29, 30, and 31.

16. On April 8, 2008 the Union served the instant motion for sanction but did not file same on that date in accordance with the twenty-one (21) day safe harbor provision in Rule 11(c)(1).

17. This motion was filed after the safe harbor period expired.

For the reasons and upon the authority set forth in the Union's Memorandum of Law, I respectfully request that this Court grant the Union's motion for sanctions against Plaintiff's and Calabro pursuant to FRCP Rule 11, together with whatever further relief this Court deems fair and appropriate. I further request that this Court order Plaintiffs to annex a copy of its decision and order to any pleadings Plaintiffs may seek to file against the Union, the Union's employees, or Hotel employees the Union represents, in any forum.

Dated: New York, N.Y.
      April 8, 2008

BARRY N. SALTZMAN

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X

TRAN DINH TRUONG, individually and on behalf of
ALPHONSE HOTEL CORP. d/b/a
THE HOTEL CARTER,

Index No.: 07603958

                             Plaintiff,

                                       **SUMMONS**

      -against-

                                      **Plaintiff designates New
York County as Place for
Trial**

                                      **The Basis of Venue is
Plaintiff's Place of
Business:**

                                      **250 West 43rd Street**

                                      **New York, New York**

NEW YORK HOTEL & MOTEL TRADES COUNCIL,
AFL-CIO, THE OFFICE OF THE IMPARTIAL
CHAIRMAN, and PETER WARD,

                                Defendants.

---------------------------------------------------------------X

      TO THE ABOVE-NAMED DEFENDANTS:

      **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to

serve a copy of your Answer, or, if the Complaint is not served with this Summons, to

serve a Notice of Appearance upon the Plaintiff's attorney within 20 days after service

of this Summons, exclusive of the day of service (or within 30 days after service is

complete if this summons is not personally delivered to you within the State of New

York); and in case of your failure to appear or answer, Judgment will be taken against

you by default for the relief demanded in the Complaint.

Dated: New York, New York
        November 2_1_, 2007

Yours, etc.,

CALABRO & ASSOCIATES, P.C.
Attorneys for Plaintiff
1412 Broadway, Suite 1504
New York, New York 10018
(646) 688-6095

By:_____
        Gregory G. Calabro, Esq.

TO:    **NEW YORK HOTEL & MOTEL TRADES COUNCIL,
        AFL-CIO**
        709 Eighth Avenue
        New York, New York 10036

        **THE OFFICE OF THE IMPARTIAL CHAIRMAN**
        321 West 44th Street, Suite 400
        New York, New York 10036

        **PETER WARD**
        709 Eighth Avenue
        New York, New York 10036

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
TRAN DINH TRUONG, individually and on behalf of      Index No.:
ALPHONSE HOTEL CORP. d/b/a
THE HOTEL CARTER,

<div align="center">Plaintiff,</div>

   -against-                                   COMPLAINT

NEW YORK HOTEL & MOTEL TRADES COUNCIL,
AFL-CIO, THE OFFICE OF THE IMPARTIAL
CHAIRMAN, and PETER WARD,

<div align="center">Defendants.</div>
------------------------------------------------------------------X

The Plaintiff, Tran Dinh Truong, individually and on behalf of Alphonse Hotel Corp. d/b/a The Hotel Carter (the "Hotel"), by his attorneys Calabro & Associates, P.C., as and for his complaint against Defendants New York Hotel & Motel Trades Council, AFL-CIO, the Office of the Impartial Chairman, and Peter Ward, alleges as follows:

<div align="center">NATURE OF THE ACTION</div>

1.     This is an action brought principally by a local New York City Hotel against the New York Hotel & Motel Trade Council affiliated with AFL-CIO (hereinafter the "Union") and the individual Defendants seeking monetary damages based upon an egregious pattern of discrimination and targeting of Plaintiff in violation of the New York State and New York City Human Rights Law and a clear pattern of bias against Plaintiff. In addition, Plaintiff seeks judgment against the Defendants for intentional infliction of emotional distress based upon conduct as perpetrated by the Union and the individual Defendants against Plaintiff, which conduct has caused significant mental and physical injury to him.

2.     The sordid history of abuse, bias and prejudice against the Plaintiff is

pervasive. As alleged in further detail herein, the Union and the individual Defendants have engaged in a course of conduct of bias and with a discriminatory intent and have used their position to harass Plaintiff and cause mental and physical injury by:

(a)    Forcing the Hotel to continue the employment of certain individuals who are clearly insubordinate, overtly hostile, and physically violent toward management and their co-workers and who have in the presence of the Union officials threatened bodily harm against the Hotel's management;

(b)    affirmatively and in bad faith forcing the Hotel to continue to employ the Union's employee delegate under the threat of immediate reprisals and retaliatory action;

©    endorsing, promoting and assisting in the preemptive filing of frivolous grievance proceedings to protect the employment of certain Union members after learning that the Hotel had disciplined them or intended to terminate their employment, the purpose of which was to unfairly prevent the Hotel from asserting its rights and taking any action against these insubordinate employees (set forth in more detail below);

(d)    violating the Me Too Agreement between the parties in which it was agreed that there would be no further grievances to the Impartial Chairman for the time period prior to March 16, 2006, by bringing claims and grievances on behalf of employees for the period prior to March 16, 2006, including complaints of Hamadou Diallo, Ana

Pena and Ylonka Pena, plus Elizabeth Santiago and Glenny

Castillo, who, as will be set forth below, were not employees but

the union aided them in bringing grievances despite this fact;

(e)     suborning palpably perjurious testimony by the Union's employee

representative who is known by the Union (I) to lack personal

knowledge of the relevant facts, (ii) to give false testimony; and (iii)

to have received payments from other employees as consideration

for giving such tainted testimony;

(f)     permitting Manny Lisanti, a Union agent, to threaten Plaintiff with

physical harm without cause or justification during a meeting at the

union office, causing Plaintiff to be unable to properly represent

himself and the Hotel at said meeting since he was required to

leave due to fear for his safety. Mr Lisanti stated that he "throw you

out the window";

(g)     forcing the Hotel to pay and hire persons who were never

employed by the Hotel but who filed false grievances at the urging

of the Union, including Elizabeth Santiago and Glenny Castillo.

Neither worked for the hotel, yet the Union allowed them to file

grievances despite no proof of employment and then aided them in

giving false testimony, leading to a decision in their favor by the

Impartial Chairman, despite no valid proof. Their testimony was not

supported by any documentary evidence and the Plaintiff's records

proved that they were not employees;

(h)   failing to address the Hotel's concerns about Hamidou Diallo, who
       fought constantly with another employee because that employee
       did not agree with the union. The Union did not follow up on
       Plaintiff's complaints and took no steps to reprimand, warn or
       reassign either one of these employees. Ultimately, this led to the
       murder of the other employee by Hamidou Diallo, which led to bad
       publicity for the Hotel and the loss of substantial income for the
       Hotel.  Mr. Diallo then stated that all he was owed was his pay for a
       six day period and requested that the union obtain those funds for
       him. Ten years later, Mr. Diallo commenced a court action seeking
       monies from the Hotel and alleging that the Union had failed to
       fairly represent him. Despite the fact that in order to prove unfair
       representation, it must be proven that the Union acted far outside a
       wide range of reasonableness, and that Mr. Diallo did not prove
       this factor, the Union, instead of fighting this claim, set up a hearing
       on this grievance, causing Plaintiff to be harmed by having to prove
       its' defense over ten years later and the Impartial Chairman's office
       proceeded, against its' own policies, in allowing this to take place;

(I)    filing grievances on behalf of Ana Pena, a former employee of the
       Hotel, who was only an employee for approximately three weeks,
       which was supported not only by the testimony of the Hotel
       employees but the records that the Union placed into evidence and
       who had been fired both because she was unable to perform the

necessary duties and, of more importance, she had been caught stealing from various guests which was proven by letters from the guests and by the fact that it was her card key which was used to enter the rooms at the time that the thefts took place. Despite the fact that she had been stealing and had not been employed during the time for which she was seeking additional pay, and despite the fact that the guests refused to pay part of the hotel bill because of the stolen property, and despite the fact that there was an on-going police investigation and judgments entered against her in the Civil Court, the union insisted that she be reinstated and receive back wages. This was in violation of the Me Too agreement, as well as in direct contradiction of the evidence produced at the hearing. The Impartial Chairman supported the Union and these persons, despite no valid proof;

(j)      filing grievances on behalf of Elizabeth Santiago and Glenny Castillo, who were not employed by the Hotel but were encouraged by the Union to provide perjurious testimony to the Impartial Chairman, after which the Impartial Chairman, despite no valid evidence, supported the Union in requiring the Plaintiff to give these persons a job. Since that date, in October 2007, it was discovered that Ms. Santiago entered a room which was not on her list of rooms to be cleaned and took guests' belongings, the police have investigated and required her to return some of the items but

the balance of the stolen items remain missing. Had the Union and the Impartial Chairman not improperly required Plaintiff to give her the job, this would not have happened and would not have caused bad publicity and a loss of guests;

(k)    filing grievances on behalf of Ylonka Pena, a subordinate employee who was damaging hotel property and aiding in the theft of hotel property, such as towels, which continued after she was given a warning and, in order to avoid being fired, she then falsely claimed that the Hotel had told her she would be fired if she went to the Union and once again, the Union improperly targeted Plaintiff with the support of the Impartial Chairman; ;

(l)    issuing an arbitration award requiring the Hotel to engage a specific industrial consultant to conduct an inspection of health and safety at the Hotel, in contravention of the Collective Bargaining Agreement.  Pursuant to the 2006 Memorandum of Understanding, the parties were to agree on a consultant from a list of consultants. However, the list consisted of merely one consultant.  The Impartial Chairperson's selection of one consultant was spurious, and the Chairperson ordered the Hotel to provide access and to pay the consultant. This was done without the proper notice as required by the contract and many inspectors were sent, completely outside the realm of the normal procedure for most hotels, proving that the Union was acting in a deliberate and willful manner to harass and

discriminate against Plaintiff;

(m)    The Union has consistently and persistently acted in a demeaning nature towards Plaintiff, they have called meetings with Plaintiff, made Plaintiff wait for 2 hours and then dismissed Plaintiff without further explanation or justification. On one specific occasion, October 15, 2007, Rolando Ruiz, a union representative, came to the hotel with another union representative and Ylonka, Ana and Elizabeth, looking for Hana and Robert Chen to discuss a complaint which alleged that they were told that if they did not clean a specific number of rooms per shift, their pay would be docked. Ylonka also alleged that she had already been docked. Without inquiring into the facts, the Union ordered that we pay her the alleged time without determining if there had been some type of error. Mr. Chen questioned how Elizabeth's card was punched on a day that she was not at work, and, without any investigation, the Union accused Plaintiff of tampering with the card. Every issue raised by Plaintiff, i.e. that the housekeepers were not performing to hotel standards, not handling their time effectively, failing to adhere to the New schedules, were not only ignored by the Union but the union representative shouted at the office employees, told them that they were stupid, that they should shut their mouths and that the Union representatives could say whatever they wanted to the office employees. He physically raised his hands and pointed

his fingers into the office employees' faces and screamed and made a scene both in the office and in the lobby and refused, when courteously asked to lower their voices, to stop screaming and speaking in a demeaning manner. The union representatives told the Plaintiff that the housekeepers had a right to waste time by talking when they were supposed to be working and asked for information which had nothing to do with the issues that they had arrived to discuss. This incident caused alarm for the hotel guests as the office is situated above the lobby and there was much yelling and screaming. This is clearly discrimination and harassment as it is doubtful that this behavior occurs in other hotels.

(n)     the Impartial Chairperson has failed to timely schedule a hearing when Plaintiff files a grievance as against the Union.  On or about September 25, 2007, Plaintiff filed a grievance against the Union for trespass onto Hotel property by Union officials. The Impartial Chairperson, despite ample opportunity to do so, has failed to date to schedule or hold a hearing.

(o)     the Impartial Chairperson has issued an arbitration award regarding alleged health and safety violations without holding a hearing and in contravention of the Collective Bargaining Agreement;

(p)     During the 9/11 tragedy, the union employees begged Plaintiff not to lay them off despite the fact that the hotel's business had

declined. Plaintiff agreed to allow the employees to work four days but be paid for five days, with the understanding that when business was better, the employees would pay back the monies for the days during which they did not work. This money was never paid back and due to the Me Too Agreement, Plaintiff had to stop a case commenced to recover those monies. However, though Plaintiff complied with the Me Too Agreement, the union has never done so.

3.     In addition, the Union has initiated spurious and entirely frivolous investigations intended (I) to unfairly burden the Hotel and its managers to produce voluminous business records; (ii) to gain forcible entry into areas of the Hotel reserved for guests and service areas, steam rooms, telephone rooms and storage rooms, for reasons having nothing to do with collective bargaining but which are intended to harass and embarrass Plaintiff and to unlawfully disrupt business operations.

4.     Under the guise of "investigation" the Union has refused to acknowledge the Plaintiff's reasonable security procedures and protocol implemented by the Plaintiff to protect the safety and welfare of the guests and employees by: (I) refusing to sign in before entering the non-public areas of the Hotel; (ii) refusing to arrange visits with management in advance as required by the collective bargaining agreement; (iii) trespassing on to the Hotel premises and guest rooms; (iv) intentionally disrupting the Hotel's business operations thereby forcing management to call for police intervention; and (v) intimidating the Hotel's employees, guests and Plaintiff by publicly challenging the authority and disobeying the requests of the Hotel management to adhere to its

security procedures.

5.      Moreover, the Union has refused to acknowledge the violent or criminal propensities of several employee Union members in the context of proceedings and disciplinary action, and have encouraged and sponsored criminal activity on the Hotel's premises by wrongfully shielding these violent employees from disciplinary action measures and affirmatively assisted them in bringing actions against the Hotel.

### PARTIES

**(I) Plaintiff**

6.      Alphonse Hotel Corp. d/b/a The Carter Hotel (hereinafter referred to as the "Hotel") is a corporation organized and existing under the laws of the State of New York and operates the Carter Hotel at 250 West 43rd Street, New York, New York. Plaintiff Tran Dinh Truong is an individual and the principal owner and manager of the Hotel, and resides at 250 West 43rd Street, New York, New York. Mr. Truong is a naturalized United States citizen who emigrated to this country from South Vietnam in 1975.

7.      For many years prior to April 1975, Mr. Truong was the Chief Executive Officer, chairman and principal owner of Vishipco Line, the largest shipping company in South Vietnam which owned and operated a fleet of twenty-four (24) commercial merchant ships, hundreds of trucks, numerous hotels, stevedores and various shipping related facilities.

8.      As the communist regime began to infiltrate South Vietnam, Mr. Truong used his position to dispatch the company's vessels and other assets to locations where American civilians and United States military forces were trapped in order to

rescue them; even as Saigon fell to the communists on April 30, 1975, Mr. Truong used his position to assist United States military which had withdrawn its support and ordered its troops and civilian personnel to evacuate South Vietnam which was under massive artillery attacks that isolated and trapped many American soldiers and civilians in the troubled areas of South Vietnam.

9.    Mr. Truong was responsible for evacuating more than 8,300 people, including Americans, allies, Koreans and Vietnamese to safe international ports located in Hong Kong, Subic Bay, Guam and Singapore at his own cost and at great personal danger having to leave many of his family members behind.

10.    Mr. Truong's own immigration from Vietnam was extremely difficult, having traveled on the same vessels with thousands of other Vietnamese nationals and Americans in order to flee the communists.  Having been advised by the United States Embassy in Saigon that his life and that of his relatives were in great danger, Mr. Truong evacuated to the Philippines where he was eventually flown to the safety of the United States where he relocated to New York City and became a hotel operator in the late 1970s. As the result of his assistance to the United States government, many of Mr. Truong's family members were persecuted and ultimately murdered by the communists.

11.    Mr. Truong has continued his philanthropy in the United States.  On or about September 13, 2001, Mr. Truong donated Two Million Dollars ($2,000,000.00) to the September 11th Fund operated by the Red Cross.  He was one of the first to make a major contribution to the Fund, and played a pivotal role in the emotional, physical and economic recovery from the disaster.

**ii. The Defendants**

12.    At all times hereinafter mentioned, Defendant New York Hotel & Motel Trades Council, AFL-CIO, was and remains a labor organization comprised of members of the hotel and motel trades, organized under the laws of the State of New York, and is constituted for the purposes, in whole or in part, of collective bargaining or of dealing with employers concerning grievances and terms and conditions or employment.

13.    At all times hereinafter mentioned, Defendant Office of the Impartial Chairman is a standing organization of labor arbitrators empaneled to hear disputes arising out of the Industry Wide Agreement ("IWA").

14.    At all times hereinafter mentioned, Defendant Peter Ward was and is an individual and president of Defendant New York Hotel & Motel Trades Council, AFL-CIO, and, upon information and belief, resides in the State of New York.

## AS AND FOR A FIRST CAUSE OF ACTION

15.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 14 as though fully pleaded herein.

16.    That the Plaintiff is a member of a protected class by virtue of his ethnicity and race.

17.    That the various actions and investigations conducted by Defendants were undertaken solely to harass, embarrass and harm Plaintiff, due to his ethnicity and race and the Defendants have attempted to take advantage due to the fact that there are some language difficulties.

18.    That the acts of Defendants constituted an unjust discrimination as against the Plaintiff in his civil rights because of his race, color and national origin, and

such acts were in violation of the express provisions of §8-107 of the Administrative Code of the City of New York.

19.     As a direct and proximate cause of said unlawful activities, Plaintiff has suffered the indignity of discrimination, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in physical illness and emotional stress.

20.     As a further direct and proximate result of said unlawful activities, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety, painful embarrassment among his employees, damage to his good reputation, disruption of his private and personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

21.     That Plaintiff demands judgment as against the Defendants in an amount to be determined by this Court, but in no event less than Five Million Dollars ($5,000,000.00).

## AS AND FOR A SECOND CAUSE OF ACTION

22.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 21 as though fully set forth herein.

23.     That the Plaintiff is a member of a protected class by virtue of his national origin and race.

24.     That the various actions and investigations conducted by Defendants were undertaken solely to harass, embarrass and harm Plaintiff, due to his national origin and race.

25.     That the acts of Defendants constituted an unjust discrimination as against the Plaintiff in his civil rights because of his race, color and national origin, and

such acts were in violation of the express provisions of the New York State Executive Law Article 15, the Human Rights Law.

26.    As a direct and proximate cause of said unlawful activities, Plaintiff has suffered the indignity of discrimination, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in physical illness and emotional stress.

27.    As a further direct and proximate result of said unlawful activities, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety, painful embarrassment among his employees, damage to his good reputation, disruption of his private and personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

28.    That Plaintiff demands judgment against the Defendants in an amount to be determined by this Court but in no event less than Five Million Dollars ($5,000,000.00).

## AS AND FOR A THIRD CAUSE OF ACTION

29.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28 as though fully set forth herein.

30.    That the forgoing actions constitute extreme and outrageous conduct.

31.    That it was and is the Defendants' intent to cause severe emotional distress.

32.    That the conduct caused Plaintiff injury.

33.    That the Plaintiff has suffered severe emotional distress as a result.

34.    That Plaintiff demands judgment against the Defendants in an amount to be determined by this Court but in no event less than Five Million Dollars

($5,000,000.00).

    **WHEREFORE,** Plaintiff demands:

    1.   Judgment on the first cause of action in the amount of Five Million Dollars ($5,000,000.00); and

    2.   Judgment on the second cause of action in the amount of Five Million Dollars ($5,000,000.00); and

    3.   Judgment on the third cause of action in the amount of Five Million Dollars ($5,000,000.00).

Dated: New York, New York
       November _21_, 2007

                    Yours, etc.,

                    CALABRO & ASSOCIATES, P.C.
                    Attorneys for Plaintiff
                    1412 Broadway, Suite 1504
                    New York, New York 10018
                    (646) 688-6095

                    By:_____
                        Gregory G. Calabro, Esq.

TO:   **NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO**
       709 Eighth Avenue
       New York, New York 10036

       **THE OFFICE OF THE IMPARTIAL CHAIRMAN**
       321 West 44th Street, Suite 400
       New York, New York 10036

       **PETER WARD**
       709 Eighth Avenue
       New York, New York 10036

## VERIFICATION

STATE OF NEW YORK        )

                             : ss.:

COUNTY OF NEW YORK    )


TRAN D. TRUONG, being duly sworn, deposes and says:

I am the Plaintiff in this proceeding, both individually and on behalf of Plaintiff Alphonse Hotel Corp. I have read the foregoing Summons and Complaint and know the contents thereof. The contents thereof are true to my knowledge, except as to matters stated therein to be alleged upon information and belief and as to those matters I believe them to be true.

                                                              TRAN D. TRUONG

SUPREME    COURT  OF THE STATE OF NEW YORK
STATE OF NEW YORK, COUNTY OF NEW YORK                    Index No.            Year

---

**TRAN DINH TRUONG individually and on behalf of
ALPHONSE HOTEL CORP. d/b/a THE HOTEL CARTER,**

Plaintiff,

-against-

**NEW YORK HOTEL & MOTEL TRADES COUNCIL,
AFL-CIO, THE OFFICE OF THE IMPARTIAL CHAIRMAN, and PETER WARD
Defendants.**

---

# SUMMONS & COMPLAINT

---

CALABRO & ASSOCIATES, P.C.

*Attorney(s) for* Plaintiff

*Office and Post Office Address, Telephone*

1412 BROADWAY
SUITE 1504
NEW YORK, NY 10018
(646) 688-6095

---

To

Signature (Rule 130 1.1-a)

_____ name beneath        Katherine Helbig, Esq.

Service of a copy of the within is hereby admitted

Attorney (s) for                         Dated:_____

---

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY

that the within is a *(certified) true copy of a*
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT

that an order                                      of which the within is a true copy
will be presented for settlement to the HON.             one of the judges of the
within named Court, at
on                        at            M.
Dated,

Yours, etc.

CALABRO & ASSOCIATES, P.C.

# Exhibit 2

PITTA & DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 652-3890
*Attorneys for Respondent/Third-Party Plaintiff*
*New York Hotel and Motel Trades Council, AFL-CIO*

Barry N. Saltzman (BS 6533)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -    X

TRAN DINH TRUONG, individually and of
Behalf of ALPHONSE HOTEL CORP. d/b/a          :    Case No. 1:07-Civ-11383 (RJH)
HOTEL CARTER,                                                   :
                                                                            :
                        Plaintiff,                                   :
                                                                            :
          -against-                                                 :
                                                                            :    **ANSWER AND COUNTERCLAIMS**
NEW YORK HOTEL & MOTEL                           :
TRADES COUNCIL, AFL-CIO, and                   :
THE OFFICE OF THE IMPARTIAL                     :
CHAIRMAN and PETER WARD,                        :
                                                                            :
                        Defendants.                              :
                                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - -    :X

Defendants New York Hotel & Motel Trades Council, AFL-CIO ("Union") and Peter

Ward ("Ward", included in "Union" as its President unless expressly stated otherwise), hereby

respond to Plaintiffs' complaint dated November 21, 2007 (the "Complaint") filed in the

Supreme Court of the State of New York, County of New York, served on the Union and

removed within 30 days to this Court on December 19, 2007, as follows:

NATURE OF THE ACTION

1.  No response is required to the averments of Paragraph (1) of the Complaint; alternatively,

the Union denies such averments.

2.   Denies the averments of Paragraph (2) of the Complaint.  The Union further avers that the Office of the Impartial Chairperson ("OIC"), the arbitration office established by the Hotel Association of New York City, Inc. ("Hotel Ass'n") representing employer hotels and the Union representing hotel employees, found merit in the following Union grievances for employees, issuing the following awards in the Union/employees' favor:  Award No. 2007-38 regarding employees Ana Pena and Elizabeth Santiago attached as Exhibit A; Award No. 2006-26 regarding Glennys Castillo attached as Exhibit B; Award No. 2007-59 as supplemented by Award No. 2007-62 regarding threats and intimidation by the Hotel, attached as Exhibit C. The Union further avers that although it initially declined to bring the grievance of former Carter Hotel employee Hamadou Diallo to the OIC, the Union is diligently prosecuting such grievance at the OIC in accordance with the decision of the Hon. Loretta A. Preska, USDJ of this Court, dated February 13, 2007, copy attached as Exhibit D.  The Union further avers regarding Complaint subparagraph (n) that, upon information and belief, Plaintiffs have failed to pay the necessary fees to the OIC.

3.   Denies the averments of Paragraph (3) of the Complaint.

4.   Denies the averments of Paragraph (4) of the Complaint.

5.   Denies the averments of Paragraph (5) of the Complaint.

## PARTIES

6.   Based upon its knowledge and information, believes the averments of Paragraph (6) of the Complaint to be true.

7.   No response is required to the irrelevant and immaterial averments of Paragraph (7) of the Complaint, which should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  Alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of these averments.

8.  No response is required to the irrelevant and immaterial averments of Paragraph (8) of the Complaint, which should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  Alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of these averments.

9.  No response is required to the irrelevant and immaterial averments of Paragraph (9) of the Complaint, which should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  Alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of these averments.

10. No response is required to the irrelevant and immaterial averments of Paragraph (10) of the Complaint, which should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  Alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of these averments

11. No response is required to the irrelevant and immaterial averments of Paragraph (11) of the Complaint, which should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  Alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of these averments

12. Admits the averments of Paragraph (12) of the Complaint.

13. Admits the averments of Paragraph (13) of the Complaint.

14. Admits the averments of Paragraph (14) of the Complaint.

### FIRST CAUSE OF ACTION

15. Repeats its responses to Paragraphs (1) -(14) of the Complaint as if fully set forth here.

16. No response is required to the legal averment of Paragraph (16) of the Complaint; alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of those averments.

17. Denies the averments of Paragraph (17) of the Complaint.

18. Denies the averments of Paragraph (18) of the Complaint.

19. Denies the averments of Paragraph (19) of the Complaint.

20. Denies the averments of Paragraph (20) of the Complaint.

21. No response is required to the demand averments of Paragraph (21) of the Complaint.

## SECOND CAUSE OF ACTION

22. Repeats its responses to Paragraphs (1) -(21) of the Complaint as if fully set forth here.

23. No response is required to the legal averment of Paragraph (23) of the Complaint; alternatively, the Union lacks knowledge and information sufficient to form a belief as to the truth of those averments.

24. Denies the averments of Paragraph (24) of the Complaint.

25. Denies the averments of Paragraph (25) of the Complaint.

26. Denies the averments of Paragraph (26) of the Complaint.

27. Denies the averments of Paragraph (27) of the Complaint.

28. No response is required to the demand averments of Paragraph (28) of the Complaint.

## THIRD CAUSE OF ACTION

29. Repeats its responses to Paragraphs (1) -(28) of the Complaint as if fully set forth here.

30. Denies the averments of Paragraph (30) of the Complaint

31. Denies the averments of Paragraph (31) of the Complaint

32. Denies the averments of Paragraph (32) of the Complaint

33. Denies the averments of Paragraph (33) of the Complaint

34. No response is required to the demand averments of Paragraph (34) of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

35. The Complaint is barred by the doctrines of arbitration and award.

## SECOND AFFIRMATIVE DEFENSE

36. The Complaint is barred by the statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

37. The Complaint fails to state a claim upon which relief can be granted.

## FOURTH AFFIRMATIVE DEFENSE

38. The Complaint is barred for failure to exhaust arbitration remedies. *See, Alphonse Hotel Corp. v. New York Hotel & Motel Trades Council, AFL-CIO,* 2004 WL 414836 (SDNY 3/5/04) aff'd w/o Opin. 117 Fed. Appx. 803 (2d Cir. 2005).

## FIFTH AFFIRMATIVE DEFENSE

39. The Complaint is preempted under Section 301 of the Labor Management Relations Act, 29 U.S.C. §185. *See, Alphonse Hotel Corp. v. New York Hotel & Motel Trades Council, AFL-CIO,* 2004 WL 414836 (SDNY 3/5/04) aff'd w/o Opin. 117 Fed. Appx. 803 (2d Cir. 2005).

## FIRST COUNTERCLAIM, TO CONFIRM AWARD No. 2007-38

40. The Union is a "labor organization" within the meaning of the federal labor laws, including 29 U.S.C. §185, §301 of the Labor Management Relations Act ("LMRA"), with offices at 707 Eighth Avenue, New York, New York.

41. Plaintiff Alphonse Hotel d/b/a The Carter Hotel (the "Hotel") is an "employer" in interstate commerce within the meaning of federal labor law, including 29 U.S.C.§185. Plaintiff Tran Dinh Truong is an owner of the Hotel and a supervisor/manager within the meaning of federal labor law. The Hotel premises, where Tran resides, are located at 250 W. 43d Street, New York, New York.

42. The Office of the Impartial Chairperson ("OIC"), located at 321 West 44th Street, New York, New York is a permanent arbitration tribunal established by the Union and the Hotel Association of New York City, Inc. ("Hotel Ass'n") which represents numerous hotels operating

in New York City, under a collective bargaining agreement between the Hotel Ass'n and the

Union known as the Industry-Wide Agreement ("IWA").The OIC consists of three arbitrators

who hear cases on a rotating basis between the Union and hotels involving any "acts, conduct or

relations between the parties, directly or indirectly."   A copy of the IWA is attached as Exhibit

E.  A copy of the resumes of the arbitrators of the OIC is attached as Exhibit F.

43. Article 26 of the IWA contains the following relevant broad arbitration provisions:

> All complaints, disputes or grievances arising between the parties hereto
> involving questions or interpretation or application of any clause of this
> Agreement, or any acts, conduct or relations between the parties, directly
> or indirectly, which shall not have been adjusted by and between the
> parties involved shall be referred to a permanent umpire(s) to be known as
> the Impartial Chairman, and his/her decision shall be final and binding
> upon the parties hereto...

> In the event of a willful default by either party in appearing before the
> Impartial Chairman, after due written notice shall have been given to the
> said party, the Impartial Chairman is hereby authorized to render a
> decision upon the testimony of the party appearing...

> The parties consent that any papers, notices or process, including
> subpoenas, necessary or appropriate to initiate or continue an arbitration
> hereunder or to enforce or confirm an award may be served by ordinary
> mail directed to the last known address of the parties or their attorneys, or
> when authorized by the Impartial Chairman, by telegram, facsimile or
> telephone.

> The parties consent that all arbitration hearings shall be heard at the office
> of the Impartial Chairman located at 321 West 44th Street in the City of
> New York, or at such other place as the Impartial Chairman may
> designate.

> The Impartial Chairman may call such arbitration hearing on giving five
> (5) days' notice to all of the interested parties.  The Impartial Chairman,
> however, may call a hearing on shorter notice if he/she deems it
> appropriate.

> The parties hereby expressly waive the requirements regarding the
> Arbitrator's oath and the manner and time for the service of notice of
> hearing contained in the Civil Practice Law and the Rules of the State of
> New York and agree and consent that the Impartial Chairman my proceed
> with the hearing.

The compensation of the Impartial Chairman and his/her proper and necessary expenses shall be shared and paid equally by the ASSOCIATION and the UNION...

The decision rendered by the Impartial Chairman shall have the effect of a judgment entered upon an award made, as provided by the Arbitration Laws of the State of New York, entitling the entry of a judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by such decision.

44. The Hotel/Tran signed a "MeToo" Agreement dated March 16, 2006 which bound the Hotel to the IWA from July 1, 2006 to and including June 30, 2012. A copy of the MeToo Agreement is attached as Exhibit G. The MeToo Agreement incorporates the IWA arbitration provisions in full.

45. The Union brought grievances against the Hotel on behalf of employee Ana Pena and Elizabeth Santiago before the OIC on or about December 20, 2006. The Union alleged that the Hotel discharged room attendants Pena and Santiago after they complained that they had not been paid properly. Following hearings on March 27, April 24 and May 15, 2007 at which both the Hotel and Union appeared with counsel, presented argument, witnesses and evidence, and cross examined witnesses under oath, the OIC issued Award No. 2007-38 dated June 27, 2007 in favor of the Union/employee, copy attached as Exhibit A. The OIC ordered the Hotel to reinstate Ms. Pena and Ms. Santiago immediately with full contractual backpay.

46. The OIC mailed Award No. 2007-38 to the Hotel on or about June 27, 2007. A copy of the record mailing of Award No. 2007-38 to the Hotel is attached with Exhibit A. Upon information and belief, a copy of Award No. 2007-38 was received by the Hotel and/or counsel within 3-5 days of June 27, 2007.

47. No basis exists to vacate Award No. 2007-38.

48. The Hotel did not move to vacate Award No. 2007-38 within ninety (90) days of receipt.

49. Under the doctrine of *Local 802, Associated Musicians of Greater New York v. The Parker Meridien Hotel,* 145 F.3d 85 (SDNY 1998) the Hotel may not now move to vacate Award No. 2007-38.

50. To date, despite demand made by the Union, the Hotel has not reinstated Ms. Pena nor Ms. Santiago, nor paid either any backpay due.

51. Accordingly, the Union requests that Award No. 2007-38 be confirmed to judgment pursuant to Section 301 of the LMRA, 29 USC §185.

SECOND COUNTERCLAIM, TO CONFIRM AWARD NO. 2007-26

52. The Union repeats the averments of Paragraphs (40) through (51) above as if fully set forth here.'

53. The Union brought a grievance against the Hotel on behalf of employee Glennys Castillo before the OIC on or about January 17, 2007. Following hearings on March 28 and May 23, 2007, at which both the Hotel and Union appeared with counsel, presented argument, witnesses and evidence, and cross examined witnesses under oath, the OIC issued Award No. 2007-26 dated August 14, 2007 in favor of the Union/employee, copy attached as Exhibit B. The OIC ordered the Hotel to reinstate Ms. Castillo with full contractual backpay.

54. The OIC mailed Award No. 2007-26 to the Hotel on August 14, 2007. A copy of the record mailing of Award No. 2007-26 to the Hotel is attached with Exhibit B. Upon information and belief, a copy of Award No. 2007-26 was received by the Hotel and/or its counsel within 3-5 days of August 14, 2007.

55. No basis exists to vacate Award No. 2007-26.

56. The Hotel did not move to vacate Award No. 2007-26 within ninety (90) days of receipt.

57. Under the doctrine of *Local 802, Associated Musicians of Greater New York v. The Parker Meridien Hotel,* 145 F.2d 85 (SDNY 1998) the Hotel may now move to vacate Award No. 2007-26.

58. To date, despite demand made by the Union, the Hotel has not reinstated Ms. Castillo nor paid her any backpay due.

59. Accordingly, the Union requests that Award No. 2007-26 be confirmed to judgment pursuant to Section 301 of the LMRA, 29 USC §185.

### THIRD COUNTERCLAIM, TO CONFIRM
### ARBITRATION AWARD NOs. 2007-59 AND 2007-62 SUPPL.

60. The Union repeats the averments of Paragraph (40) through (59) above as if fully set forth here.

61. The Union brought a grievance before the OIC against the Hotel for intimidating and threatening Yolando Pena on or about April 26, 2007. Following hearings at which both the Hotel and Union appeared with counsel, presented argument, witnesses and evidence, and cross examined witnesses under oath, the OIC issued Award No. 2007-59 dated August 14, 2007 and Award No. 2007-62 Supp. dated September 18, 2007 in favor of the Union, copies attached as Exhibit C. The OIC ordered the Hotel to cease intimidation and threats, and to post and read a notice promising not to threaten or intimidate employees.

62. The OIC mailed to the Hotel Award No. 2007-69 on August 14, 2007 and Award No. 2007-62 on September 25, 2007, following a fax transmission to the Hotel on September 18, 2007. A copy of the record mailing of Award No. 2007-59 and fax/mailing of Award No. 2007-62 to the Hotel is attached with Exhibit C. Upon information and belief, these Awards were received by the Hotel and/or its counsel within 3-5 days of mailing, and on September 18, 2007.

63. No basis exists to vacate Award Nos. 2007-59 or 62 Suppl.

64. The Hotel did not move to vacate Award No. 2007-59 or 62 within ninety (90) days of receipt.

65. Under the doctrine of *Local 802, Associated Musicians of Greater New York v. The Parker Meridien Hotel,* 145 F.3d 85 (SDNY 1998) the Hotel may not now move to vacate Award No. 2007-59 or 62 Supp.

66. To date, despite demand by the Union, the Hotel has not complied with these Awards.

67. Accordingly, the Union requests that Award No. 2007-59 and 2007-62 Supp. be confirmed to judgment pursuant to Section 301 of the LMRA, 29 USC §185.

<u>CLAIM FOR RELIEF</u>

WHEREFORE the Union requests the following relief of this Court:

A.  Judgment dismissing the Complaint in its entirety with prejudice;

B.  Judgment confirming Award No. 2007-26;

C.  Judgment confirming Award No. 2007-36;

D.  Judgment confirming Award No. 2007-59 and 2007-62 Supp.;

E.  The costs and attorneys fees incurred by the Union in defending against the Complaint; and

F.  Such further relief as this Court deems fair and appropriate.

Dated: New York New York
         December 26, 2007

Respectfully,

PITTA & DREIER LLP

By:
     Barry N. Saltzman (BS 6533)
     499 Park Avenue
     New York, New York  10022
     (212) 652-3890

Of Counsel:
     Vincent F. Pitta, Esq. (VP 1435 )
     Michael J. D'Angelo (MD 3030)

{00313831.DOC;}                                    10

# EXHIBIT A

# APPEARANCE SHEET

2007-38

**EMPLOYER:** The Carter Hotel    **Business Agent:** Hazel Hazzard

☐ Perempt V Union
☒ Perempt V Mgmt
☐ Perempt V Both

**Case #:** U06-654    **Arbitrator:** Philip Ross

**Date:** 5/15/2007    **Time:** 2:00PM

**Day of Week:** ☐ Mon ☐ Wed ☐ Fri ☒ Tues ☐ Thurs

**Bill:** $675.00    **Status:** Posted: ☒ Yes ☐ No
**Invoice #:** 1409    **Updater:** ☒ LP ☐ CD

| UNION REPS AND WITNESSES | EMPLOYER REPS AND WITNESSES |
|---|---|
| **Business Agent:** Bob Lyons / Eddie Colado | **General Manager:** Tran Dinh Truong / Erwin Luminglass |
| **Other:** Teodoro Cardova | **HR Director:** |
| **Attorney for Union:** Joseph Fardli | **Attorney for Employer:** David M Levy |
| **Witnesses:** Angelio Chati / Mo Hong / Elizabeth Santiag | **Witnesses:** Hang Pham / Abdul Yakub / Erwin Luminglass |

## ARBITRATOR NOTES

3 weeks for brief

## ADMINISTRATOR NOTES

**DECISION #**
2007-38
mailed 6/27/07

#2007-38
The Carter Hotel
June 27, 2007
Page 1 of 4

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

**EMPLOYER**:  THE CARTER HOTEL

HTC Case #U06-606/Ana Pena, Room Attendant/Unjust termination of grievant Ana Pena, Room Attendant, for alleged theft of guest property; Management's failure and refusal to pay Pena the correct Schedule A rate of pay; Management's failure and refusal to pay Pena overtime in accordance with Article 11 of the IWA.

HTC Case #U06-654/Elizabeth Santiago, Room Attendant/Unjust termination of Elizabeth Santiago, Room Attendant, for associating with former employee, Ana Pena.  Management's failure and refusal to pay Ms. Santiago the IWA Schedule A rate of pay and management's failure and refusal to pay grievant overtime in accordance with Article 11 of the IWA.

Hearings held at the Office of the Impartial Chairperson on March 27, April 24 & May 15, 2007.

**A P P E A R A N C E S :**

|  |  |
|---|---|
| For the Employer: | Tran Dinh Truong<br>Owner |
| Counsel for the Employer:<br>By: | Levy & Boonshoft, PC<br>David Levy, Esq. |
| For the New York Hotel & Motel Trades Council, AFL-CIO:<br>Counsel:<br>By: | Pitta & Dreier LLP<br>Joseph Farelli, Esq. |
| For the Union: | Rolando Ruiz<br>Hazel Hazzard<br>Eddie Cedeno |
| Spanish Interpreter: | Teodoro Cordova |

\*    \*    \*

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212 FAX: (212) 541-9356

#2007-38
The Carter Hotel
June 27, 2007
Page 2 of 4

The Employer submitted as a threshold issue that the two Grievants had never been employed at the Hotel. Consequently, evidence was initially taken on this issue and I subsequently ruled that the evidence substantiated the existence of a past employment relationship. The hearing then proceeded on a more or less normal course, given the unusual factual circumstances.

The essence of the case's peculiarity is the absence of any Hotel personnel documents, time cards or wage records of any kind. The Exhibits include past settlement of prior Union grievances and entry of a Consent Award for the Hotel's failure to pay its employees for sick days, personal days, vacation time and correct number of days worked. (IC Award #2006-09)

Grievant Ana Pena ("Pena") testified that on June 2, 2005, together with Grievant Elizabeth Santiago ("Santiago") (collectively, "Grievants"), she applied for a job as a Housekeeper at the Hotel. A manager named "Elaine" interviewed them and gave them a work tryout on a room. [The Union identified the manager from a prior case as Elaine Nguyen, Hotel Manager.] The next day, Pena was hired as a Housekeeper. She had no prior experience but was told she would get $9 per hour for eight hours work daily, but was initially only paid $7 per hour. She later got the $9 per hour. She worked nearly every day, with Tuesdays off. She said that every night she would get a call about the next day's work from a "Miss San" (phonetic) who worked at the front desk. She reported to work at 9AM or, on occasion, at 8AM, and worked until 6PM or 7PM. The minimum number of rooms she would finish was between 25 and 30. She described in detail her daily tasks, which included doing the bathroom (including washing the tubs), making the bed, vacuuming and using detergent. The detergent was kept in Room 211. She was paid every five days in cash by Miss San in the lobby. At first, she received $280 and this was increased to $300. She was given a one-hour lunch break, but she generally worked into this for about 15 minutes in order to leave early. She frequently worked overtime but did not receive any overtime pay or any benefits such as vacation or holiday pay.

Pena identified the following exhibits as job-related: a note given to her with job duty instructions signed by "Haner", which she said was Hana Pham, a Hotel Manager and Director of Housekeeping, dated August 23, 2006 (Union Exhibit #1); a similar note dated September 3, 2006; a form of apparent room assignments from the same source dated September 11, 2006 (Union Exhibit #3); a very detailed list of rooms with instructions given to her by Miss San dated "9/7" (Union Exhibit #4); and an un-dated note listing three days, addressed to Pena using a written "A" very similar to the other notes identified as issuing from Pham. Furthermore, Pena had Hotel card keys in her possession, which were also introduced as exhibits (Union Exhibit #7)

On September 12, 2006, Pena was told by Hana Pham that she would only be able to work weekends. Pena told her that she was going to the Union to

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212 FAX: (212) 541-9356

#2007-38
The Carter Hotel
June 27, 2007
Page 3 of 4

complain and a short time later she was told of her discharge because of this intention and did not work thereafter.

Pena received a discharge letter dated September 16, 2006 from Hana Pham stating that guests have complained about missing items and added that Pena had not been following Hotel rules. (Union Exhibit #6)

Grievant Elizabeth Santiago ("Santiago") testified that she accompanied Pena on June 2, 2005 in search of a job, had an interview with "Elaine "and did a trial room clean up. She was hired to work the next day and reported at 9AM. Miss San gave her a list of rooms to do and she was paid on the fifth day. At first, she received $280 a week, which was increased to $300, all in cash. She signed no withholding statement or tax forms. She worked until January 2006 full-time, five days a week, although sometimes six or seven days weekly. She stopped working January 2006 and was called back in March and worked until sometime in September, when Hana [Pham] told her "you cannot work because your Ana's [Pena's] friend."

The Hotel had two witnesses - Hana Pham ("Pham") and Abdul Yakub ("Yakub"). Pham, a Housekeeping Manager at the Hotel since June 2006, testified that Santiago had never worked for the Hotel. She also testified that Pena worked only as a probationary employee the last week of August and first part of September but that she was fired because she was stealing. Yakub, a former Hotel General Manager, testified that he wrote the September 9, 2006 letter to "a Greg Mzurpski, Investigator, Manhattan Transit Detectives, Transit District 01" (no other address was furnished on the letter), whose subject is listed them. It ended, "Please help us find this woman and held [sic] her liable for all this complains [sic] that can affect our hotel." (Hotel Exhibit #4) He also identified a memo listing stolen items (Hotel Exhibit #1), and guest letters complaining of thefts (Hotel Exhibit #2). He also said that he did a computerized key check of Pena's key card and discovered unauthorized room entries.

I find unnecessary a protracted discussion of the Hotel's defense. The Hotel's raising as a threshold issue the matter of the Grievants' claimed non-employment is symptomatic of its bad faith and duplicity. There is something otherworldly about an Employer who can deny having ever employed an individual while admitting that it wrote her a discharge letter. The Hotel's failure to keep timecards and other wage and personnel records is decisive and dispositive. Pham's testimony was obviously concocted with the objective of fitting in with whatever documents the Grievants had. Her testimony is plainly untrue, in detail and on the whole. It is similarly so with regard to Yakub's testimony. His testimony was self-contradictory and added nothing to the Hotel's Exhibits on Pena's alleged misconduct. For example, he had no record of the computerized key check discrepancies, and a record is a normal and standard

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-38
The Carter Hotel
June 27, 2007
Page 4 of 4

byproduct of such an inspection. The guest complaints by themselves are worthless as evidence and I find the letter to the Manhattan Transit Detectives (whoever they are) very strange. For one thing, it is dated September 9, 2006, and, most singularly, it requests help in finding Pena, to whom the Hotel gave a work order on September 11, 2006. (Union Exhibit #3)

Finally, I must turn to the Hotel argument that its unit-wide settlement with the Union of grievances for sick days, personal days, vacation time and back wages for the year 2005 and the first quarter of 2006, and the absence of these Grievants from this settlement should estop the Union from claiming that they were employees for this period of time. The issue here involves employee rights under the IWA and no estoppel against them exists.

The grievances are sustained.

## AWARD

The Grievants are to be reinstated and to be made whole at the contractual rate of pay from September 13, 2006, until their reinstatement and an additional sum to be paid to the various Funds in accordance with the IWA on behalf of the Grievants.

I retain jurisdiction on any dispute arising from this Award.

It is so ordered.

Dated:      June 27, 2007
            New York, New York

PHILIP ROSS, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

IMPARTIAL CHAIRPERSON

# EXHIBIT B

# APPEARANCE SHEET

#2007-26

**EMPLOYER:** The Carter Hotel    **Business Agent:** Rolando Ruiz

☐ Perempt V Union
☒ Perempt V Mgmt
☐ Perempt V Both

**Case #:** U07-003    **Arbitrator:** Ira Drogin

**Date:** 6/12/2007    **Time:** 9:00AM

| | | |
|---|---|---|
| **Bill:** $675.00 | **Status Posted:** ☐ Yes ☒ No |

**Day of Week:** ☐ Mon  ☐ Wed ☐ Fri  ☒ Tues ☐ Thurs

**Invoice #:** 1418    **Updater:** ☒ LP ☐ CD

| UNION REPS AND WITNESSES | EMPLOYER REPS AND WITNESSES |
|---|---|
| **Business Agent:** Robert G Ruiz  Nick Palmos | **General Manager:** Erwin Luminglass |
| | **HR Director:** Hana Pham  Abdul Yakub |
| **Other:** | |
| **Attorney for Union:** Joseph Forth | **Attorney for Employer:** David M Levy |
| **Witnesses:** | **Witnesses:** E. Luminglass  H. Pham  A. Yakub. |

## ARBITRATOR NOTES

Hotel brief to be submitted in 2 weeks. Union shall have 2 weeks from receipt of Hotels brief to reply.

H- 6/26    U - 7/10

## ADMINISTRATOR NOTES

DECISION #
2007-26
Mailed 8/14/07

**OFFICE OF THE IMPARTIAL CHAIRMAN**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

**EMPLOYER**:  THE CARTER HOTEL

HTC Case #U07-003/ Glennys Castillo, Room Attendant/Unjust discharge of Glennys Castillo, Room Attendant.

Hearings held at the Office of the Impartial Chairperson on March 28 and May 23, 2007.

## APPEARANCES:

For the Employer:

Abdul Yakub, General Manager
Erwin Luminglass, General Manager
Hana Pham, Director of Human Resources

Counsel for the Employer:
By:

Levy and Boonshoft, PC
David Levy, Esq.

For the New York Hotel & Motel Trades Council, AFL-CIO:
Counsel:
By:

Pitta & Dreier LLP
Joseph Farelli, Esq.

For the Union:

Rolando Ruiz
Nick Andrews
Local 6

\*    \*    \*

In this most unusual case, the Union contends that Glennys Castillo ("Castillo" or "Grievant") was discharged without just cause.  The Hotel contends that Castillo was never an employee.

Castillo testified that she began working as a Room Attendant at the Hotel in May 2005 after her friend, Richard Grullon, who worked at the Hotel, told her they needed workers.  Castillo testified that she was interviewed by the boss, a Mr. Tick (phonetic).  She described him physically as being of medium height, black hair, overweight, about 68 years old, and Chinese.  Castillo testified that she was then instructed in the duties of a Room Attendant by Mr. Abdul Yakub ("Yakub"), the General Manager of the Hotel.  He instructed her on how to make beds, vacuum rooms, clean the bathroom and other duties.  Castillo testified that she was not asked to fill out any papers – no I-9 form, no W-4.  She was put to work initially on the 12AM-8PM shift and her hours were subsequently changed

**OFFICE OF THE IMPARTIAL CHAIRMAN**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212 FAX: (212) 541-9356

and she regularly worked the 9AM-5PM shift. Castillo testified that she worked seven days her first week and six days per week thereafter before regularly working five days per week. She was given a written schedule, which she had to return daily. She never punched in or punched out or swiped in or swiped out, or signed in or signed out. She was paid in cash approximately every six days and signed a receipt for cash, which was retained by the woman at the front desk, who paid her and she identified her as "Missan" (ph) Castillo described her as short, white, and wearing glasses.

On September 8, 2005, Castillo was approached by Union Delegate Ylonka Pena Rodriguez, ("Rodriguez") who asked Castillo to sign a Union membership card and a dues deduction authorization, which Castillo signed. Rodriguez testified that she knew Castillo as a housekeeper who worked on the same floors that Rodriguez worked as a housekeeper. She testified that she gave Castillo's dues deduction authorization to Elaine Nguyen ("Nguyen"), the then Director of Human Resources about two weeks after she received it from Castillo. Shortly after Rodriguez gave the authorization to Nguyen, Castillo was laid off by "Missan" for lack of work and was never called back.

Castillo testified that two other Room Attendants had been hired after her and that she complained to the Union that she had been laid off out of seniority after she had completed her trial period. She identified Elizabeth Santiago and Ana Pena as two Room Attendants who had been hired after her. Castillo testified that after she was laid off, she could not find other hotel employment and worked in a bake shop for approximately two months and then at Wendy's Fast Food.[1]

Rodriguez testified that at a meeting in the owner's office at the Hotel in November 2005, at which Nguyen and Business Agent Keith Armstrong were present, she complained that workers who joined the Union were getting fired. Nguyen said she did not know anything about it. Rodriguez testified that at a second meeting the following week, she brought the matter up again and produced a copy of Grievant's dues deduction authorization. This may have taken place as late as summer 2006.

The Union introduced into evidence a letter on Hotel stationery to "Ana" from Hana Pham, Housekeeping Manager, complaining about the failure to perform duties properly and discharging her. The Hotel has taken the position that it did not know who Ana was and the she also was not a Hotel employee.

The Union also introduced into evidence Chairman Ross' Awards in 2006-09 (January 2006) and 2006-09Supp. (April 2006), in which the Union grieved

---

[1] She was not asked and did not state how long she worked at Wendy's or how much she earned at the bake shop or at Wendy's.

OFFICE OF THE IMPARTIAL CHAIRMAN
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

numerous wage and compensation violations at this Hotel involving a number of Hotel employees, including housekeeping employees. The Hotel agreed to a monetary settlement of those claims. Among other things, the Union complained that employees were not paid for sick days, personal days, vacation time and correct wages for days worked. The Union also claimed that the Hotel failed to provide information regarding status and wages and that the Hotel had retaliated by refusing to schedule work following Union investigation and claims. The Union also complained that the Hotel failed and refused to provide relevant documents relating to employee information, thereby obstructing the Union from investigating whether grievances were warranted. In that Award, the Hotel was directed to pay Absa Rodriguez, an "On Call Housekeeper" one thousand dollars ($1,000) in severance pay.

The Hotel's General Manager for the past four years, Yakub, testified. He testified that he was familiar with the Housekeeping staff in 2005, the year in which Grievant claimed to have worked for approximately six months at the Hotel. He also testified that there may have been housekeeping employees at the Hotel who he was not aware of even though he was the General Manager. He testified that there were only three Housekeepers who worked at the Hotel during that period. One was Ylonka Pena Rodriguez. The second was Antonia Espinal (Maria) and the third was Burbuoe Mechaj. Yakub's testimony was contradicted by the aforementioned Ross awards. Yakub did not mention Absa Rodriguez, whose name was listed in the aforementioned Ross Awards as a Room Attendant to whom the Hotel was required to pay monies for contract violations. Absa Rodriguez' name is also not shown on the Hotel's Paychex Summaries, or in its W-2 form files, or in its I-9 files, or in its Worker's Compensation file.

Yakub testified that he had met Grievant at the Hotel previously only about three times. Once, when Grievant was talking to Nguyen in June or July 2005. He testified that he never had any dealings with her and denied having trained her as a Room Attendant. He also denied knowing Richard Grullon, who Grievant testified was a Hotel employee who told her there was a job opening.

Yakub testified that Room Attendants wear green uniforms and that the three Room Attendants he identified as working at the Hotel wore them. He testified that he never saw Grievant wearing a green uniform. The Hotel was unable to provide any intelligible summary of information regarding rental or purchase of housekeeping uniforms during 2004-2005, which might be helpful in determining whether Grievant had been issued a Hotel uniform. Yakub testified that he never heard of Ana Pena or Elizabeth Santiago, the two women who Grievant claimed had begun work as Room Attendants after Grievant. He denied hiring Grievant and testified that the former Director of Human Resources, Elaine Nguyen, did the hiring.

**OFFICE OF THE IMPARTIAL CHAIRMAN**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212 FAX: (212) 541-9356

#2007-26
CARTER HOTEL
August 14, 2007
Page 4 of 8

On cross-examination, Union's counsel reminded Yakub at a hearing in this Office several days ago, Room Attendants Ana Pena and Santiago presented claims that they had worked in 2005 and 2006 in a case separate from the instant one. When Yakub was asked to explain, his response was, "I wasn't here at that hearing." Union counsel presented the payroll register of the Hotel, which he had obtained at the March 27 hearing, and pointed out that Pena's name did not appear on the payroll register. Yakub then testified that he knows Pena and Santiago only as "visitors" to the Hotel. Union counsel then put into evidence the Hotel's termination notice to Ana Pena dated September 2006, which clearly established that she had been employed at this Hotel as a Room Attendant.

Yakub acknowledged that he acted as the Housekeeping Manager between May and November 2005. He testified that the three Housekeepers rotated their shifts so that each of them took a turn, in order, at working weekends and a Monday through Wednesday shift, while the other two would work a Monday through Friday shift. He testified that the Hotel has approximately 700 rooms and that approximately 360 were rentable.[2] He testified that all Housekeepers worked 8AM-4PM shifts.

I administratively adjourned the Hearing on March 28, 2007 and directed the Hotel to produce the following at the adjourned date with regard to the May 2005 through November 2005 time period:

1. Documents showing how many rooms were occupied each day during that period.
2. Bills for any Housekeeping uniforms purchased or rented for the years 2004, 2005 and 2006.
3. "Paychecks" documentation for May through November 2005.
4. Receipts for cash payments of wages signed by Room Attendants.
5. Workers compensation reports showing the names of employees reported to Workers Compensation as working at the Hotel during the period.
6. I-9 file for the year 2005.
7. W-2 forms sent to employees showing wages earned in the year 2005.

The response showed that Grievant's name did not appear in the Paychex summary, which is consistent with her testimony that she was paid in cash. She also was not listed for Worker's Compensation coverage or for a W-2 form and there is no I-9 form for her in the Hotel's records. As previously noted, another housekeeping employee, Absa Rodriguez, was awarded severance pay as an "On Call Housekeeper" and her name also was absent from pertinent Hotel records, which identify who were employees of the Hotel.

---

[2] Room Occupancy records produced by the Hotel pursuant to my direction showed as many as 530 occupied rooms per day, with many days exceeding 360.

OFFICE OF THE IMPARTIAL CHAIRMAN
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212 FAX: (212) 541-9356

#2007-26
CARTER HOTEL
August 14, 2007
Page 5 of 8

The Hotel did submit a schedule reflecting the number of rooms that were occupied each day during the period May 1 through November 30, 2005. The range of occupied rooms was from one hundred thirty-two (132) to five hundred thirty (530) rooms during this period. According to the General Manager's testimony, during this period the Hotel employed three housekeepers over the seven-day week and each had two days off. Yakub, the General Manager, testified that the Hotel employed no part-time or "on call" housekeepers during the period in issue. He testified that the quota for each housekeeper was twenty rooms, which means on days when all three housekeepers were working, they could clean a maximum of sixty rooms and on days when a housekeeper was off, only forty rooms could be done. Based on these numbers, three Room Attendants could not complete even half the occupied rooms at the lowest point of occupancy.

Yakub attempted to explain how the Hotel could get by with only three housekeepers. He testified that most of the rooms were rented by travel agencies who paid the Hotel fifty dollars ($50) per night, and that the "walk-in" rate was eighty-nine dollars ($89) per night. He explained that the Hotel's policy was that upon check-in, a guest was given a clean room. Thereafter, if the guest stayed more than one night, a Room Attendant would not change the sheets, clean the bathroom, and vacuum the floor daily, but only every fourth day. If a guest complained, he would be transferred to a clean room and the dirty room would not be cleaned upon his transfer. Guests who requested clean towels and linen, soap, toilet paper, etc. could request same at the front desk, which would give them to the guest. Soiled linen was supposed to be left outside the room for housemen to pick up.

When asked if part-time help or "on call" help was brought in to clean and make up "check out" rooms, Yakub said they were never brought in. He testified that once housekeepers cleaned their twenty rooms each, uncleaned rooms were left dirty until the next day.

The average number of occupied rooms from May through November 2005 was two hundred sixty-eight (268). If Yakub's testimony is to be credited, there must have been a massive accumulation of dirty rooms each day and the Hotel could not rent clean rooms to guests, as it claims it did. If each of the three housekeepers cleaned one hundred (100) rooms a week, the three of them cleaned a maximum of three hundred (300) rooms over a seven-day week. Multiplying the daily average of occupied rooms which was two hundred sixty-eight (268) by seven (7) days results in one thousand eight hundred seventy-six (1,876) occupied rooms per week. If each room was cleaned every fourth day, four hundred sixty-nine (469) rooms had to be cleaned each week. Since the three Room Attendants could clean a maximum of three hundred rooms per week, it was impossible for the Hotel to function without additional Room Attendants. The impossibility is even greater when factoring in Yakub's testimony that the Room Attendants also cleaned checkout rooms daily in addition to cleaning non-checkout rooms every fourth day.

**OFFICE OF THE IMPARTIAL CHAIRMAN**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212 FAX: (212) 541-9356

#2007-26
CARTER HOTEL
August 14, 2007
Page 6 of 8

I find Yakub's testimony to be totally unbelievable. He was evasive and unresponsive to questions he obviously did not care to answer. He exhibited selective recall, conveniently forgetting or not knowing information, which, as General Manager, he should have known and for which he was responsible. I find it unbelievable that this Hotel operated with only three room attendants. The documentary evidence shows that the practice of the Hotel was to employ room attendants "off the books" and to pay them in cash, without any record of their payment or their employment. The Hotel's books and records are in disarray or nonexistent for the most part. Records required to be kept under Federal, State and City laws are nonexistent, casting severe doubt on the overall credibility of the Hotel. For example, the aforementioned Ross Awards show not only a "hidden" housekeeper, Absa Rodriguez, but a failure on the part of the Hotel to comply with the law, and the Industry-Wide Agreement, with regard to wages and other compensation due the three acknowledged Room Attendants.

I credit the Grievant's testimony as well as the testimony of the Union's witnesses that Grievant did work as a Room Attendant at the Hotel during the period she claims, and that she was discharged without cause, and was discharged unlawfully as well because she joined the Union and signed a dues deduction authorization.

All of the evidence convinces me that the Hotel has intentionally and flagrantly violated the Collective Bargaining Agreement, the rights of the Grievant, and numerous Federal and State labor protective laws and requirements. The Hotel does have the right to charge whatever room rates it pleases, but it does not have the right to support those rates off the backs of its employees and by violating the contractual rights of those employees.

I have read and considered the Hotel's post-hearing brief and I find the arguments raised therein to be unpersuasive. While the Hotel has the legal right to pay employees in cash it has clearly violated the record-keeping requirements imposed by the Internal Revenue Service, the Fair Labor Standard Act and the New York State Labor Law. Its attempt to shift its statutory record-keeping burden onto its employees is unacceptable. Its attempt to claim a failure by Castillo to retain documents flies in the face of the evidence that the Hotel intentionally acted in ways to prevent any paper trail regarding its employees and their payment.

Chairman Ross in 2007-38, The Carter Hotel (June 27, 2007) also dealing with the Hotel's claim of non-employment of Housekeeper found that defense to be "symptomatic of its bad faith and duplicity", a finding with which I concur based on the credible evidence in the case before me. Chairman Ross also found the testimony of the Hotel's Manager, YaKub to be "plainly untrue in detail and on the whole", a conclusion I have also reached in the case before me.

**OFFICE OF THE IMPARTIAL CHAIRMAN**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-26
CARTER HOTEL
August 14, 2007
Page 7 of 8

The Hotel also urges that Castillo's claims are barred equitable estoppel and laches. With regard to equitable estoppel, first applying principles of equity, it is astonishing that the Hotel invokes the principles of equity. Equity demands that the party seeking equity must have clean hands. The Hotel does not have clean hands in the instant case. Its conduct shows bad faith, duplicity, and conscious violation of basic employment protection laws involving record keeping and employees free choice to engage in Union activity. The Hotels failure to maintain proper records appears to have resulted in the Union being unaware of Castillo's employment at the time the Union settled its back wage and benefits grievance with regard to known Hotel employees. The Hotel may not invoke equitable estoppel in view of its intentional, evasive and duplicitous conduct.

Similarly the Hotel's assertion of the defense of laches is without merit. The Hotel has failed to convince me that it has suffered any prejudice to its defense of this grievance as a result of the Union taking 11 months or 15 months as claimed by the Hotel, to file this grievance.

It produced the former Manager Abdul Yakos to testify and just a few weeks before produced the Hotel's owner (who did not testify before me to contradict any Union evidence), Tran Din Truong, who testified before Chairman Ross. Any absence of Hotel records is clearly the fault of the Hotel which must keep them by statute for at least 3 years. No prejudice claim may be asserted by the Hotel because of its failure to keep and retain necessary wage and hour records.

The Hotel must make this Grievant whole for the wrong it has done her. Castillo is entitled to back pay from the date of her discharge until the date of this Award and offer of reinstatement. While the record is not clear with regard to her discharge date, it appears from the testimony to be September 22, 2005, based on her dues deduction authorization, which was signed on September 8, 2005.

I award and direct the Hotel to pay Grievant back pay at the contractual housekeeper rates of pay in effect from September 22, 2005 until the date of this Award and an unconditional offer of reinstatement to her.

I shall retain jurisdiction of this case should the parties be unable to agree upon the calculation of the monetary amount due Grievant.

## AWARD

The Union's grievance is sustained. The Hotel shall make payment in accordance with the above decision.

**OFFICE OF THE IMPARTIAL CHAIRMAN**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-26
CARTER HOTEL
August 14, 2007
Page 8 of 8

It is so ordered.

Dated:        August 14, 2007
              New York, New York


IRA DROGIN, under the penalties of perjury duly affirms that he is
the arbitrator described herein, and that he executed the foregoing
instrument.

_____
IMPARTIAL CHAIRPERSON

# EXHIBIT C

# APPEARANCE SHEET

2007-59

**EMPLOYER:** The Carter Hotel        **Business Agent:** Rolando Ruiz

☐ Perempt V Union
☐ Perempt V Mgmt
☐ Perempt V Both

**Case #:** U07-140        **Arbitrator:** Ira Drogin

**Date:** 8/9/2007    **Time:** 9:30AM

**Day of Week:** ☐ Mon  ☐ Wed  ☑ Fri
☐ Tues  ☒ Thurs

**Bill:** $675.00    **Status Posted:** ☒ Yes ☐ No

**Invoice #:** No Bill    **Updater:** ☐ LP ☒ CD

| UNION REPS AND WITNESSES | | EMPLOYER REPS AND WITNESSES | |
|---|---|---|---|
| **Business Agent:** Rolando Ruiz | | **General Manager:** | |
| | | **HR Director:** | |
| **Other:** | | | |
| **Attorney for Union:** Joseph Parolli | | **Attorney for Employer:** _Colobro & Rampofa by Gregory Ralston_ | |
| **Witnesses:** Ylonka Pena | | **Witnesses:** ERWIN LUMINGUN CHAM NGUYEN | |

## ARBITRATOR NOTES

## ADMINISTRATOR NOTES

DECISION #
2007-62 suppl.
Fax- 9/18/07
Mailed  9/25/07

DECISION #
2007-59
Mailed 8/14/07

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

### EMPLOYER: CARTER

HTC Case #U07-140/ Emergency Hearing requested by the New York Hotel & Motel Trade Council, AFL-CIO, re management's illegal threatening of bargaining unit employees for engaging in concerted and protected activity.

Hearing held at the Office of the Impartial Chairperson on August 9, 2007.

## APPEARANCES:

| | |
|---|---|
| For the Employer: | No Appearance |
| Counsel for the Employer:<br>By: | Calabro & Associates, P.C.<br>Gregory Calabro |
| For the New York Hotel & Motel Trades Council, AFL-CIO:<br>Counsel:<br>By: | Pitta & Dreier LLP<br>Joseph Farelli, Esq. |
| For the Union: | Rolando Ruiz<br>Local 6 |

\*    \*    \*

The Union has sought an emergency hearing claiming that Management is illegally threatening Bargaining Unit employees for engaging in concerted and - protected activity. The Hotel denies the allegations.

After hearing all of the evidence I issued a bench ruling that a cease and desist order is not warranted but that decision was reserved with regards to the merits of the grievance and the relief to be granted should the Union prevail.

The grievance involves a single employee, Yolando Pena ("Pena") the Housekeeping Delegate, and a single incident on April 24, 2007. The undisputed evidence established that on that date Pena attended an arbitration hearing at this Office involving a different Union grievance at the Hotel. Pena did not testify and it is undisputed that she returned to the Hotel between 10:30 and 11:00 AM

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-59
Carter Hotel
August 14, 2007
Page 2 of 4

in order to resume her duties as Room Attendant. It is also undisputed that while in the lobby, waiting for an elevator, the owner of the Hotel, Tran Dinh Truong (Tran) came out of his office and summoned Pena into it.

Once inside the office, Pena found present "Erwin", Trans assistant and Director of Sales and Marketing as well as Hana Pham, who was a Manager and the Director of Housekeeping. What occurred in Trans office is in dispute.

Pena testified that Tran showed her the Union contract and wanted to talk to her about it. She testified she told Tran she had no authority to do so and he should speak to the Union, not her. According to Pena, Tran then threatened her that if she continued to go to Union meetings he will fire her as well as two other Union Room Attendants, Antonio and Buja. Pena testified that Tran told her "from now on there wasn't a Union contract here and there won't be for 100 years". Pena claims that Erwin then added, "then you won't have a job and will go hungry", and Pham added, "if you strike you are only 3 people and you are not going to win". Pena claims Tran said that he didn't understand why the Union was against him – perhaps because he is Vietnamese – and that she responded that she too comes from another country and the Union doesn't do things like that.

Tran then said he would pay Pena for the day but she was to stop going to the Union and that he had fired 2 other Room Attendants for theft and if she kept going to the Union about this she would be fired.

Pena was not subsequently fired or suspended to date, nor does she or the Union claim she was ever subsequently threatened regarding engaging in protected concerted activities. The record also shows she attended a hearing at this office and testified, on May 15, 2007, approximately 3 weeks after the meeting in Trans office and that no disciplinary action was taken against her as a result.

On cross-examination, the Hotel's counsel attacked Pena's credibility. She testified she had received no written complaint from the Hotel about her work in 2007. The Hotel introduced work complaint letters dated 1/3/07, 4/24/07 and 5/9/07. Pena denied ever receiving the 4/24/07 and 5/9/07 letters and the Hotel did not provide a witness to testify that the letters had actually been given to her.

The Hotel produced Erwin to testify about the 4/24/07 meeting in Trans office. Erwin testified that he was present along with Pena, Tran and Pham and that Pena had been summoned into the office. Erwin said Tran asked Pena what she had said at the hearing from which she had just returned and that Pena responded that she said whatever she knew. Erwin said that Tran had the Union contract in hand and told Pena that he had fired two other Room Attendants for stealing and she should tell that to the Union. According to Erwin, Pena told Tran

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212   FAX: (212) 541-9356

she had no authority to do so and he should do it himself. Erwin testified that Tran told Pena he pays the Housekeepers and he feels the Union is discriminating against him. Erwin denied that either he or Pham said anything to Pena at the meeting.

Pham did not testify to deny the allegations made by Pena. No explanation was offered for her non-appearance at the hearing. Under the circumstances, it is presumed that if she had testified, her testimony would not be supportive of the Hotel's position.

Tran did not testify and also was not present at the hearing. Hotel counsel stated at the outset of the hearing that Tran had quadruple bypass surgery 8 weeks ago, was 5 weeks out of the hospital and was feeling ill today. Union Business Agent Rolando Ruiz, stated he had visited the Hotel immediately before the hearing and observed Tran going about what appeared to be business as usual. The undersigned offered to continue the hearing on August 30, three weeks hence to allow Tran to recover and testify. Counsel stated at the conclusion of the hearing that he did not intend to call Tran and rested his case. Under these circumstances an inference is drawn that had Tran testified, his testimony would not have been supportive of the Hotel's case.

Pena was a credible witness. It is undisputed that Tran summoned her to his office to interrogate her regarding her testimony regarding another grievance. This is clearly violative of the Industry Wide Agreement and the National Labor Relations Act. Erwin confirmed Tran was trying to influence the Union through Grievant regarding another grievance, conduct which is also improper.

I credit Pena's testimony regarding threat of discharge over that of Erwin, particularly in view of the absence of direct denial from Tran and/or Pham, and I note the testimony of both Tran and Pham has been discredited at other hearings before this tribunal. The fact that Pena overlooked in her testimony a "write up" just 3 days into 2007 when asked if she had ever been written up this year, is insufficient to discredit her testimony which otherwise was entirely credible.

In conclusion, I find merit to the Union's grievance and I sustain same.

The Hotel's conduct strikes at the heart of employee's rights to engage in Union activity, without threat of reprisal, It is of the most serious nature and when it is a Delegate who is threatened for engaging in Union activity the effort is to intimidate all Union employees at the Hotel. For these reasons I am granting the Union relief similar to that granted by the NLRB when it has found that an employer has engaged in egregious unfair labor practices.

Accordingly, I am directing the Union to prepare, send to me, with a copy to the Hotel's attorney, a notice to be posted through-out the Hotel, out of

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

sight of guests, to the effect that the Hotel has engaged in the conduct alleged by the Union and shall cease and desist from further conduct of this nature, that employees are free to engage in Union activity without fear of reprisal and that Management will take appropriate steps to ensure that such conduct shall not re-occur.

Additionally the Union shall prepare a verbal statement to be read to all employees by Tran, in the presence of Pham and Irwin similar to the aforementioned notice.

A draft of the written statement and verbal statement shall be submitted to the undersigned within 7days from today's date.  Counsel for the Hotel may submit objections and /or comments regarding the text to the undersigned within 7days from receipt of the statements.

The undersigned retains jurisdiction to review and modify the statements prior to their posting and being read to employees.

It is so ordered.

Dated:        August 14, 2007
              New York, New York

IRA DROGIN, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

IMPARTIAL CHAIRPERSON

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

#2007-62 Supp.
The Carter Hotel
September 18, 2007
Page 1 of 2

**EMPLOYER:**  The Carter Hotel

HTC Case #U07-140/ Emergency Hearing requested by the New York Hotel & Motel Trade Council, AFL-CIO, re management's illegal threatening of bargaining unit employees for engaging in concerted and protected activity.

Hearing held at the Office of the Impartial Chairperson on August 9, 2007.

## APPEARANCES:

For the Employer:                    No Appearance

Counsel for the Employer:        Calabro & Associates, P.C.
By:                                         Gregory Calabro, Esq.


For the New York Hotel & Motel Trades Council, AFL-CIO:
Counsel:                                 Pitta & Dreier LLP
          By:                              Joseph Farelli, Esq.

For the Union:                         Rolando Ruiz
                                            Local 6

## SUPPLEMENTAL AWARD

In my Decision and Award in this case dated August 14, 2007 (#2007-59), I found that the Hotel had engaged in serious violations of employees' rights to engage in Union activity, without threat of reprisal. The evidence convinced me that the owner of the Hotel, Mr. Tran, was a principal transgressor by virtue of his improper activities. In order to remedy this conduct, violative of the law and the IWA, I ordered the Union to prepare and send to me a proposed notice, to be posted throughout the Hotel, out of the sight of guests, to the effect that the Hotel has engaged in the conduct alleged by the Union and shall cease and desist from further conduct of this nature, that employees are free to engage in Union activity without fear of reprisal and that Management will take appropriate steps to ensure that such conduct shall not re-occur. Additionally, the Union was ordered by me to prepare a verbal statement to be read to all employees by Mr. Tran, in the presence of Pham and Irwin, similar to the aforementioned notice.

I have received the proposed notice to be posted and the proposed verbal statement from the Union and the Employer's objection to their language. After

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-62 Supp.
The Carter Hotel
September 18, 2007
Page 2 of 2

considering both, I am attaching hereto the notice to be posted, and the verbal statement, both modified by me to fit the established facts of this case and to effectuate the remedy required.

The Hotel is to provide the Union with 24-hour written advance notice of the date and hour that the verbal statement is to be read to all employees and shall notify the Union in writing that the notice has been posted, and shall keep the notice posted for seven days. All of the foregoing is to be done within fourteen (14) days of receipt of this Supplemental Award.

It is so ordered.


Dated:          September 18, 2007
                New York, New York


        IRA DROGIN, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.


                                    _____
                                    IMPARTIAL CHAIRPERSON

## STATEMENT TO BE POSTED IN HOTEL

From Hotel Management

Recently, the contract arbitrator, the Impartial Chairperson, found that the Hotel had violated the union contract and federal labor law by Tran Dinh Truong::

1)  threatening to fire your Union delegate for appearing at an arbitration to testify for the Union;
2)  interrogating your Union delegate as to what she told the Union and what she did at the arbitration; and
3)  attempting to deal with her and not the Union in resolving other employees' grievances.

For this conduct, the Hotel and Tran Dinh Truong are sincerely sorry.  The Hotel and Tran Dinh Truong wish to clarify that:

**You have the right to join the Union.**

**You have the right to complain to the Union about any term or condition of employment at the Hotel.**

**You have the right to file a grievance with the Union regarding any term or condition of employment at the Hotel.**

**You have the right to appear at any arbitration to testify or to participate in any union or concerted activity.**

**You have the right to have a Union representative deal with Tran Dinh Truong and the Hotel for your grievances or complaints.**

**You have the right to exercise all of the rights just described to you without fear of retaliation or reprisals by the Hotel or Tran Dinh Truong, for exercising such rights.**

**THE HOTEL AND TRAN DINH TRUONG AGREE THAT NEITHER TRAN DINH TRUONG NOR ANY HOTEL REPRESENTATIVE WILL DISCHARGE YOU OR THREATEN TO DISCHARGE OR PUNISH YOU FOR EXERCISING ANY OF THESE RIGHTS.**

**If you believe that Tran Dinh Truong or any Hotel representative has threatened you or punished you for exercising any of the rights just described, you should report such conduct to your Union representative Rolando Ruiz at (212) 957-8000.**

**Again, Tran Dinh Truong sincerely apologizes on behalf of the Hotel and himself for their improper conduct.**

## STATEMENT TO BE READ BY MR. TRAN DINH TRUONG

I have an important statement to make and I'm asking each employee to show me the courtesy of carefully listening to what I have to say.

Recently, the contract arbitrator, the Impartial Chairperson, found that the Hotel and I had violated the union contract and federal labor law by:

1)   threatening to fire your Union delegate for appearing at an arbitration to testify for the Union;
2)   interrogating your Union delegate as to what she told the Union and what she did at the arbitration; and
3)   attempting to deal with her and not the Union in resolving other employees' grievances.

For this conduct by me and the Hotel, I am sincerely sorry. I wish to clarify that:

**You have the right to join the Union.**

**You have the right to complain to the Union about any term or condition of employment at the Hotel.**

**You have the right to file a grievance with the Union regarding any term or condition of employment at the Hotel.**

**You have the right to appear at any arbitration to testify or to participate in any union or concerted activity.**

**You have the right to have a Union representative deal with me and the Hotel for your grievances or complaints.**

**You have the right to exercise all of the rights which I have just described to you without fear of retaliation or reprisals by the Hotel or me for exercising such rights.**

THE HOTEL AND I AGREE THAT NEITHER I NOR ANY HOTEL REPRESENTATIVE WILL DISCHARGE YOU OR THREATEN TO DISCHARGE OR PUNISH YOU FOR:

**JOINING THE UNION;**

**COMPLAINING TO THE UNION ABOUT WORKING CONDITIONS AT THE HOTEL;**

**FILING A GRIEVANCE WITH THE UNION;**

**APPEARING AT AN ARBITRATION TO TESTIFY;**

**ENGAGING IN ANY PROTECTED UNION ACTIVITY OR CONCERTED ACTIVITY; AND**

REQUESTING UNION REPRESENTATION IN ANY DEALINGS WITH THE HOTEL OR ME REGARDING YOUR WORKING CONDITIONS.

If you believe that I or any Hotel representative has engaged in any such type of conduct which I have just described, you should report such conduct to your Union representative Rolando Ruiz at (212) 957-8000.

Again, I sincerely apologize on behalf of the Hotel for my improper conduct.

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
                                :
HAMIDOU DIALLO,                 :
                                :
                   Plaintiff,   :
                                :
        -against-               :                05 Civ. 00430 (LAP)
                                :
NEW YORK HOTEL AND MOTEL TRADES :                <u>MEMORANDUM AND ORDER</u>
COUNCIL, MR. TRUONG D. TRAN,    :
and ALPHONSE HOTEL CORPORATION, :
                                :
                   Defendants.  :
                                :
-------------------------------x

LORETTA A. PRESKA, U.S.D.J.

     Plaintiff Hamidou Diallo ("Plaintiff") brought the

above-captioned action seeking back wages, damages, and

costs against The New York Hotel and Motel Trades Council

(the "Union"), Mr. Tran D. Troung ("Mr. Troung"), [1] and the

Alphonse Hotel Corporation ("AHC"). [2]  The Union now moves

---------------------

[1] Mr. Tran D. Troung was sued as "Mr. Truong D. Tran."  The
Court will recognize Defendant Troung as he refers to
himself in his affidavit of May 11, 2006.
[2] On Sept. 6, 2006, Plaintiff filed an Amended Complaint
adding AHC as a defendant and making no other relevant
changes.  As of the date of this Order, the Amended
Complaint appears to have been served only on the Union,
which requested in a letter of Dec. 14, 2006, that the
Court treat its motion to dismiss the Complaint as a motion
to dismiss the Amended Complaint.  Considering the relaxed
pleading standard applied to <u>pro se</u> plaintiffs, and in that
the Amended Complaint is indistinguishable from the initial
Complaint with respect to Mr. Troung, the Court (continued)

to dismiss this action pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure, for failure to state a
claim.  Mr. Troung now also moves to dismiss this action
pursuant to Rule 12(b)(6).  For the reasons set forth
below, the motions to dismiss are denied.

## BACKGROUND

Plaintiff asserts that he is owed back wages for work
performed during his employment at the Carter Hotel (the
"Carter").  (Compl. ¶ 1).  Plaintiff further asserts that
the Union breached its duty of fair representation by
failing to assist him in recovering these wages.
(Compl. ¶ 2).  Plaintiff claims to have been employed at
the Carter and a dues-paying member of the Union from May
14, 1996, to July 20, 1999.  (Compl. ¶¶ 6, 7).[3]  Plaintiff
claims to have been employed by Mr. Troung and the AHC.
(Compl. at 1 & ¶ 1, Am. Compl. ¶ 1).[4]  Plaintiff was one of
several employees who brought a grievance against the
Carter to the Union seeking back wages.  (Compl. ¶ 9).
Plaintiff was incarcerated on July 21, 1999, one day before

---

(continued) will likewise treat Mr. Troung's motion to
dismiss the initial Complaint as a motion to dismiss the
Amended Complaint.

[3] "Compl." refers to the initial Complaint of Hamidou Diallo
dated Sept. 2, 2004.

[4] "Am. Compl." refers to the Amended Complaint of Hamidou
Diallo dated Sept. 6, 2006.

his scheduled final meeting with the Union's arbitrator for
labor disputes, the Impartial Chairman.  (Am. Compl. ¶ 17,
ex. E).  Plaintiff learned of a successful settlement
against the Carter on March 16, 2002.  (Compl. ¶ 9).
Plaintiff sent several letters to Union attorneys and
officials in 2002 that went unanswered.  (Compl. ¶¶ 10,
11).  The Union, in a letter dated March 29, 2004, refused
to process Plaintiff's grievance further, citing an
arbitrator's requirement of live testimony and the length
of time elapsed since receipt of Plaintiff's request.
(Compl. Ex. E).

## DISCUSSION

1.   Legal Standard for Dismissal

       For purposes of a motion to dismiss pursuant to Rule
12(b)(6), the Court accepts the factual allegations made in
the Complaint as true and draws all inferences in favor of
the non-moving party.  See Karedes v. Ackerly Group, Inc.,
423 F.3d 107, 113 (2d Cir. 2005).  It is well-settled that
"[a] case should not be dismissed unless the court is
satisfied that the complaint cannot state any set of facts
that would entitle the plaintiff to relief."  Miller v.
Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir.
2002) (citing Patel v. Contemporary Classics of Beverly

3

Hills, 259 F.3d 123, 126 (2d Cir. 2001)).  The Court,

however, need not give "'credence to plaintiff's conclusory

allegations'" or legal conclusions offered as pleadings.

Cantor Fitzgerald v. Lutnick, 313 F.3d 704, 709 (2d Cir.

2002) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.

2001)); Van Carpals v. S.S. Am. Harvester, 297 F.2d 9, 11

n.1 (2d Cir. 1961) (Friendly, J.) ("[I]n federal pleading

there is no need to plead legal conclusions; these are for

the court to apply.").  The Court may consider materials of

which the plaintiff had notice and relied upon in framing

his complaint, as well as materials of which judicial

notice may be taken. See Fed. R. Evid. 201; Kavowras v.

N.Y. Times Co., 328 F.3d 50, 57 (2d Cir. 2003); Cortec

Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.

1991).  In addition, the Court may consider materials

outside the record if certain conditions for those

materials are met including: (1) it is clear on the record

that no dispute exists regarding the authenticity or

accuracy of the document; and (2) it is clear that there

exist no material disputed issues of fact regarding the

relevance of the document. Faulkner v. Beer, 463 F.3d 130,

134 (2d Cir. 2006).

4

Pro se complaints are construed liberally by the
Court, but are not entirely immune from the rules of
pleading.  See Shehab v. Chas. H. Sells, Inc., 2006 WL
938715 (S.D.N.Y. Mar. 29, 2006); see also Stinson v.
Sheriff's Department, 499 F.Supp. 259, 262 (S.D.N.Y. 1980)
(noting that the liberal standard accorded to pro se
pleadings "is not without limits, and all normal rules of
pleadings are not absolutely suspended.").

2.  Application to the Union's Motion to Dismiss

The Union contends that the claim of breach of duty of
fair representation is barred by the statute of limitations
and thus that Plaintiff has failed to state a claim upon
which relief may be granted.  The Union concedes that the
alleged breach occurred on April 1, 2004, and that a six-
month statute of limitations applies to such a breach under
29 U.S.C. § 185.  (Union Mem. at 3).[5]  Plaintiff's
complaint, however, is postmarked September 7, 2004, well
before the September 30, 2004 expiration of the statute of
limitations.  (Compl.).  The prison mailbox rule is applied
by federal courts to consider documents "filed" when a
prisoner relinquishes control over them to the prison

---

[5] ("Union Mem.") refers to the Union Memorandum of Law in
Support of Union Defendants' Motion to Dismiss, dated May
1, 2006.

authorities.  Houston v. Lack, 487 U.S. 266, 266 (1988)

("Unskilled in law, unaided by counsel, and unable to leave

the prison, a pro se prisoner's control over the processing

of his notice necessarily ceases as soon as he hands it

over to the only public officials to whom he has access—the

prison authorities."); Fernandez v. Artuz, 402 F.3d 111,

115 (2005) (holding that state filing laws to the contrary

do not preclude federal courts from applying the prisoner

mailbox rule to federal statutes of limitations.); accord

Kairis v. United States, No. 02 Civ. 1337, 2006 WL 2708555,

(N.D.N.Y. Sep. 20, 2006); Rosario v. Bennett, No. 01 Civ.

7142, 2002 WL 31852827, (S.D.N.Y. Dec. 20, 2002).

Accordingly, the Court considers Plaintiff's complaint

timely filed, and thus Plaintiff's claim is not barred by

the statute of limitations.

The Union's assertion that Plaintiff's factual

allegations are "utterly insufficient to establish a

violation of the duty of fair representation" is without

merit.  (Union Mem. at 5).  Plaintiff has alleged a series

of facts that, construed liberally and taken as true,

support his claim of the Union's breach of its duty of fair

representation.  (Compl., Am. Compl.).  As stated above,

the Court must accept Plaintiff's allegations as true for

the purposes of a motion to dismiss.  See Karedes, 423 F.3d

107, 113.  Accordingly, it cannot be said at this juncture

that Plaintiff cannot state any facts against the Union

that would entitle him to relief.  Thus, the Union's motion

to dismiss is denied.

3.    Application to Mr. Troung's Motion to Dismiss

    Mr. Troung asserts that he was not Plaintiff's

employer and never entered into a contract with Plaintiff

or the Union.  (Troung Mem. at 2).[6]  Although not

cognizable on a motion to dismiss, Mr. Troung concedes that

Plaintiff was an employee of AHC "at the Hotel Carter"

during the time alleged by Plaintiff.  (Troung Aff. ¶ 5).[7]

Similarly beyond the scope of a motion to dismiss, Mr.

Troung further states that he is the president of the AHC,

which is the owner and landlord of the Carter.  (Id. ¶ 4).

In that Plaintiff's Complaint alleges that Mr. Troung was

his employer, the Court may not resolve this factual

dispute on this motion but must accept Plaintiff's

allegation as true.  Accordingly, the Court will not

dismiss Mr. Troung as an improper party at this time.

---

[6] ("Troung Mem.") refers to the Memorandum of Law in Support
of Defendant's Motion to Dismiss filed on behalf of Mr.
Troung, undated, received May 19, 2006.
[7] ("Troung Aff.") refers to Mr. Troung's "Affirmation in
Support"  dated May 17, 2006.

Mr. Troung claims laches as a defense.  (Troung Mem. at 3).  Plaintiff does not seek equitable relief, and thus laches is not a proper defense to Plaintiff's claims at law.

## CONCLUSION

For the reasons set forth above, the motions to dismiss filed by the Union and Mr. Troung are denied. [Dkt. nos. 23 & 27, respectively].  In light of the apparent overlapping ownership of the Carter by Mr. Troung and the AHC, counsel for Mr. Troung will inform the court whether it is willing to accept service of the Plaintiff's Amended Complaint which names AHC as a party.  All counsel shall inform the Court in writing of how they propose to proceed no later than February 21, 2007.

SO ORDERED:

DATED:     February 13, 2007
           New York, New York

LORETTA A. PRESKA, U.S.D.J.

# EXHIBIT E

1 of 4



# HOTEL ASSOCIATION OF NEW YORK CITY, INC.

320 PARK AVENUE, NEW YORK, NY 10022-6838
(212) 754-6700    FAX (212) 754-0243

On behalf of the Board of Directors of the Hotel Association of New York City, Inc., we are pleased to distribute the consolidated New York Industry Wide Collective Bargaining Agreement between the Hotel Association of New York City, Inc. and the New York Hotel & Motel Trades Council, AFL-CIO, (more easily referred to as the "Industry Wide Agreement" or "IWA"). This is the first consolidated IWA we have had since the 1985 IWA. We believe that the consolidated IWA will be extremely beneficial to all Hotels.

During the 17 years I have been President of the Hotel Association of New York City, Inc., the Association has established a good working relationship with the Trades Council. The Association and the Union have demonstrated mutual respect for our respective organizations and members and as a result, the quality of life of Hotel employees has been enriched. The wage and benefit levels contained in the Industry Wide Employee Benefit programs and the ability of the Association and the Union to jointly support initiatives like the Javits expansion are examples of our ability to work together.

As we prepare for negotiations with the Hotel Trades Council, I am confident that, given our ability to work together, the Hotel Association and the Hotel Trades Council will be able to achieve a satisfactory renewal of the IWA.

In concluding, I want to thank Kane Kessler, P.C. for their efforts towards obtaining a consolidated IWA.

Sincerely,

Joseph E. Spinnato
**President**

# TABLE OF CONTENTS

WITNESSETH ...............................................................................................................................1

EXCLUDED CATEGORIES .......................................................................................................2

UNION MEMBERSHIP ...............................................................................................................2

UNION DUES ...............................................................................................................................3

NEW EMPLOYEES.......................................................................................................................4
    PROBATIONARY PERIOD .......................................................................................4
    TERMINATION..........................................................................................................4
    WAGES AND BENEFITS .........................................................................................4
    CONTRIBUTIONS TO FUNDS ................................................................................5

HOTEL CLASSIFICATION.........................................................................................................5

PART-TIME WORK AND PREMIUM PAY; SUBSTITUTE AND EXTRA EMPLOYEES.............5
    SUBSTITUTE EMPLOYEES ...................................................................................6
    EXTRA HOUSEKEEPING AND BANQUET EMPLOYEES...................................6

EXTRA CALL-IN SHEET ...........................................................................................................8

EXTRA PAINTERS ......................................................................................................................9

HOUSING-MEALS.......................................................................................................................9

WORKING HOURS, MEAL PERIOD, OVERTIME, ETC.........................................................9
    WORK WEEK.............................................................................................................9
    CALL-IN......................................................................................................................9
    CHANGES IN WORKING HOURS .........................................................................10
    SPLIT SHIFTS ...........................................................................................................10
    MEAL PERIOD..........................................................................................................10
    WAITERS AND WAITRESSES ...............................................................................10
    OVERTIME.................................................................................................................10

MINIMUM WAGE .......................................................................................................................11

WAGES .........................................................................................................................................12
    GENERAL...................................................................................................................12
    PRIOR WAGES AND BENEFITS.............................................................................12

WAGE INCREASES .....................................................................................................................12

EXTRA ROOMS ...........................................................................................................................13

COTS .............................................................................................................................................13

MAJOR STRUCTURAL ALTERATIONS .................................................................................14

EMPLOYER RULES AND REGULATIONS .............................................................................14

DUTIES OF EXCLUDED CATEGORIES ..................................................................................14

RELIEF EMPLOYEES .................................................................................................................14

HIRING..........................................................................................................................................15

MANAGEMENT RIGHTS...........................................................................................................17

SENIORITY ................................................................................ 17
    LAYOFF - GENERAL .............................................................. 17
    LAYOFF - RECALL ................................................................. 17
    LAYOFF - DELEGATES AND ASSISTANT DELEGATES ................ 18
    NOTIFICATION OF DELEGATES .............................................. 19

UNION ACTIVITY ........................................................................ 19

NO DISCRIMINATION ................................................................. 19

COMPLAINTS, GRIEVANCES AND ARBITRATION ......................... 19

DISCHARGES ............................................................................. 21
    GENERAL ............................................................................. 21
    DISCHARGES/SUSPENSIONS -DELEGATES AND ASSISTANT DELEGATES .... 21

VACATIONS ............................................................................... 22
    ENTITLEMENT -GENERAL ...................................................... 22
    PRORATION .......................................................................... 23
    PAYMENT .............................................................................. 23
    SCHEDULING ........................................................................ 23
    TERMINATION OF EMPLOYMENT .......................................... 33

HOLIDAYS ................................................................................. 33
    ENTITLEMENT - GENERAL ..................................................... 23
    LAYOFF ................................................................................. 24
    SICKNESS ............................................................................. 24
    PAYMENT .............................................................................. 24
    WORK ON HOLIDAYS ............................................................ 24

PERSONAL DAYS ....................................................................... 25
    ENTITLEMENT - NEW HIRES .................................................. 25
    ENTITLEMENT-REGULAR FULL-TIME AND REGULAR PART-TIME EMPLOYEES .... 25
    BANQUET PERSONNEL .......................................................... 26
    GENERAL .............................................................................. 26

JURY DUTY ............................................................................... 26

BEREAVEMENT PAY ................................................................... 27
    ENTITLEMENT ....................................................................... 27
    PAYMENT AND CALCULATION ............................................... 27

HEALTH BENEFITS FUND ........................................................... 28

401(K) PLAN ............................................................................. 28

PENSION FUND .......................................................................... 28

TRAINING AND SCHOLARSHIP FUND ......................................... 29

LEGAL FUND ............................................................................. 29

STRIKES AND LOCKOUTS .......................................................... 30

CONTRACT WITH NON-MEMBER GROUP HOTELS ...................... 30

STATUS QUO AGREEMENT OF MARCH 21, 1994 ......................... 31

MODIFICATION OF THIS AGREEMENT ....................................... 31

VISITATION CLAUSE ................................................................... 31


NOTICES ................................................................................... 33

COST OF LIVING ........................................................................ 33

AREA STANDARDS AND WORK PRESERVATION ......................... 33

FURNISHING SECURITY ............................................................. 33

BANQUET DEPARTMENT ........................................................... 34
    EXTRA BANQUET WORK ....................................................... 34
    STEADY BANQUET JOB OPENINGS ........................................ 34
    GRATUITIES .......................................................................... 35

RELIEF APPEALS ....................................................................... 38

UNIFORMS AND EMPLOYEE FACILITIES ..................................... 38

TOURS ..................................................................................... 39

NIGHT SHIFT DIFFERENTIAL ...................................................... 41
    GENERAL .............................................................................. 41
    PAYMENT RATE ..................................................................... 41
    CALCULATION ....................................................................... 41

SEVERANCE PAY ....................................................................... 41

STUDY COMMITTEE ................................................................... 41

TECHNOLOGICAL CHANGE ........................................................ 42

SICK LEAVE .............................................................................. 42
    ENTITLEMENT ....................................................................... 42
    CALCULATION AND PAYMENT ............................................... 43

LEAVE OF ABSENCE .................................................................. 43
    CASUAL ABSENCE ................................................................ 43

STUDY COMMITTEE ................................................................... 44

EXPIRATION AND RENEWAL ...................................................... 44

TEMPORARY CLOSING OR A HOTEL/CONCESSION FOR RENOVATIONS .... 47

AUTHORITY TO ENFORCE CONTRACT ........................................ 47

SUCCESSORS AND ASSIGNS ...................................................... 48

ACCRETION AND NEUTRALITY/CARD CHECK .............................. 49

MAINTENANCE AND ELECTRICAL WORK ..................................... 50

SEPARABILITY ........................................................................... 50

RATIFICATION OF AGREEMENT .................................................. 51

SCHEDULE 1 ............................................................................. 51

SCHEDULE A .............................................................................

SCHEDULE A-1 (BANQUET WAGES) ...........................................

SCHEDULE A-2 ..........................................................................

WORKING CONDITIONS .............................................................

SCHEDULE A-2
ADDENDUM I
ADDENDUM II
ADDENDUM III
ADDENDUM IV
ADDENDUM V
SCHEDULE B

AGREEMENT entered into so as to be effective July 1, 2001 between the HOTEL ASSOCIATION OF NEW YORK CITY, INC., in its own behalf and in behalf of the HANYC BARGAINING GROUP HOTELS* (hereinafter collectively referred to as the EMPLOYER or the ASSOCIATION), and the operation of hotels and motels who are active members of the ASSOCIATION and with respect to the operation of hotels, motels, and concessionaires with respect to whom the UNION may be hereinafter designated as sole collective bargaining agent for the employees of such hotels, motels, and concessionaires, and who shall become parties hereto by agreeing to this Agreement, each and every such hotel, motel, and concessionaire being hereinafter referred to as the EMPLOYER, and the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its members, now employed or hereafter to be employed by the EMPLOYER.

## WITNESSETH:

WHEREAS, the ASSOCIATION is an organization whose active members are engaged in the hotel business in the City of New York, and one of whose objects is to promote fair and harmonious labor relations between hotel keepers and their employees, and

WHEREAS, the parties hereto are signatories to a Collective Bargaining Agreement signed June 26, 1985, as amended by a Memorandum of Understanding signed January 30, 1990 (hereinafter collectively referred to as the "1990 Agreement"), which 1990 Agreement by its terms, expired on June 30, 1995, and was extended by the parties to midnight July 4, 1995, and further amended by a Memorandum of Understanding signed July 5, 1995 (hereinafter collectively referred to as the "1995 Agreement"), which Agreement by its terms, expired on June 30, 2001;

WHEREAS, the parties hereto, desiring to cooperate to stabilize such labor relations by establishing general standards of wages, hours of service and other conditions of employment, and providing arbitral machinery whereby disputes and grievances between employers and employees may be adjusted without resort to strikes, lockouts or other interferences with the continued and smooth operation of the hotel business, have agreed, pursuant to the provisions of a Memorandum of Understanding dated June 15, 2000 ("2001 MOU"), to enter into an agreement so as to be effective July 1, 2001 (except as otherwise stated herein), on the terms and conditions hereinafter placed;

NOW, THEREFORE, the parties hereto agree as follows:

1.
(A)    (1)    The term HOTEL, as used throughout this Agreement shall include hotels, motels and affiliated facilities.

---

* A list of HANYC Bargaining Group Hotels has been provided by the Association.

(2) The term CONCESSIONAIRE as used throughout this Agreement shall include all restaurants, lessees, and contractors operating within HOTELS who employ employees in job classifications covered by this Agreement.

(3) The term EMPLOYER is used throughout this Agreement shall, unless expressly distinguished elsewhere, include all HOTELS, whether or not members of the ASSOCIATION, and all CONCESSIONAIRES operating within HOTELS.

(B) The UNION represents to the ASSOCIATION that it represents a majority of all the employees covered by this Agreement in each EMPLOYER'S hotel, motel and concessionaire.

(C) The UNION represents to the ASSOCIATION that it represents a majority of all the employees covered by this Agreement in the hotels comprising the Bargaining Group Hotels of the ASSOCIATION.

(D) The UNION is duly empowered to enter into this Agreement.

(E) The ASSOCIATION and the EMPLOYER hereby recognize the UNION as the sole collective bargaining agency for the employees covered by this Agreement.

(F) The UNION agrees that the EMPLOYER shall work for the EMPLOYER upon the terms and conditions set forth in this Agreement.

## EXCLUDED CATEGORIES

2. All employees (including bell captains, floor housekeepers and all white-collar administrative employees included in Schedule A for whom the UNION has been heretofore or shall be hereafter designated as the collective bargaining representative) shall be covered by this Agreement except the following classes of employees which shall be excluded from the provisions of this Agreement: Executives, superintendents, department managers, assistant department managers; executive status having the right to hire or fire or effectively to recommend hiring of ... supervisors, assistant supervisors with ... and confidential secretaries. Also excluded are hotel house officers, bell captains, floor housekeepers and all white-collar employees included in Schedule A for whom the UNION has not been heretofore or is not hereafter designated as the collective bargaining representative, in hotels which have heretofore entered into collective bargaining agreements covering any white-collar employees the coverage and exclusion from coverage provided in such agreement shall continue in effect.

## UNION MEMBERSHIP

3. (A) It shall be a condition of employment that all employees of the EMPLOYER covered by this Agreement who are members of the UNION in good standing on the date of this Agreement shall remain members in good standing and those who are not members on the date of this Agreement shall, on the thirtieth (30th) calendar day following the date of this Agreement become and thereafter remain members in good standing in the UNION. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its

2

date shall, on the thirtieth (30th) calendar day following the beginning of such employment, become and thereafter remain members in good standing. The UNION agrees to permit all employees to become and remain members of the UNION upon payment by them of initiation fees and periodic dues uniformly required as a condition of membership.

(B) Upon notice in writing from the UNION to the effect that an employee is not a member of the UNION in good standing, i.e., he/she has failed to pay the initiation fees and dues to the UNION required herein, the EMPLOYER shall, within five (5) days discontinue the employment of such employee. The EMPLOYER and the UNION agree the foregoing discharge requirement shall only be applicable to the failure to pay dues and initiation fees uniformly required as a condition to acquiring or retaining membership in the UNION and shall have no applicability to the failure of an employee to pay authorized regular and/or special assessments which may from time to time be levied by the UNION in accordance with the Constitution and By-Laws.

(C) In the case of casual employees, the first date of employment shall be the date a casual employee is employed by a signatory or party to this Agreement and said employee shall, as a condition of employment by any EMPLOYER signatory or party to this Agreement, on the thirtieth (30th) working day following the beginning of such employment, become and thereafter remain a member in good standing in the UNION.

(D) This Article and the following Article "Union Dues" shall be construed and applied to effectuate the parties without terms subject to applicable law.

## UNION DUES

4. UNION dues, assessments, initiation and service fees, and defense fund assessments, during the term of this Agreement, shall not exceed the sums set forth in the memorandum to be furnished by the UNION to the ASSOCIATION and/or the EMPLOYER at the time of the execution of this Agreement. Notwithstanding the foregoing, the amount of UNION dues, assessments, initiation and service fees, and defense fund assessments or change at the prerogative of the UNION. The UNION agrees to give the ASSOCIATION and/or the EMPLOYER thirty (30) days' written notice prior to the effective date of any such change.

5. The UNION agrees to furnish the EMPLOYER with a memorandum showing the amount of dues, assessments, initiation and service fees and defense fund assessments payable by members of the UNION and service fees payable as non-members of the UNION by each of the employees of the EMPLOYER covered by this Agreement. Upon receipt of written authorization, the EMPLOYER agrees to transmit on a monthly basis such dues, assessments, initiation and service fees and defense fund assessments from the wages or salaries of the respective employees worked, and the EMPLOYER agrees to deduct such dues, assessments, initiation and service fee dues authorization card of each employee from whom it makes such deductions. The EMPLOYER in the month of collection. The EMPLOYER will retain in its files the dues authorization card ... The EMPLOYER agrees to furnish to the UNION a list of the employees in its hotel covered by this Agreement and will from time to time furnish to the UNION the names of all such new

3

employees who are to be covered by this Agreement, and also will notify the UNION of employees who have left the employ of the EMPLOYER. The EMPLOYER agrees that the UNION may examine the EMPLOYER's payroll records for the purpose of checking compliance with this provision.

## NEW EMPLOYEES

6. (A) **Probationary Period**

A new employee shall work under the provisions of this Agreement, but shall be employed on a trial or "probationary" basis. The probationary period for new employees shall be sixty (60) days of work.

(B) **Termination**

During the probationary period, the employee may be terminated with or without cause and without recourse to the grievance and arbitration machinery set forth in this Agreement; provided, however, that the EMPLOYER may not terminate the "employee" for the purpose of evading the Agreement, or discriminating against UNION members. In the event that the UNION claims a pattern exists that establishes that the turnover rate of employees of the EMPLOYER exceeds normal turnover rate from and after the thirty-first (31st) calendar day of employment and claims that such turnover is for the purposes of evading the Agreement or discriminating against UNION members, the UNION may grieve such termination in accordance with the grievance and arbitration machinery set forth in this Agreement.

Probationary employees shall be paid not less than the new hire rate of pay during the probationary period. If, however, it is determined by the Impartial Chairman that a probationary employee has been terminated by an EMPLOYER for purposes of evading the Agreement or discriminating against UNION members, the Impartial Chairman shall reinstate such probationary employee with full back pay computed at the appropriate full contract rate of pay for all lost days retroactive to the employee's day of discharge up to and until the employee's reinstatement date. If, upon reinstatement an employee is still in the probationary period, he/she shall be paid the applicable contract wage for probationary employees, as set forth in Section 6(C) below.

(C) **Wages and Benefits**

(1) New Hire Wage Rate. Newly hired employees shall be paid not less than seventy-five percent (75%) of the wage rate for their job classification set forth in Schedule A, and as set forth in Section 14(A)(2). This rate, as amended by subsequent wage increases during said employment, shall continue for one (1) year from the date of hire at which time it shall be increased in accordance with Section 6(C)(2). This provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months prior to an EMPLOYER signatory or party to this Agreement.

4

(2) Second Year Rate for New Employees. New employees hired on or after July 1, 2001, shall receive not less than eighty-five percent (85%) of the wage rate set forth in Schedule A of this Agreement as amended by subsequent wage increases during said employee's second year of employment. This rate shall continue for one (1) year after which time the rate shall be increased, to the full rate then in effect for the job classification. This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(D) **Contributions to Funds**

No contributions shall be made to the Pension Fund, Prepaid Legal Fund or Training Fund or for the dental component of the Health Benefits Fund on behalf of any new employee until nine (9) months after the date of employment. This provision shall not apply to any employee who during the twenty-four (24) months prior to his/her employment was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

## HOTEL CLASSIFICATION

7. For the purposes of this Agreement, the hotels in the City of New York have been grouped as follows:

Transient
Semi-Transient
Residential

The EMPLOYER and the UNION agree that the grouping of the EMPLOYER's hotel is that set forth opposite its name.

## PART-TIME WORK AND PREMIUM PAY SUBSTITUTE AND EXTRA EMPLOYEES

8. (A) Any EMPLOYER who shall change the hours of the work week of a part-time worker to hours of the work week of a full-time worker, shall pay to the employee commencing at the time when his or her hours have been so changed, not less than the commercial wage rate for his or her classification (minimum wage rate plus wage increases), at the time of the change as set forth in Schedule A, irrespective of the hourly rate such employee previously received as a part-time employee, anything contained herein to the contrary notwithstanding.

It is understood that where an EMPLOYER, for business reasons (e.g., "business reasons" include, but is not limited to, the elimination of a meal in an a la carte restaurant or the temporary closing of an a la carte restaurant, club or beverage outlet for a special banquet function), requires the temporary reduction in the work week of employees in any of its departments, it shall first give at least five (5) calendar days written notice to and obtain the Union's written consent to such work week reduction, unless emergency circumstances prevent the Employer

5

from giving such notice to and obtaining consent from the Union. The consent of the Union will not be unreasonably withheld or delayed.

In the event a dispute arises between the Union and Employer under the provisions of this paragraph, the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairman. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(B) Casual employees and part-time employees shall be paid not less than one and one quarter (1 1/4) times the hourly wage rate at which an employee is required to be paid under Sections 12 and 14 hereof for the first twenty (20) hours of work in categories where the regular work week in the industry is forty (40) hours and for the first seventeen and one half (17 1/2) hours of work in categories where the regular work week in the industry is thirty five (35) hours, and for the remaining hours of work shall be paid not less than the hourly wage rate an employee is required to be paid pursuant to Sections 12 and 14 hereof.

(C) <u>Substitute Employees</u>

Effective on July 1, 2001, new employees hired solely to substitute ("substitute employee") for an employee on leave of absence, illness or injury, shall be considered casual employees and, pursuant to Section 23(A)(1) of this Agreement, such employees will not accrue seniority during the period of their "substitute employment."

At such time as the employee on leave of absence, illness, or injury returns to work, the substitute employee may be laid off by the EMPLOYER and such layoff shall not prohibit the assignment of work on an overtime basis (or extra rooms in the case of housekeeping employees) to employees working in the same job classification as the substitute employee.

In the event the substitute employee is laid off after the expiration of sixty (60) days of work, he/she shall retain recall rights in his/her classification for the length of his/her actual employment.

In the event the substitute employee is laid off after the expiration of twenty-six (26) weeks, he/she shall have recall and all other rights in accordance with this Agreement.

(D) <u>Extra Housekeeping and Banquet Employees</u>

(1) Effective July 12, 2000, the EMPLOYER shall be entitled to hire "extra" employees only in the job classifications of A.M. room attendant, P.M. room attendant, housekeeping attendant, and banquet steward.

(2) The number of "extra" employees permitted to be employed hereunder within each of the aforementioned job classifications shall not exceed ten percent (10%) of the then current number of full-time employees in each of the aforementioned job classifications or one (1) employee, whichever is greater.

(3) No employee on the EMPLOYER's payroll on or before the effective date of this provision shall be converted to "extra" status.

(4) All "extra" employees will be subject to all terms and conditions of employment set forth in this Agreement with the following exceptions:

(a) The EMPLOYER shall be permitted to schedule and call in "extra" employees to work without five (5) days' written notice to such "extra" employees as required by Section 11 of this Agreement.

(b) The EMPLOYER will not be required to give such "extra" employees notice of layoff, recall, reduced work week or schedule change as otherwise required by Section 11(C) and Section 23 of this Agreement.

(c) The EMPLOYER shall be required to pay "extra" employees time and one-quarter (1 1/4) premium pay for all hours worked unless, notwithstanding the provisions of Paragraph D Subparagraph 4(b) hereof, said employees receive a notice of schedule in accordance with this Agreement to work a full work week and are offered a full work week. In such case, the employees will be paid at straight time for the full work week.

(5) "Extra" employees will not be scheduled for, or called in to, work if any full-time or regular part-time employees in the aforementioned job classifications are on layoff or reduced work week.

(6) All "extra" employees shall accrue seniority and shall be scheduled for, and called in to, work on the basis of strict seniority.

(7) "Extra" employees shall be eligible to fill full-time or regular part-time job openings in their job classifications on the basis of strict seniority.

(8) The EMPLOYER will keep a record of all calls made for the purpose of scheduling and calling in "extra" employees to work using the form entitled "Extra Call-In Sheet", attached hereto.

(9) The EMPLOYER acknowledges that due to the irregularity and uncertainty with which "extra" employees may be scheduled and called in to work, "extra" employees may be frequently unavailable or unable to work when requested to do so by the EMPLOYER. Such employees shall not be disciplined or otherwise suffer a loss of future job opportunities because of such inability or unavailability to work on request by the EMPLOYER. Notwithstanding the foregoing, the EMPLOYER shall be entitled to replace an "extra employee" when such Employee demonstrates his/her unavailability other than on a reasonable basis.

**Extra Call-In Sheet**

| Hotel: | | | | | Date: | |
|---|---|---|---|---|---|---|
| Name: | Phone | Time Called | Spoke to' | Result ("agreed to come to work" or "did not agree to come to work." If no one was home, write what message was left or "no answer") | Delegate Initials | Manager Initials |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |
| | | a.m. p.m. | | | | |

## EXTRA PAINTERS

9. An extra painter is one whose employment terminates at any time within eighteen (18) weeks after the probationary period. An extra painter shall be paid not less than the rates established by Section 14 each week and in addition, when his or her employment is terminated, shall be paid a lump sum equal to $15.00 for each week of his or her employment. An extra painter shall be paid for any of the holidays provided for in Section 29 of this Agreement which may occur during his or her period of employment, and shall receive prorated vacation pay.

A painter who is employed for a period of more than eighteen (18) weeks after the probationary period shall not come within the provisions of the preceding paragraph hereof and shall attain the status of a regular permanent employee.

## HOUSING-MEALS

10. In cases where the EMPLOYER furnishes housing accommodations to its employees, it shall be allowed $2.50 per week for such housing accommodations.

In cases where the EMPLOYER furnishes meals to its employees, it shall be allowed $2.25 per meal.

In cases where the EMPLOYER furnishes housing accommodations and meals by the week, it shall be allowed $7.75 per week.

In the event any EMPLOYER who has heretofore furnished meals or housing accommodations, or both, as part of compensation, shall desire to discontinue the same, it may do so by substituting cash for meals or lodging, as the case may be, at the scales above set forth, in lieu thereof.

If any EMPLOYER, who has not heretofore furnished meals and housing accommodations, or either, as part of compensation, shall desire to do so, and the EMPLOYER and the UNION cannot agree, the matter shall be submitted to the Imperial Chairman for decision.

## WORKING HOURS, MEAL PERIOD, OVERTIME, ETC.

11. (A) Work Week

The working hours per week on which the minimum wage is predicated shall be forty (40) hours within five (5) days of the week for captains, hosts and hostesses and all tip classifications covered by this Agreement, and thirty-five (35) hours in five (5) days of the week for all non-tip classifications covered by this Agreement.

(B) Call-In

In the event any employee who normally works a full work day is called in to work on any day, he or she shall be offered a full day of work.

-9-

**(C)    Changes in Working Hours**

The EMPLOYER shall be free to fix the daily working hours. The EMPLOYER agrees that it will give the affected employee at least five (5) calendar days prior written notice of their work schedules, including notice of a change of an employee's work schedule. In the event of a change in schedule of daily working hours, seniority will be observed insofar as compatible with efficiency. Should the UNION claim that changes in the schedules of hours result in any abuses of the rights of employees, the claim shall be subject to the grievance and arbitration procedures set forth in Section 26 hereof.

**(D)    Split Shifts**

It is mutually agreed that the custom existing as of July 1, 2001, among certain employees of EMPLOYERS of maintaining long and short watches and split shifts in certain categories of employees shall be permitted to continue, but shall not be extended. Any changes in the existing custom shall be made only by agreement between the UNION and the EMPLOYER. If they shall fail to agree on a proposed change, the same shall be submitted to the Impartial Chairman or any other dispute arising under this Agreement.

**(E)    Meal Period**

All employees shall be entitled to one (1) hour per day for meals. Time out for meals shall not be considered working time.

**(F)    Waiters and Waitresses**

Waiters and waitresses shall complete service on a guest notwithstanding the fact that the employee has reached his or her quitting time, and the first fifteen (15) minutes of such additional time shall not be deemed to be overtime.

**(G)    Overtime**

(1)    Overtime at the rate of time and one-half shall be paid for all hours worked in excess of eight (8) hours per day or forty (40) hours per week in categories where the regular work week under this Agreement is forty (40) hours per week, and for all hours worked in excess of seven (7) hours per day or thirty-five (35) hours per week in categories where the regular work week under this Agreement is thirty-five (35) hours per week.

(2)    It is agreed that employees will work a reasonable amount of overtime and on the sixth (6th) day when requested to do so at the rate of pay set forth in this Agreement provided, however, that there shall be no scheduled overtime in any job classification if there are half-off employees in that job classification in the hotel and there shall be no scheduled extra hours for room attendants, if there are room attendants laid off in the hotel until available work in the job classification in the hotel has been offered to employees laid off in that job classification, such offer to be made by reasonably available means of communication.

-10-

(3)    The UNION and EMPLOYER agree that overtime pay shall be paid for all work performed on the sixth (6th) and seventh (7th) consecutive days of work unless such overtime work is occasioned by an EMPLOYER's business needs and further provided prior written notice of same is given and written consent is obtained from the UNION which consent will not be unreasonably withheld or delayed, unless emergency circumstances prevent the EMPLOYER from giving such notice to and obtaining consent from the UNION.

In the event a dispute arises between the UNION and an EMPLOYER under the provision of this paragraph, the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairman. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(4)    Effective July 1, 2001, unless required by law, overtime shall not be paid where an employee or employees, subject to the written approval by the EMPLOYER, mutually agree in writing to change their schedule(s) or day(s) off under conditions which would otherwise result in overtime. This waiver shall also apply to any scheduling premiums or notice period under this Agreement if the change is mutually agreed upon pursuant to this provision.

(5)    If one or more employee(s) refuse(s) to agree to the change in schedule or days off, and said change is nonetheless instituted by the EMPLOYER in accordance with the scheduling provisions of this Agreement, only the employee who did not agree to the change shall be paid overtime.

(6)    No employee shall receive overtime pay unless such overtime work has been authorized previously by such employee's department or division manager.

(7)    Any employee who has heretofore been paid time and one-half after a shorter work day or shorter work week than specified under this Agreement shall continue to receive overtime pay after such shorter work day or shorter work week as heretofore.

(8)    If the UNION feels that an industry-wide condition of unemployment exists in any job classification covered by this Agreement and that an excessive amount of overtime in such job classification or, in the case of room attendants, an excessive amount of extra rooms has been scheduled in any hotel, the UNION may raise the matter as a grievance under Section 26 hereof and if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder.

## MINIMUM WAGE

12.    Each EMPLOYER shall pay not less than the minimum weekly wages for the total number of hours per week, as set forth in the attached Schedule A, except as provided in Section 6(C).

-11-

## WAGES

**13.** (A) **General**

(1) In the case of an ASSOCIATION member hotel, the minimum weekly wage rates set forth herein shall not be changed except, by agreement between the ASSOCIATION and the UNION.

(2) In the case of all other EMPLOYERS, the minimum weekly wage rates set forth in this Agreement shall not be changed except by agreement between the EMPLOYER and the UNION.

(B) **Prior Wages and Benefits**

(1) No employee shall suffer a reduction in hourly wage rate or fringe benefits previously enjoyed on account of the execution of this Agreement.

(2) The minimum wage rates set forth in this Agreement, payable by the EMPLOYER, are applicable to a forty (40) hour work week for captains, hosts/hostesses and all tip classifications and to a thirty-five (35) hour work week for all other classifications.

(3) Where a full time employee works less than his or her regular work week or an hourly basis for the number of hours or fractions thereof actually worked. However, when a full-time employee is changed to a part-time basis, such employee shall receive his or her wages in accordance with the applicable provisions of Section 8.

## WAGE INCREASES

**14.** (A) All employees in the employ of the EMPLOYER on the date of the signing of this Agreement shall receive the wage increases as set forth in Schedule 1 attached.

(B) All employees hired after the effective date of this Agreement shall receive the wage increases set forth in Schedule 1 attached which are effective subsequent to the date of the employee's hiring as follows:

(1) An employee who, during the twenty-four (24) months prior to his/her employment was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement shall receive the wage increase, as set forth in Schedule 1, for his/her job classification.

(2) The length of time which an employee shall receive seventy-five (75%) or eighty-five (85%) percent of the Schedule A minimum wage for his/her job classification shall be governed by Section 9(C) hereof.

(C) Extra meal waiters and waitresses shall receive the wage increases per meal and/or per day provided for in Schedule A.

-12-

(D) The minimum rates set forth in Schedule A-1 of the 1995 Agreement shall be increased by the wage increases provided for in Schedule 1.

(E) The minimum rates set forth in Schedule A of the 1995 Agreement shall be increased by the wage increases provided for in Schedule 1.

(F) The EMPLOYER and the UNION agree that, the increases provided for in Schedule 1 shall be applicable to all wage-related items contained in the 2001 Agreement, e.g., extra room rates, night shift differential rates, banquet rates, etc.

## EXTRA ROOMS

**15.** The EMPLOYER shall have the right to require a room attendant to do extra rooms during the regular daily hours of work and shall pay the following amount for each such extra room:

| | |
|---|---|
| Effective July 1, 2000 | $8.07 for each extra room |
| Effective July 1, 2001 | $8.39 for each extra room |
| Effective July 1, 2002 | $8.73 for each extra room |
| Effective July 1, 2003 | $9.08 for each extra room |
| Effective July 1, 2004 | $9.44 for each extra room |
| Effective July 1, 2005 | $9.82 for each extra room |

The above provisions are not intended to affect the overtime provisions set forth elsewhere in this Agreement.

## COTS

**16.** (A) Room attendants shall make up cots when assigned such work by the EMPLOYER and shall be paid the following sums for each cot made up after the room attendant's quota of rooms has been completed:

| | |
|---|---|
| Effective July 1, 2000: | $2.67 for each cot |
| Effective July 1, 2001: | $2.78 for each cot |
| Effective July 1, 2002: | $2.89 for each cot |
| Effective July 1, 2003: | $3.01 for each cot |
| Effective July 1, 2004: | $3.13 for each cot |
| Effective July 1, 2005: | $3.25 for each cot |

On any day during which a room attendant makes up cots, three (3) cots shall constitute a: room and shall be credited towards the room attendant's quota of rooms for that day.

(B) Room attendants shall clean saunas when assigned such work by the EMPLOYER. On any day during which a room attendant cleans saunas, four (4) saunas shall constitute a room and shall be credited towards the room attendant's quota of rooms for the day.

-13-

## MAJOR STRUCTURAL ALTERATIONS

17.  (A)  Mechanics and maintenance employees shall perform the work heretofore performed by mechanics and maintenance employees in the hotels.

(B)  All major structural alteration work on the premises of the EMPLOYER shall be performed by employees covered by this Agreement. Employees required to perform major structural alterations shall be paid the prevailing wages being paid to employees performing similar construction work in the City of New York.

(C)  Any dispute as to whether work constitutes mechanical maintenance work or major structural work, or as to the wages to be paid therefore, shall be determined by arbitration, as any other dispute arising under this Agreement.

(D)  The UNION shall be given at least thirty (30) days' notice by the EMPLOYER of its intention to effectuate major structural alterations. Upon receipt of said notice, the UNION shall have a right to call for a conference at the ASSOCIATION to discuss the matter. If, as a result of the conference, there is a dispute concerning the proposed major structural alteration, the matter shall be submitted to the Impartial Chairman for his decision. Pending the conference, or if the matter is submitted to the Impartial Chairman, pending his decision, the contract for such major structural alterations shall not be signed, nor shall the EMPLOYER commence said alterations.

## EMPLOYER RULES AND REGULATIONS

18.  The EMPLOYER may continue, and from time to time may change, such rules and regulations as it may deem necessary and proper for the conduct of its business; provided that the same are not inconsistent with any of the provisions of this Agreement. All such rules and regulations shall be observed by the employees. The UNION may raise as a grievance any new or changed rule or regulation under Section 26 hereof and if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder.

## DUTIES OF EXCLUDED CATEGORIES

19.  Nothing herein contained shall prevent employees in the excluded categories from performing the duties that they performed heretofore.

## RELIEF EMPLOYEES

20.  Employees may be assigned for no more than one and one-half (1-1/2) hours in any one day to relieve other employees in other positions for meal and rest periods, without additional compensation. An employee relieving other employees for more than one and one-half (1-1/2) hours in any one day shall be paid his/her regular rate of pay or the contractual wage rate (minimum wage rate plus applicable wage increases) for the classification of the employee relieved, as set forth in Schedule A, whichever is higher.

-14-

## HIRING

21.  (A)  New employees shall be hired in the following manner: A Joint UNION-HOTEL ASSOCIATION employment office shall be opened immediately for the hiring of all employees, in categories covered by this Agreement, except banquet waiters/waitresses and banquet captains, who are covered by the provisions of Section 47 hereof.

The following principles shall govern the operation of the joint employment office:

The UNION and the ASSOCIATION will jointly establish a central registration office. The ASSOCIATION and the UNION will each establish a branch office for the dispatching of job applicants. The central registration office shall be administered jointly by the ASSOCIATION and the UNION.

Any person, whether or not a member of the UNION, and whether or not previously employed in the hotel industry, seeking to obtain employment in any job category covered by this Agreement, shall fill out a registration form at the central registration office. Each registration form shall contain, among other things, the following information: name, address, occupation, personal references, special qualifications, employment history including the names of hotel EMPLOYERS and periods of employment in the hotel industry, and other such information as may be required. A copy of all registration forms and a master list of all registered applicants shall be maintained at the UNION branch and at the ASSOCIATION branch or the joint employment office.

Each EMPLOYER party to this Agreement desiring to employ a new employee in any job category covered by this Agreement in its hotel or concession, must apply for such employee to either the UNION branch or the ASSOCIATION branch of the joint employment office. The branch applied to shall select from the file of registered applicants, one or more applicants for the job opening. Preference in referring applicants and in employment shall be given to persons who have been previously employed in the hotel industry in New York City, and among such persons first preference shall be given to employees whose employment was terminated by reason of the closing of hotels covered by this Agreement and thereafter to other hotel employees who are on permanent layoff status from hotels covered by this Agreement.

Unless an applicant satisfactory to the EMPLOYER shall be referred by 4:00 P.M. of the second business day following the day when the request was made, the EMPLOYER shall be free to fill the vacancy from any source. An EMPLOYER application for an employee filed after 2:00 P.M., shall be considered as placed on the next business day. The foregoing time limitations shall not apply to emergency extra required by the EMPLOYER. In the case of an emergency extra, unless an applicant satisfactory to the EMPLOYER shall be referred within one (1) hour after the request is made, the EMPLOYER shall be free to hire such emergency extra from any source.

The expenses of the ASSOCIATION branch shall be borne by the ASSOCIATION. The expenses of the UNION branch shall be borne by the UNION. The expenses of the central registration office shall be borne equally by the UNION and the ASSOCIATION.

-15-

The records of both branches and of the central registration office shall at all times be open to the inspection of both the UNION and the ASSOCIATION, and there shall be a daily interchange of information regarding persons dispatched to jobs and any and all pertinent data.

No charge or fee whatsoever shall be requested of or charged to any registrant, job applicant or hotel.

The service of the joint employment office shall be available to all members of the ASSOCIATION, whether or not they are under contract with the UNION.

It is recognized that an EMPLOYER may fill a vacancy from among its employees, including employees in other hotels of the EMPLOYER's chain.

Any question or dispute concerning the operation of the joint employment office shall be subject to the grievance and arbitration procedure set forth in Section 26 hereof.

The UNION and the ASSOCIATION acknowledge that they have not established the Central Registration Office for the dispensing of job applicants, as provided in this section, but have been using the services of the New York State Employment Service.

If at any time during the life of this Agreement either the ASSOCIATION or the UNION requests full compliance with the provisions of this Section 21, such full compliance shall be effectuated by all parties.

Upon the request of either party hereto, the Joint Advisory Committee, consisting of three (3) members appointed by the ASSOCIATION and three (3) members appointed by the UNION, shall convene to promulgate rules for the management of the joint employment office.

(B)    Upon a finding by the Impartial Chairman that an Employer has a pattern of intentional and/or bad faith violation of the provisions of the Industry Wide Agreement with respect to the hiring of new employees, by and among other things discriminating against members of the Union, whether they are actively employed or on lay off status, who are otherwise satisfactory to the Employer, the Impartial Chairman may, in addition to ordering the termination of the employee unlawfully hired by the Employer and the hiring of the employee discriminated against by the Employer, grant such other remedy or relief as the Impartial Chairman deems appropriate, including but not limited to the assessment of one (1) week's pay for every day the Employer is found to be in violation of the Agreement, up to a maximum of five (5) weeks pay.

In the event it is found that the Union knew of the Employer's violation of the Industry Wide Agreement and intentionally failed or delayed in acting on same, the Impartial Chairman shall also assess against the Union, a like penalty.

All monies assessed for a violation of this Agreement shall be paid to the Employee Benefits Funds for distribution in proportionate amounts to the various funds.

-16-

The parties agree, notwithstanding the provisions of this Subsection (B) seemingly to the contrary, that the Union may, in its sole discretion, upon good cause shown by the Hotel Association, agree in writing to waive, in full or in part, the provisions of this Subsection (B) and the provisions of Sections 6(C) and (D) of the Industry Wide Agreement with respect to the wages and benefits of new employees including contributions made to the industry wide funds on behalf of such new employees having prior work experience in the hotel industry.

## 22. MANAGEMENT RIGHTS

(A)    The EMPLOYER shall have the right to direct and control its employees.

The EMPLOYER shall have the right to layoff, promote, or transfer any employee. Promotions shall not be subject to contest or review. The UNION shall, by representatives designated by it, have the right to confer with the EMPLOYER on behalf of any laid-off or transferred employee. If the UNION claims that a layoff or transfer results in any abuse of the rights of employees the grievance shall be subject to the grievance and arbitration provisions of Section 26 of this Agreement.

(B)    The EMPLOYER shall have the right to establish combination jobs within the classifications set forth in Schedule A of this Agreement. Upon the implementation of such job changes, the employee(s) affected shall be paid the rate of the higher rated job as set forth in Schedule A, except that in addition to the rate of the higher rated job, front office, food preparation and engineering and maintenance department employees shall receive ten ($10.00) dollars per week. No employee currently employed shall be laid off as a result of this job change.

## 23. SENIORITY

(A)    Layoff - General

In the event of a layoff in any department, departmental seniority will be observed insofar as compatible with efficiency. In general, the last person hired in a job classification within a department will be the first laid off in such classification and the employee with the greatest seniority in the job classification in the department will be the last laid off in such job classification. The EMPLOYER shall give the UNION not less than five (5) calendar days prior written notice of layoff of an employee. Except as otherwise provided in this Agreement, casual employees do not have seniority rights.

(B)    Layoff - Recall

(i)    The EMPLOYER shall keep a list of names of all employees laid off during the term of this Agreement and furnish the UNION with a copy thereof, and in the event of rehiring, it shall give preference to the persons on said list in order of seniority, provided that it shall not be required to rehire any person from said list unless such person, before being laid off, performed identical tasks in the same department from which he or she was laid off.

-17-

(2)   In the case of an employee who is recalled to work from a layoff by the UNION at least three (3) calendar days prior to effectuating such layoff, that the requirement to give five (5) days notice of change of schedule as provided in Section 11 (C) shall not apply to recalls covered by this paragraph (B) (2).

EMPLOYER may not layoff recall and then again layoff an employee more than three (3) times in any one calendar month and further, the EMPLOYER shall, during any such recall, pay premium pay to the affected employee in accordance with the provisions of Section 8(A).

(4)   An employee absent from work because of sickness or injury for not more than twenty-six (26) weeks shall be returned to his/her former job with all job rights and seniority, provided the employee is physically capable of performing the duties of the job. The employee shall give the EMPLOYER one (1) week's notice of intention to return to work.

(5)   An employee absent from work because of sickness or injury for more than twenty-six (26) weeks but not more than one hundred and four (104) weeks shall be placed upon a rehiring list and shall be offered the first available job opening in his/her job classification, provided that at the time the job opening becomes available the employee is physically capable of performing the duties of the job. Upon rehiring the employee shall be restored to all his/her job rights and seniority. If not rehired by the expiration of the one hundred and four (104) week period, the employee shall lose his/her seniority.

In either case the EMPLOYER may require satisfactory proof of sickness or injury and recovery. If the employee presents a statement by the Health Center or another appropriate health care professional that the employee is able to return to work and if the EMPLOYER challenges said certification, the dispute may be submitted to an impartial physician designated by the EMPLOYER, and the UNION, or if they are unable to agree, designated by the Impartial Chairman, and the UNION and EMPLOYER agree to be bound by the decision of said physician.

(C)   Layoff - Delegates and Assistant Delegates

(1)   In the case of ASSOCIATION Labor Relations Group member EMPLOYERS: if a hotel intends to lay off a delegate or assistant delegate the hotel shall, prior to effectuating such layoff, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the hotel shall consult the office of the ASSOCIATION and an immediate conference with the UNION will consult the office of the ASSOCIATION to discuss the matter. The conference held at the ASSOCIATION will constitute the conference provided for in this section. Pending the result of the conference at the office of the ASSOCIATION and until a hearing is held at the Office of the Impartial Chairman, if such hearing is necessary, the delegate or assistant delegate shall remain on the job. In accordance with existing practices, accredited UNION delegates shall have top seniority in their job classifications.

-18-

(2)   In the case of all other EMPLOYERS: if an EMPLOYER intends to lay off a delegate or assistant delegate the EMPLOYER shall, prior to effectuating such layoff, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the EMPLOYER shall immediately notify the office of the Impartial Chairman and request a hearing. Pending the hearing before the Impartial Chairman, the delegate or assistant delegate shall remain on the job. In accordance with existing practices, accredited UNION delegates shall have top seniority in their job classifications.

(D)   Notification of Delegates

The UNION will furnish a written list of delegates to each hotel upon written request by the hotel, and the Union will notify the hotel in writing of any change in the list of delegates within ten (10) days of the making of such change.

UNION ACTIVITY

24.   No employee shall be discharged or laid off because of UNION activities. In the event of a claim being made that an employee has been discharged or laid off because of UNION activities, such claim must be filed with the Labor Manager within one (1) week and disposed of by him within three (3) days thereafter. If the controversy cannot be satisfactorily adjusted between the UNION and the Labor Manager, the same shall be promptly referred to the Impartial Chairman, who shall render his decision within a reasonable time after receiving the claim.

In cases involving non-ASSOCIATION EMPLOYERS, all such claims which cannot be satisfactorily adjusted between the EMPLOYER and an officer or business agent of the UNION, shall be promptly referred to the Impartial Chairman for adjustment.

NO DISCRIMINATION

25.   The opportunity to give and obtain employment and maintain employment without discrimination because of race, color, creed, sex, age, national origin, religion, disability, sexual orientation, union activity or any factor illegal under federal, state or city law is hereby recognized by the parties to this Agreement.

COMPLAINTS, GRIEVANCES AND ARBITRATION

26.   All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent impartial to be known as the Impartial Chairman, and his/her decision shall be final and binding upon the parties hereto. Any such complaint, dispute or grievance involving an EMPLOYER member of the ASSOCIATION shall in the first instance, be submitted to the Labor Manager who will be appointed and employed by the ASSOCIATION, to consider and adjust with a duly accredited representative of the UNION, for their joint consideration and adjustment if they agree, such decision shall be binding on the parties hereto. Should the matter not be resolved by the Labor

-19-

Manager and the representative of the UNION, it shall then be referred to the Imperial Chairman, as aforesaid.

## Non-ASSOCIATION

In the event of a willful default by either party in appearing before the Imperial Chairman, after due written notice shall have been given to the said party, the Imperial Chairman is hereby authorized to render a decision upon the testimony of the party appearing.

member hotel and concessionaire EMPLOYER complaints, disputes, or grievances are to be taken directly to the Imperial Chairman.

If any EMPLOYER experiences an unanticipated emergency which justifies relief from the provisions of Section 45[B], the matter—if unresolved between the EMPLOYER and the UNION—may be submitted to the Imperial Chairman who may grant such relief as he/she deems proper. If relief is granted, the parties agree to comply with the provisions for the employee involved as he/she deems appropriate. The Imperial Chairman may not grant relief predicated solely upon economic factors.

The parties consent that any papers, notices or process, including subpoenas, necessary or appropriate to initiate or continue an arbitration hereunder or to enforce or confirm an award, may be served by ordinary mail addressed to the last known address of the parties or their attorneys, or when authorized by the Imperial Chairman, by telegram, facsimile or telephone.

The parties consent that all arbitration hearings shall be heard at the office of the Imperial Chairman located at 321 West 44th Street in the City of New York, or at such other place as the Imperial Chairman may designate.

The Imperial Chairman may call such arbitration hearing on giving five (5) days' notice to all of the interested parties. The Imperial Chairman, however, may call a hearing on shorter notice if he/she deems it appropriate.

The parties hereby expressly waive the requirements regarding the Arbitrator's oath and the manner and time for the service of notice of hearing contained in the Civil Practice Law and Rules of the State of New York and agree and consent that the Imperial Chairman may proceed with the hearing.

The compensation of the Imperial Chairman and his/her proper and necessary expenses shall be shared and paid equally by the ASSOCIATION and the UNION.

Should the Imperial Chairman resign, refuse to act, or be incapable of acting, or should the office become vacant for any reason, the ASSOCIATION and the UNION shall immediately and within five (5) days after the occurrence of such vacancy designate another person to act as such Imperial Chairman. If they fail to agree, the United States District Court, Southern District of New York shall, upon application of either party, on due notice to the other, similarly make such appointment.

The decision rendered by the Imperial Chairman shall have the effect of a judgment entered upon, an award made, as provided by the Arbitration Laws of the State of New York,

-20-

entitling the entry of a judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by such decision.

## 27.   (A)   General

### DISCHARGES

The EMPLOYER shall have the right to discharge any employee. The UNION may question whether an employee's discharge was for just cause. In the case of ASSOCIATION Labor Relations Group member EMPLOYERS, the UNION shall submit the matter to the Labor Relations Group member EMPLOYERS, the UNION shall submit the matter to the Labor Manager within ten (10) days after the discharge and should the matter not be adjusted by the Labor Manager under the procedure set forth in Section 26 hereof, the UNION may submit the matter to the Imperial Chairman within ten (10) days after the conference before the Labor Manager for decision as any other dispute under this Agreement. In the case of non-ASSOCIATION Labor Relations Group member EMPLOYERS, the UNION shall submit the matter directly to the Imperial Chairman. The Imperial Chairman may uphold the discharge or reinstate the employee with or without back pay.

(B)   Discharges/Suspensions: Delegates and Assistant Delegates

(1)   In the case of ASSOCIATION Labor Relations Group member EMPLOYERS: If a hotel intends to suspend or discharge a delegate or assistant delegate the hotel shall, prior to effectuating such suspension or discharge, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the hotel shall consult the office of the ASSOCIATION and an immediate conference with the UNION will be arranged at the office of the ASSOCIATION to discuss the matter. The conference held at the Association will constitute the conference provided for in this section. Pending the result of the conference at the office of the ASSOCIATION and until a hearing is held at the Office of the Imperial Chairman, if such hearing is necessary, the delegate or assistant delegate shall remain on the job in all cases except theft, physical fighting or on the job drug/alcohol abuse, or such related charges. The parties agree to request that said hearing be held within 48 hours of the conference at the Hotel Association.

(2)   In the case of all other EMPLOYERS: If an EMPLOYER intends to suspend or discharge a delegate or assistant delegate the EMPLOYER shall, prior to effectuating such suspension or discharge, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the EMPLOYER shall immediately notify the office of the Imperial Chairman and request a hearing. The delegate or assistant delegate shall remain on the job pending the hearing at the Office of the Imperial Chairman.

-21-

**VACATIONS**

28.

(A) **Entitlement-General**

All employees covered by this Agreement who shall have been employed continuously for the period specified below shall receive the following annual vacations with pay:

One (1) year but less than two (2) years - One (1) week
Two (2) years but less than five (5) years - Two (2) weeks
Five (5) years but less than seven (7) years - Twelve (12) days
Seven (7) years but less than fifteen (15) years - Three (3) weeks
Fifteen (15) years or more - Four (4) weeks

Tip employees shall receive the foregoing vacations and their vacation pay shall be twice their regular weekly rate of pay including night shift differential and premium pay, if any.

Banquet employees shall receive their vacations as set forth in Schedule A-1 annexed hereto.

Checkroom employees shall receive their vacations as set forth in Schedule A-2 annexed hereto.

Steady extra banquet bartenders shall receive their vacations as set forth in Schedule A-3 annexed hereto.

(B) **Proration**

(1) Permanently, regularly scheduled part-time employees shall receive their vacations prorated in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Section 8(B) of this Agreement.

(2) In the event an employee is absent due to layoff, illness or injury, closing or extended absence for a period aggregating more than sixty (60) days in any employment year or a longer period as may be granted in writing by the EMPLOYER, the employee's vacation pay shall be pro-rated in proportion to the number of weeks actually worked during said employment year.

(3) Except as provided in the preceding paragraph of this section, an employee who has been employed for one (1) year or more whose employment terminates within one hundred eighty (180) days prior to the end of his/her employment year shall receive vacation pay pro-rated in proportion to the number of weeks the employee actually worked during said year. An employee employed for less than one (1) year shall receive vacation pay pro-rated in proportion to the number of weeks actually worked since his/her date of employment, provided his/her employment terminated within one hundred twenty (120) days prior to the end of his/her employment year.

-22-

Subject to paragraph (B)(2) of this section, if an employee's employment is terminated by reason of the closing of a hotel or concessionaire, the employee shall receive vacation pay pro-rated in proportion to the number of weeks the employee actually worked since the beginning of his/her current employment year.

(4) After service breaks aggregating more than twenty-six (26) weeks that employment year, accrual of vacation employment pursuant to Section 28(A) shall toll.

(C) **Payment**

Vacations shall be given as soon as practical after the employee's completion of the required continuous employment. If deductions for meals were made during the year from the wages of the employee, the vacation pay shall be the full wages without meal deductions, providing the employee does not take meals at the hotel during the vacation period. This vacation pay shall be given to the employee at the end of the week preceding the vacation week.

(D) **Scheduling**

The EMPLOYER shall fix the time of period when such vacation may be taken and it shall give the UNION at least four (4) weeks' notice of the vacation schedule.

(E) **Termination of Employment**

An employee who has completed the required period of employment shall, in the event his/her employment is terminated prior to receiving his/her vacation, be entitled to receive his/her vacation pay.

**HOLIDAYS**

29.

(A) **Entitlement - General**

The EMPLOYER shall grant to all non-probationary employees covered by this Agreement the holidays listed below with pay.

New Year's Day
Martin Luther King Jr.'s Birthday
Washington's Birthday
Memorial Day
July Fourth
Labor Day
Thanksgiving Day
December 24th
Christmas Day

The EMPLOYER shall grant to all employees covered by this Agreement the personal days listed below with pay:

Employee's Birthday
Employee's Anniversary Date of Employment
One (1) personal day in each contract year to be scheduled by arrangement between the employee and the EMPLOYER not less than two (2) weeks prior to said day off.

-23-

Permanent, regularly-scheduled part-time employees shall receive holidays and personal days, pro-rated in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Section 8(B) of this Agreement.

(B) Layoff

When an employee is laid off because of lack of work on any of the above enumerated holidays, he/she shall be paid for such holiday, provided the holiday occurs within twenty (20) working days following the beginning of such layoff, and also provided the laid-off employee does not receive pay for the holiday from another hotel EMPLOYER.

(C) Sickness

When an employee is absent because of sickness or injury on any of the above holidays, he/she shall be paid for such holiday provided he/she has not been replaced by another employee who also receives pay for such holiday. The EMPLOYER may require satisfactory proof of sickness.

(D) Payment

(i) Should it be necessary for an employee in a non-tip classification to work on any of the above holidays, he/she shall receive regular straight-time pay, including night shift differential and regular premium overtime pay, if any, in addition to holiday pay. Employee shall be notified five (5) days in advance as to whether it will be necessary for them to work on the holiday.

(ii) An employee in a tip classification (except for banquet waiters and waitresses and banquet bartenders who shall receive holiday pay as provided in Schedule A-1 or A-3) shall receive twice their regular rate of pay as holiday pay including night shift differential and regular premium overtime pay, if any. Notwithstanding the foregoing, should said tip employee work on the holiday, he or she shall receive an additional one-half (½) day's pay for a total of two and one-half (2-1/2) days' pay.

(iii) All employees shall receive not less than a normal week's pay in any week during which a holiday falls.

(iv) If the EMPLOYER requires an employee to work on a holiday, the EMPLOYER may not require the employee to take another day off in lieu of the holiday. If a holiday falls on an employee's regular day off, the EMPLOYER may give the employee another day off in lieu of the holiday, which day off shall be the employee's regular work day immediately following the holiday. Should a holiday fall during an employee's vacation, the EMPLOYER may grant the employee an additional day's vacation in lieu thereof which shall be the day immediately before or the work day immediately following the vacation.

-24-

provisions of Section 29(E)(1) above, that if a Hotel (i) requires an employee to work on a holiday or (ii) if a holiday falls on an employee's regular day off or (iii) if a holiday falls during an employee's vacation, an employee may voluntarily take a day off, with pay, in lieu of receiving holiday pay which day off with pay shall be scheduled within thirty (30) days before or after the holiday, provided prior written notice together with written consent by the employee is given to the UNION, which consent will not be unreasonably withheld or delayed.

In the event a dispute arises between the UNION and an EMPLOYER under the provision of this paragraph (2), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairman. In no event, however, shall such expedited arbitration cause a delay in the foregoing.

(3) Employees in departments which are closed for the summer shall be paid for any of the above holidays which occur during such closing providing the employee returns to work when recalled to work.

PERSONAL DAYS

30. (A) Entitlement - New Hires

(1) In order to be eligible for his/her paid personal days, an employee not previously employed in the hotel industry must be in the employ of the hotel for not less than sixty (60) working days.

(2) An employee whose birthday falls within his first fifteen (15) days of his/her employment, shall receive his/her birthday personal day between the thirty-first (31st) day of employment and the ninetieth (90th) day of employment. In the event an employee's birthday falls subsequent to the first fifteen (15) days of his/her employment, he/she shall receive same on the day it falls.

(3) An employee who is severed from his/her employment prior to completion of the ninetieth (90th) day of employment, but whose birthday occurred prior to his/her severance from employment, shall receive pay for his/her birthday personal day provided the birthday occurred after not less than fifteen (15) days of employment.

(B) Entitlement - Regular Full-Time and Regular Part-Time Employees

(1) Subject to the provisions set forth herein, all regular full-time employees of the EMPLOYER shall be eligible for three (3) personal days per year. Permanently regularly-scheduled part-time employees shall receive personal days pro rata in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Section 8(B) of this Agreement.

(2) The personal days to which employees are entitled shall be compensated at the rate of one (1) day's pay at straight time except for tip employees who shall be compensated at twice the regular daily rate of pay at straight time.

-25-

(3) If a non-tip employee is required by the EMPLOYER to work on any of his/her personal days, he/she shall receive an additional day's pay at regular straight time pay including night shift differential and regular premium overtime pay, if any. In the event a tip employee works on his/her personal day, said employee shall receive one and one-half (1-1/2) days' pay at regular straight time pay, including night shift differential and regular premium overtime pay, if any, in addition to his/her normal daily wages.

(C) Banquet Personnel

(1) Banquet waiters/waitresses, banquet captains and banquet bartenders on a hotel steady rotation list, and checkroom and washroom attendants, shall receive personal days based upon the same eligibility applicable to regular employees. The amount of pay for their personal days (i) for the said banquet waiters/waitresses and banquet captains shall be the amount payable to an a-la-carte waiter or an a-la-carte captain under the wage schedule set forth in Schedule A, (ii) for the said checkroom and washroom attendants shall be the amount payable under the wage schedule set forth in Schedule A-2.

(2) Should it be necessary for banquet waiters/waitresses to work on any of the personal days, pay for said personal days shall be at one and one-half (1½) times the amount payable to a-la-carte waiters/waitresses under the wage schedule set forth in Schedule A, in addition to the wages paid for each banquet function or functions.

(3) Should it be necessary for banquet captains or banquet bartenders to work on any of the personal days, pay for said personal days shall be at the rate of one (1) day's pay for a-la-carte captains in the case of banquet captains and for service bartenders in the case of banquet bartenders, in addition to the wages paid for each banquet function or functions.

(4) In the event a personal day falls within the summer months during which such banquet and/or checkroom employees are not working they shall nonetheless receive such personal days, or payment in lieu thereof, in accordance with arrangements to be agreed upon between the Hotel and the said employee.

(D) General

The following rules shall be applicable to the three (3) personal days:

(1) In the event an EMPLOYER has a group of employees whose anniversary date with the EMPLOYER is the same, said employees shall enjoy such personal day off thirty (30) calendar days after their birthday.

(2) If an employee's authorized personal days off falls on either his/her regular day off, during vacation, or on a holiday, the EMPLOYER shall have the option of granting another day off with pay by arrangement, or paying said employee for the personal day.

(3) If an employee's authorized personal day of falls while he/she is absent due to sickness or injury on the job, said employee shall be paid for such personal day

upon return to regular employment or shall receive another day off with pay by arrangement with the EMPLOYER.

(4) Notwithstanding the above, nothing contained herein shall prevent the employee from applying all or a portion of his/her authorized personal days off to other than the reasons specified as a result of an unusual sudden occurrence.

JURY DUTY

31. All employees who have been employed for not less than one (1) consecutive year and who are summoned to serve Jury Duty will be paid for every second year of such service by the EMPLOYER the difference between their per diem jury pay and their regular rate of pay provided that such payment shall be made for a period of no more than two (2) weeks (or such shorter period as the employee shall be on Jury Duty). To receive pay for Jury Duty, the employee must present to his/her EMPLOYER written evidence of his/her call to Jury service together with a copy of receipt for payment for his/her Jury duty. Tipping classified employees shall be paid the difference between their per diem Jury pay and twice their regular rate of pay.

BEREAVEMENT PAY

32. (A) Entitlement

(1) All employees who have been employed for not less than one (1) continuous year shall be granted bereavement pay in the event of a death in his/her immediate family.

(2) The "immediate family" is defined as the employee's father, mother, sister, brother, spouse or children.

(B) Payment and Calculation

(1) Bereavement pay for the death of the employee's immediate family, (father, mother, sister, brother, spouse and children) shall be paid for the day before, the day of, and the day following the funeral providing each of those days fall on days the employee was scheduled to work. In the event any of these three (3) days fall on a day when the employee was not scheduled to work, the employee shall receive pay for those days on which he or she was scheduled to work. No employee, however, shall receive bereavement pay more than once during any twelve (12) month period within the term of this Agreement.

(2) The bereavement pay off to which employees are entitled shall be compensated at the rate of one (1) day's pay at straight time except for tip classification employees who shall be compensated at twice the regular daily rate of pay at straight time including, for both non-tip and tip employees, night shift differential and regular premium overtime pay, if any.

same from the EMPLOYER in advance of taking same. At its sole discretion, the EMPLOYER may require evidence of death and kinship.

(b) No bereavement pay will be granted unless the employee requests

33. (A) The EMPLOYER agrees to contribute sums of money equal to stated percentages of the payroll to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund, all as provided herein, in Section 6(D) and Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference. Should government or other funds be appropriated on behalf of the dental program hereunder, the EMPLOYER's contribution shall be reduced accordingly.

## HEALTH BENEFITS FUND

(B) The EMPLOYER and the Union acknowledge that, effective January 1, 1999, the New York Hotel Trades Council and Hotel Association of New York City, Inc. Insurance Fund, Union Family Medical Fund and Hotel Association of New York City, Inc. Family Medical, Insurance and Dental Fund were merged to form the "New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund". The EMPLOYER and Union agree that the Health Benefits Fund is the successor to the Union Family Medical, Insurance and Dental Funds and they also agree that the obligations of any EMPLOYER owed to the Union Family Medical, Insurance and Dental Funds are merged into and are henceforth owed to the Health Benefits Fund.

## 401(k) PLAN

34. Effective July 1, 2001, the parties hereto agree that a non-EMPLOYER contributory 401(k) Plan, known as the New York Hotel Trades Council and Hotel Association of New York City, Inc. 401(k) Savings Plan and Trust, will be established in accordance with applicable law for the benefit of employees covered by this Agreement, all as provided herein and in Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference. Employee contributions into said 401(k) Plan shall be made by employees on a voluntary basis. Any and all costs attendant to the establishment, implementation and administration of said 401(k) Plan, other than cost of deducting and withholding from employees' wages and transmitting same to the Plan, shall be paid out of the employee elective deferral contributions.

## PENSION FUND

35. The EMPLOYER agrees to contribute to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, all as provided herein, in Section 6(D) and Schedule B annexed hereto, the terms and provisions of Schedule B being specifically incorporated herein by reference.

## TRAINING AND SCHOLARSHIP FUND

36. The ASSOCIATION and the UNION have established a program to train employees for promotion and advancement. Said program is known as and operated by the New

York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund established by an Agreement and Declaration of Trust which provides, among other things, for equal representation upon the Board of Trustees of the Trust. Fund of ASSOCIATION and UNION representatives. The Impartial Chairman designated under this Agreement shall act as Impartial Chairman of said Trust Fund.

The EMPLOYER agrees to contribute to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Training and Scholarship Fund, all as provided herein, in Section 6(D) and in Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference.

No new training programs, other than those organized by the Trustees of the Fund, shall be instituted.

Should government or other funds be appropriated on behalf of the training program hereunder, the EMPLOYER's contribution shall be reduced accordingly.

The parties agree to jointly study the Industry Training Program ("ITP") in order to meet the EMPLOYER's concerns that the program(s) be reviewed to (1) more accurately meet the employment needs of hotels, (2) provide training in skills that employees will need to fulfill hotel employment requirements and (3) that the ITP's administrative offices, programs and facilities be combined with the Joint Employment Office in order to effectuate this position, and to more closely align the purposes of ITP's benefit programs with the purpose of the Joint Employment Office to better service EMPLOYERs and their employees and to effectuate the UNION's request that graduates of the ITP be granted preferential hiring and promotion opportunities on an industry-wide basis.

## LEGAL FUND

37. The EMPLOYER agrees to contribute to the jointly trusted New York Hotel Trades Council and Hotel Association of New York City, Inc. Pre-Paid Legal Services Fund, all as provided herein, in Section 6(D) and Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference.

## STRIKES AND LOCKOUTS

38. Both the UNION and the EMPLOYER recognize the service nature of the hotel business and the duty of the hotel operator to render continuous and hospitable service to the public in the way of lodging, food and other necessary hotel accommodation. Therefore, the UNION agrees that it will not call, engage in, participate in, or sanction any strike, sympathy strike, stoppage of work, picketing of the hotel, sit-down, sit-in, boycott, refusal to handle merchandise, or any other interference with the conduct of the EMPLOYER's business, for any reason whatsoever, nor will it interfere with any guest or tenant at the hotel, while holds it is a guest or tenant occupying a room or space, who sells or exhibits non-UNION-made merchandise or employs non-UNION help. The EMPLOYER agrees that it shall not lock out its employees or any part of its employees.

# EXHIBIT E

2 of 4

The UNION and the employees agree that they will not, at any time, either directly or indirectly, interfere with, or prevent, the EMPLOYER from purchasing merchandise or any service requirements, which, it may desire from any source whatsoever because of the employment by the said source of non-members of a union or non-union workers, and the UNION and the employees further agree that they will not refuse to handle, sell, deliver or work on any such merchandise which may be so purchased.

The UNION and the employees further agree that they will not call, participate in or sanction any sympathy strike or the employees because the EMPLOYERS purchase any merchandise manufactured by or used by any service requirements supplied by non-members of a union or by EMPLOYERS of a union or of non-union workers because it has such merchandise manufactured for it by non-members of a union or workers or employees of non-union workers. Such a strike shall be in violation of this Agreement.

The UNION and the employees further agree that they will not call upon the EMPLOYER to participate or assist in the enforcement of any public or silent boycott against any product sold or offered for sale, or used by the EMPLOYER.

Any kind of act shall be a violation of this Agreement, and the same, including any and all disputes in reference thereto or with respect to any of the foregoing provisions, shall be submitted to the Impartial Chairman at any other dispute under this Agreement.

During the term of this Agreement there shall be no lockout, strike or stoppage of any kind pending the determination of any complaint or grievance and for a period of ten (10) days thereafter, and then only for the refusal of either party to abide by such determination.

### CONTRACT WITH NON-MEMBER GROUP HOTELS

39.    The UNION obligates itself to enter into no contract whereby any person, firm or corporation operating a hotel in the City of New York shall receive any benefit or aid not accorded to the HANYC Bargaining Group EMPLOYERS pursuant to the terms of this Agreement.

The UNION agrees to insert a clause in all of its Agreements with hotel and concessionaire EMPLOYERS who are not HANYC Bargaining Group members or hotel and concessionaire EMPLOYERS which cease to be HANYC Bargaining Group members to the effect that such EMPLOYERS shall submit to the plan of adjustment and arbitration as provided for. Not later than two weeks after the effective date of this Agreement, all non labor relations member hotel and concessionaire EMPLOYERS shall deposit with the Impartial Chairman the following sums of money as security for the EMPLOYERS' payment of the assessment of the Office of the Impartial Chairman:

In the case of a hotel EMPLOYER with less than three hundred (300) rooms - the sum of $1,000.

---

In the case of a hotel EMPLOYER with three hundred (300) or more but less than nine hundred (900) rooms - the sum of $1,350.

In the case of a hotel EMPLOYER with nine hundred (900) or more rooms but less than one thousand (1,000) rooms - the sum of $2,000.

In the case of a hotel EMPLOYER with one thousand (1,000) or more rooms - the sum of $2,500.

The Impartial Chairman shall assess each non labor relations member, hotel of the HANYC and concessionaire, EMPLOYER on each occasion said EMPLOYER is required to appear for a hearing, whether or not said hearing is held, one-half of its deposit.

In the event a non labor relations member, hotel of the HANYC or concessionaire EMPLOYER fails to pay the assessment levied by the Impartial Chairman to the subsidiary as herein above set forth, the monies due the arbitration fund shall be deducted from the monies deposited with the Impartial Chairman as aforesaid and the said non-labor relations member hotel of the HANYC or concessionaire EMPLOYER shall be required to replace forthwith any monies so deducted. The Impartial Chairman may institute a lawsuit to recover any monies due defendant.

Contracts with such other EMPLOYERS, who are not HANYC Hotels, shall not run longer than the period of this Agreement.

## STATUS QUO AGREEMENT OF MARCH 23, 1938

40.    (A)    Any hotel for whom employees the UNION has been designated as the exclusive collective bargaining agent, and which does not become a party to this Agreement by signing the same, shall nevertheless be bound by any of the rights, benefits, or privileges of this Agreement.

(B)    Irrespective of any increases in wages made prior to the execution of this Agreement by an EMPLOYER who has not been previously in an agreement relationship with the UNION with respect to any appropriate collective bargaining unit, such EMPLOYER shall nevertheless be required to increase the wages of all employees by the amount of increases set forth in Schedule 1 for the respective job classifications (but such increase, shall not be retroactive), in order to obtain the benefits and privileges of this Agreement, for such collective bargaining unit.

## MODIFICATION OF THIS AGREEMENT

41.    No EMPLOYER and no worker or group of workers shall have the right to modify or waive any provision of this Agreement.

-30-                                                                                            -31-

**42. VISITATION CLAUSE**

Authorized representatives of the UNION shall have admission to the establishments of the EMPLOYERS but such representatives shall make arrangements with the management as to time of making such visits.

It is further agreed that conferences held between UNION representatives and the employees shall not be held during the employees' working time, and if held on the premises, said conference must be within a place arranged for with the management.

**43. NOTICES**

The EMPLOYER shall permit the UNION to post announcements of meetings and functions on bulletin boards to be designated and provided by the EMPLOYER and placed in convenient positions in the hotel to be designated and provided by the EMPLOYER.

**44. COST OF LIVING**

Notwithstanding any other provision of this Agreement, in the event the aggregate increases paid by the EMPLOYER for the period ending June 30, 2005, is exceeded by the cost of living (based on New York City Consumer Price Index) for the period ending June 30, 2005, the UNION shall have the right to request that a joint study committee be formed to examine and discuss the impact of said increase on the employees and the need, if any, for a wage review. In the event the parties fail to agree on what action to take, either party may submit the matter to the Impartial Chairman who shall be empowered to make a final decision with regard to said matter.

**45. AREA STANDARDS AND WORK PRESERVATION**

(A) Any contract, lease or agreement entered into between a hotel and a concessionaire which employs employees in job classifications covered by this Agreement must contain a provision that the concessionaire agrees that the persons employed in the job classifications covered by this Agreement will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health, dental, welfare, legal, training and scholarship and/or other economic benefits required by this Agreement, legal, training and compliance with the foregoing, or lessee further agrees to submit any question concerning determination. Any party affected may institute such arbitration.

(B) All work performed on the EMPLOYER's premises by employees covered by this Agreement and all products produced on the EMPLOYER's premises by employees covered by this Agreement and all products effective date of this Agreement shall not be performed or provided by this Agreement as of the products and/or work presently produced and performed on its premises may arrange to have persons employed in job classifications covered by this Agreement provided that such persons

-32-

work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, training and scholarship, and/or any other economic benefits required by this Agreement or the EMPLOYER or their equivalent and further provided that the employment of those employed by the EMPLOYER or group of EMPLOYERS at the time of the arrangement shall not be adversely affected thereby.

(C) With regard to any contract, lease or agreement, entered into on or after May 1, 1995, between an EMPLOYER and a Concessionaire, the EMPLOYER and Concessionaire will be considered a joint EMPLOYER for the purposes of this Agreement. The EMPLOYER shall at all times hold and exercise full control of the terms and conditions of employment of employees and the schedule of hours, wages and economic benefits including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal and training and/or any other economic benefits required by this Agreement. The EMPLOYER's liability shall be limited as provided for in Section 46 of this Agreement. The Employees of the joint EMPLOYER shall be members of the bargaining unit, as set forth in Section 2 of this Agreement.

**FURNISHING SECURITY**

46. In order to insure the faithful performance of the obligations contained in this Agreement every concessionaire shall be required to furnish security in the form of cash or bond in the amount of three (3) months' wages prior to entering into its operation, or at any time thereafter, upon demand by the UNION or hotel. Failure to demand security shall not be deemed to be a waiver of a concessionaire's obligations hereunder.

The cash or bond shall be deposited with the Impartial Chairman. In the event the Impartial Chairman finds that a default has occurred in the payment of wages or economic benefits provided in this Agreement, including vacation, holiday, premiums, overtime, insurance, pension, medical, training and scholarship, legal, dental benefits, severance pay, and/or any other economic benefits required by this Agreement or UNION dues, fees or assessments, he shall order that the cash or bond be restored to its original amount.

In the event a concessionaire who is required to post cash or bond hereunder fails to do so, the hotel shall be responsible for any defaults.

At the termination of any contract, concession or lease the Impartial Chairman shall return the cash or bond, upon being satisfied that there are no unpaid wages or economic benefits provided in this Agreement, including vacation, holiday, premiums, overtime, economic benefits required by this Agreement or UNION dues, fees or assessments.

-33-

The demotion of the bond shall be subject to whole approval of the ASSOCIATION and the UNION will, in the class of a non-ASSOCIATION hotel, the hotel and the UNION, and if they fail to agree, the dispute of the bond shall be determined by the impartial Chairman.

## BANQUET DEPARTMENT

47. (A) The EMPLOYER shall furnish the UNION with a list of banquet servers now employed by, or on, the UNION at the time of such employment, such servers as are not members of the UNION at the time of the execution of this Agreement by the EMPLOYER shall become apprentices of the UNION within thirty (30) days from the execution of this Agreement by the EMPLOYER, and the UNION shall accept such banquet servers as members upon the same terms and conditions as other members. Banquet servers other than those now employed or on the EMPLOYER's steady A and B lists, shall be procured as set forth below.

The UNION agrees that all individuals who register with it as applicants for jobs as banquet servers shall be referred to jobs on a non-discriminatory basis and selection of applicants shall not be based on, or in any way affected by, UNION membership, the UNION's by-laws, rules or regulations, constitutional provisions, or any other aspect or obligation of UNION membership, policies or requirements.

Notice of the provisions of this Section and the functioning of job referral and hiring arrangements shall be posted on bulletin boards in hotels and in the UNION where applicants apply for jobs.

The classification of meals, hours, wages and working conditions of banquet servers and banquet captains are contained in Schedule A-1 annexed hereto and made a part of this Agreement.

Each hotel shall establish a "B" list, on an individual hotel basis, provided that said "B" list shall not exceed sixty percent (60%) of the hotel's "A" list.

(B)    Extra Banquet Work

(1)    Protection of rights of current roll-call employees

(a)    All persons registered with roll-call on or before July 1, 2001 ("current roll-call employees") shall continue in such status, subject to annual re-registration, and shall continue to enjoy the same right to be offered extra banquet work.

(b)    In order to provide current roll-call employees with greater opportunity to obtain extra banquet work, as of July 1, 2001, the roll-call list shall be "frozen" and no other person will be added to the roll-call list.

(2)    Banquet job opportunities for non-banquet personnel

-34-

(a)    In order to provide equal employment opportunity for advancement to all hotel employees working in the industry, the EMPLOYER shall be permitted to establish a banquet C-list.

(b)    The banquet C-list shall consist only of employees covered by this Agreement and working for the EMPLOYER in job classifications (other than banquet servers) who desire to work as an extra banquet servers.

(c)    The number of C-list servers shall not exceed one hundred percent (100%) of the EMPLOYER's B-list. Effective July 1, 2004, the number of C-list servers shall not exceed one hundred and twenty five percent (125%) of the EMPLOYER'S B-list. In the event the number of C-list servers is insufficient, the EMPLOYER shall notify the UNION and the parties shall meet to discuss an increase. In order to seek an increase of the C-list, the EMPLOYER must have a B-list which is 60% of its A-list.

(d)    In the event, after the EMPLOYER's utilization of its A-list, B-list and roll-call referred servers, there is not a sufficient number of servers to staff a banquet function, all remaining banquet server work for the function shall be staffed from the EMPLOYER's C-list. Provided the Employer has fully staffed A, B, and C lists, if the Employer exhausts the available A-List, B-List, Roll Call, and C-List, where applicable, for a particular function, it may seek additional banquet servers from any source.

(e)    Banquet server work shall be offered to the C-list on a rotated basis as is customary and applied in the industry.

(f)    The UNION and the EMPLOYER shall mutually agree upon reasonable and fair procedures for notifying C-list servers of available extra banquet work and for offering such work to members of the C-list.

(g)    The EMPLOYER shall notify the UNION in writing that an employee has been added to its C-list not less than five (5) business days prior to scheduling said employee to work any banquet function.

(h)    No employee of the EMPLOYER shall be compelled to register to work as a C-list employee.

(i)    Assignment of C-list servers to work any banquet function shall be voluntary.

(j)    The EMPLOYER is not required to offer extra banquet work where overtime or premium pay would be incurred or where the offer conflicts with the employee's regular schedule.

(C)    Steady Banquet Job Openings

The following shall pertain to Steady Banquet Job Openings:

-35-

(1) **Hiring Procedure**

Effective as of July 1, 2001, all openings for banquet B-list jobs, and in the case of hotels which do not have a banquet B-list, openings for banquet A-list jobs, henceforth to be collectively referred to as "steady banquet job openings," shall be filled in accordance with the following procedure:

(a) Open A-list jobs shall be filled from the B-list in accordance with seniority.

(b) The EMPLOYER shall immediately notify the UNION of such job openings and the UNION shall post notice of such job openings and post in visible location any such job openings and the UNION shall post notice of such job openings on a dedicated bulletin board at the UNION's headquarters.

(c) Employees/applicants who are certified as eligible to apply for such job openings, in accordance with the rules set forth in Paragraph 2 hereof, shall submit their applications to the UNION no later than one (1) week after said job opening has been posted by the UNION.

(d) The UNION shall transmit to the EMPLOYER all applications for the job opening which were submitted by employees/applicants who are certified eligible in accordance with the rules set forth in Paragraph 2 hereof.

(e) The EMPLOYER shall interview every employee/applicant certified as eligible who is referred for a job opening. The EMPLOYER shall decide which applicant to hire and shall notify the UNION in writing of the identity of the person hired three (3) days prior to hiring said applicant. Once an EMPLOYER interviews an employee/applicant certified as eligible, the EMPLOYER is not required to reinterview said person for future job openings for twelve (12) months.

(2) **Certification of Eligibility to Apply**

(a) All employees registered with Roll-Call prior to the effective date of this Agreement shall be deemed certified as eligible to apply for steady banquet job openings.

(b) Except as provided in Subparagraph (a) of this Paragraph 2, any person who (during the five (5) year period prior to the posting of the opening) does not have at least one (1) year of experience working in a position covered by this Agreement for an EMPLOYER signatory to this Agreement, shall not be certified as eligible to apply for any steady banquet job opening.

(c) A list of current Roll-Call servers who are deemed certified under this provision has been provided by the Union.

(d) The Industry Training Program ("ITP") shall certify as eligible all applicants who the ITP determines possess the requisite skills and ability.

(3) **Banquet Training**

(a) The ITP shall screen, examine and certify applicants in accordance with reasonable, objective, uniformly applied, non-discriminatory criteria, procedures and standards which the ITP shall establish.

(b) The ITP shall establish a training course to help employees/applicants who are eligible to enroll in ITP to acquire the banquet service skills needed to obtain eligibility for employment.

(c) Applicants who have not been certified as eligible to apply who are eligible to enroll in ITP may register for said banquet training course.

(d) Training opportunities shall be provided in the order of registration on a "first come first serve" basis. Applicants who successfully complete the ITP banquet training course and obtain certification shall be permitted to apply for steady banquet job openings.

(4) **Eligibility Notification**

The Industry Training Program shall promptly notify Hotels of the identity of applicants who are certified as eligible to be utilized as banquet servers.

(5) **Limitation on Number of Positions Held for Banquet Servers**

(a) Effective September 1, 2004, no Banquet Server may simultaneously hold in New York City more than two (2) A or B-list Banquet Server positions. Banquet Servers who simultaneously hold two (2) such positions may hold (a) one (1) Banquet A-list and one (1) Banquet B-list position, or (b) two (2) Banquet B-list positions, but may not hold two (2) A-list positions.

(b) Banquet Servers who hold a greater number of positions than permitted in Section 47(C)(5)(a) as of September 1, 2004 shall be red circled and may retain the positions held as of that date. Such red circled Banquet Servers may not obtain additional positions or substitute a new position for an existing one, unless s/he can do so in compliance with Section 47(C)(5)(a).

(c) A Banquet Server who has met the limitations set forth in Section 47(C)(5)(a) may nonetheless apply for a new Banquet Server position, provided s/he:

employee the Banquet Server positions held at the time of the application.

   i. Disclose, in his/her application to the prospective employer, his/her qualification as a Banquet Server but, prior to the first day of work in such position, resign appropriate Banquet Server position(s) such that s/he is in compliance with Section 47(C)(5)(e), and

   ii. Provide written notice of such resignation(s) to the new employer prior to commencing such new Banquet Server position.

   (d) Employers shall include on applications for any A or B-list position in accordance with Section 47(C)(5)(a) (i) certifying that s/he is eligible for the position and will be disqualified from continued employment as a Banquet Server if s/he fails to maintain in compliance with Section 47(C)(5)(e) while employed by the employer. A misrepresentation on the Representation or failure to remain in compliance with Section 47(C)(5)(e) shall constitute just clause for summary termination from the Banquet Server position(s) most recently obtained with employee(s) or bound by this Agreement with which continued employment creates a violation of Section 47(C)(5)(e) for discipline by any employer signatory to or bound by this Agreement with which the offending employee holds other Banquet Server jobs. The employer(s) signatory to or bound by this Agreement which most recently hired the offending Banquet Server and with which continued employment creates a violation of Section 47(C)(5)(e) shall be liable for back pay, but only if said employee(s) hired, or continued to employ, the Banquet Server knowing s/he was not in compliance with Section 47(C)(5)(e).

   (e) Notwithstanding anything apparently to the contrary in Section 47(C)(5)(e) and (d), those Sections shall also apply to internal promotions from B-list to A-list positions, as provided for in 47(C)(5)(a).

   (D) Gratuities

   (1) Effective July 1, 1995, except as otherwise provided herein, the UNION and the EMPLOYER agree that with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%) shall be paid to tip category employees (banquet waiters/waitresses and captains) working said functions, pursuant to established practice and functions, pursuant to established practice in each hotel as of July 1, 1995.

If, however, any EMPLOYER signatory hereto is currently paying its employees banquet gratuity amounts which would require that EMPLOYER to increase the current gratuity paid by more than one percent (1%) during the first year of this Agreement, such EMPLOYER shall increase the gratuity required hereunder in two (2) equal increases in each of the first two years of this Agreement.

   (2) The foregoing notwithstanding, the UNION and EMPLOYER agree that, in the case of hotels (other than the traditional large banquet hotels, such as the New York Hilton, Waldorf-Astoria, Sheraton New York, Plaza, Pierre, St. Regis and other like hotels), which other hotels for purposes of this provision will be called "small banquet hotels," a

-38-

minimum gratuity equal to fourteen percent (14%) shall be paid to tip category employees (banquet waiters/waitresses and captains) working said functions, pursuant to established practice in each hotel. The UNION and EMPLOYER also agree, however, that if at any time during the term of this Agreement any small banquet hotel increases its July 1, 1995 gratuity or service charge to its banquet customers, the aforesaid minimum gratuity payable hereunder to tip category employees (banquet waiters/waitresses and captains) working said functions shall be increased from fourteen percent (14%) to fifteen (15%) percent, pursuant to established practice in each such hotel as of July 1, 1995.

   (3) The EMPLOYER and UNION agree that where an EMPLOYER does not utilize the services of a captain, all of the gratuity amounts payable hereunder shall be paid to the banquet waiters and waitresses.

## RELIEF APPEALS

48. Whenever, upon a written application of an EMPLOYER, it shall appear to the Impartial Chairman that the factual situation with respect to a particular EMPLOYER is such that the wage and hour scales provided in this Agreement will work unusual hardship on such EMPLOYER, and affect adversely the interest of the workers therein, such wage and hour scales may be modified, in the case of such EMPLOYER, to the extent approved by the Impartial Chairman.

An EMPLOYER that intends to make such application in connection with the wage increase under the Collective Bargaining Agreement shall make such application within ninety (90) days before the effective date of such wage increase and in all cases, all other changes, for wage increase shall go into effect on the scheduled date unless the Impartial Chairman awards otherwise. If application for relief is not made within the ninety (90) days, the increase shall be put into effect, provided; however, that this shall not preclude an EMPLOYER from making application for relief thereafter.

## UNIFORMS AND EMPLOYEE FACILITIES

49. The EMPLOYER agrees that whenever it requires employees to wear special uniforms, such uniforms shall be supplied and shall be laundered at the expense of the EMPLOYER. The EMPLOYER agrees to supply cooks with uniforms. A cook's uniform is defined as jacket, cap, apron, kerchief and pants.

The EMPLOYER agrees to provide adequate locker space for employees customarily provided with locker space. The EMPLOYER shall provide sanitary places for eating and changing clothes and washroom facilities.

## TOURS

50. (a) In the case of all tour parties, adult as well as youth, bellpersons shall receive not less than one dollar and thirty-seven and one-half cents ($1.37½) per bag checking in and per bag checking out.

-39-

(B) Bellpersons shall receive fifty (50¢) cents for each person coming into a hotel to occupy a room which is one of a block of rooms retained or set aside on a permanent basis, such person on leaving the hotel.

(C) (1) When a tour group having reservations at an EMPLOYER arrives and/or departs from a hotel or motel in motorized buses, doorpersons will be paid a gratuity equal to sixty-seven and one half (67.5¢) cents for arrival and sixty-seven and one half (67.5¢) cents for departure per person.

(2) This gratuity will apply to tour groups arriving only by bus and will be applicable to initial arrival and final departure.

(3) Buses are as we commonly know them and this gratuity arrangement does not apply to stretch-out wagons, such as used to transfer airline crews, and other such vehicles.

(4) Doorpersons will assist in the handling of the baggage and those hotels not employing doorpersons will not be subject to this gratuity payment.

(D) All hotels who are currently paying the aforesaid gratuities on a per person basis shall convert such payments to a per bag basis, provided, however that no gratuity will be paid on any bags in excess of two (2) for any one guest.

(E) Any hotel where employees have been paid rates or employed under conditions more favorable than those set forth in paragraph (A) and (C) above shall, in addition to the increases set forth above, maintain the differential between the rate set forth in the Agreement and the like rate paying, and shall maintain the conditions presently in effect.

(F) In the case of all tour parties, where meals are included, adult as well as youth, waiters and waitresses shall receive twenty-five (25¢) cents per meal per person for fifteen (15%) percent of the price of the meal, whichever is greater.

(G) Where the rooming arrangements for professional athletic teams do not permit bellpersons to earn tips, a rooming shall be considered a tour, except that where other tip arrangements have been in effect, they shall continue.

(H) The parties agree to submit the following matter to a study committee consisting of a representative of the UNION and a representative of this ASSOCIATION:

Notwithstanding Section 50(C)(3) above, whether or not doorpersons shall receive the tip referred to in Section 50(C)(1), in the case of stretch-out wagons used for tours.

In the event the parties are unable to agree on any of the above, either party may submit same to the Impartial Chairman for decision.

-40-

## NIGHT SHIFT DIFFERENTIAL

51.

(A) General

Night shift differential shall apply to all employees covered by this Agreement except those listed in Schedule A-1.

(B) Payment Rate

The night shift differential shall be paid for all hours worked after 8:00 P.M. in the evening and before 6:00 A.M. the next morning. Each employee employed during the hours stated above, shall receive in addition to his or her regular wages, seventy-two (72¢) cents per hour for each hour worked during said period. Effective July 1, 2001, 2002, 2003, 2004 and 2005 (31¢) cents, eighty-four (84¢) cents, seventy-five (75¢) cents, seventy-eight (78¢) cents, eighty-one (81¢) cents, eighty-four (84¢) cents, and eighty-seven (87¢) cents, respectively.

(C) Calculation

(1) The wage rate on the basis of which overtime compensation is to be calculated shall not include the night shift differential. Although the night shift differential shall not be added to the regular rate for the purpose of calculating overtime compensation, the amount of the agreed upon night shift differential shall be paid for each hour of work of an employee during the nighthours to which such night shift differential payment is applicable.

(2) Vacation, sick days, personal days, bereavement, jury duty pay and holiday pay shall include the night shift differential, provided, however, that this applies only to regular and full-time employees who are regularly scheduled for work during the hours for which the night shift differential is paid.

52. SEVERANCE PAY

(A) In the event of termination resulting from the closing of a hotel or a restaurant therein or a department thereof, or a concession, or from (1) conversion of the elevators to self service elevators or (2) the conversion of telephone department equipment or (3) the conversion of hotels to cooperatives, severance pay shall be paid as a result of any of the foregoing.

(B) For the purpose of calculating severance pay the EMPLOYER shall pay over to the UNION, for distribution by the UNION to the employees affected an amount equal to four (4) day's regular wages for each year of service for each affected employee provided the employee was employed for not less than six (6) months service. The above formula shall receive twice the amount of severance pay calculated in accordance with the above formula. Unless otherwise proven, all employees laid off within one (1) year of a permanent closing shall be presumed to have been terminated as a result of the closing and shall be therefore eligible for severance pay. In connection with the foregoing, the EMPLOYER shall issue, and send to the UNION for distribution, checks made payable to the individual employees entitled to severance pay, in accordance with the foregoing formula. The EMPLOYER agrees to make all statutory tax

-41-

withholdings prior to the transmittal of the checks to the UNION for distribution. In addition, unless as otherwise agreed by the ASSOCIATION and the UNION, a further payment equal to twenty-five (25%) percent of such amount shall be paid to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Funds, and become part of and allocated among the Funds in such proportions as the ASSOCIATION and the UNION shall agree. Payment shall be computed to the nearest quarter year.

## TECHNOLOGICAL CHANGE

§3.

(A)   The UNION has long cooperated with EMPLOYERS in the introduction of new equipment, changes in operating techniques and technological improvements (all three (3) herein referred to as "modifications") in the various departments of the hotels. Accordingly, in the event the EMPLOYER intends to introduce modification in its hotel, it shall notify the UNION at least thirty (30) days in advance of its intention to implement same, to discuss the ramifications.

(B)   If the parties agree to said modifications and, as a result, job transfers or job changes occur, the parties shall discuss severance pay for employees who are terminated. If severance pay is required, the formula set forth in Section 37(D) shall be applied. Such job changes and terminations are not those referred to in Section 29(H) hereof.

(C)   It is agreed that the introduction of new technology or equipment or certain modifications which may accelerate job skills, duties or responsibilities does not automatically require additional compensation or an adjustment in the wage rate of the affected employee.

(D)   If the parties fail to agree on the EMPLOYER's right to the proposed modification(s) or an adjustment in the wage rate of the affected employee, or to discuss same as provided in paragraph (A) above the UNION shall have the right to call for a conference at the ASSOCIATION to discuss the matter. If as a result of the conference there is a dispute concerning the proposed modification(s) the matter shall be submitted to the Impartial Chairman for his decision. In no event shall submission to the Impartial Chairman's office delay implementation of the EMPLOYER's modification(s).

## SICK LEAVE

§4.   (A)   Entitlement

(1)   All employees covered by this Agreement who have been continuously employed by the EMPLOYER for a period of at least one (1) year shall be entitled to six (6) days sick leave and full pay for each calendar year. Subject to paragraph (A)(6) hereof, effective with the second payroll week of December of each year of this Agreement, each eligible employee who has not used all his/her sick leave shall receive one day's pay for each limited sick day.

(2)   Effective on July 1, 2003, the number of paid sick days to which employees shall be entitled under the provisions of this paragraph shall be increased to seven (7) paid sick days.

(3)   Sick leave pay shall be prorated after an employee's first year of continuous employment from his/her date of hire to December 31st in accordance with the number of months worked during that calendar year. Beginning with the first calendar year following thereafter, for each full year of employment, the employee shall be entitled to full entitlement pursuant to the provisions hereof. Where an employee is hired after January 1, his/her anniversary date shall control for provision of sick leave pay.

(4)   Subject to Paragraph (A)(6) hereof, sick leave benefits shall accumulate from one year to the next.

(5)   Payment of sick leave is intended solely to provide compensation to employees who are absent from work because of illness or injury. An employee who abuses sick leave benefits shall be subject to disciplinary action.

The UNION agrees to cooperate in preventing and correcting abuses of these sick leave benefits.

(6)   Effective July 1, 2001, in lieu of receiving one day's pay for each unused sick day in December of each year, each employee shall have the option to carry over unused sick days from year to year, provided that no employee shall be permitted to accumulate more than fifteen (15) unused sick days at any time. If in January of any calendar year, an employee's entitlement to sick days for that year would result in an accumulation of more than fifteen (15) days, the EMPLOYER shall pay to the employee the accumulation to fifteen (15) in January. If the employee's then current rate of pay reduces the accumulation to fifteen (15) in January. If the employee's then current rate of pay, the EMPLOYER with two (2) weeks advance written notice. Upon an employee's termination of employment, the EMPLOYER shall pay the employee for any unused sick days accrued by the employee, at the employee's then current rate of pay.

(B)   Calculation and Payment

(1)   Sick leave pay shall be calculated in the same manner as holiday pay.

(2)   Sick leave pay shall not be paid on the employee's scheduled day off, holiday, vacations, or any other day on which the employee is drawing pay for time not worked, or would not have otherwise worked.

(C)   Absence

An employee absent from work due to illness on a scheduled workday immediately before and/or on the scheduled workday immediately after a holiday or vacation period shall not be eligible for sick pay for said absent workday or workdays.

## LEAVE OF ABSENCE

55. (A) An employee who has been employed by an EMPLOYER for five (5) years or more shall be entitled to one leave of absence without pay not to exceed sixty (60) days upon giving two (2) weeks written notice of request for leave of absence to the EMPLOYER and the UNION. The EMPLOYER shall not be required to grant more than one (1) employee in a job classification to be on leave of absence at the same time. If more than one (1) employee in a job classification requests a leave of absence at the same time, preference shall be given to the employee with greater seniority.

(B) The EMPLOYER may, for good cause, defer the time of the commencement of the requested leave of absence.

(C) An employee on leave of absence hereunder shall not take other employment during such leave without the prior written consent of the EMPLOYER.

(D) Leaves of absence under this provision shall not affect seniority rights but which fall during the period of such leave.

## STUDY COMMITTEE

56. (A) The 1985 Agreement provided as follows:

The parties agree to convene joint study committees each consisting of an equal number of members designated by the ASSOCIATION and the UNION to study and report upon problems relating to the following:

1. Industry-Wide Benefit Programs
2. Industry Training Fund
3. Delayed or Canceled Flights
4. Job Posting and Bidding
5. Grievance Procedures
6. Major Structural Alterations
7. Operating Distinctions Between Hotels
8. Productivity

In the event that any of the foregoing study committees are unable to reach agreement, within ninety (90) days or such other time as the parties may agree, either party shall have the right to submit the matter to the Imperial Chairman for decision.

-44-

(1). The parties recognize (i) the need to continue to provide the variety of benefits offered by the Industry-wide pension, welfare and training programs, (hereinafter called "benefit programs"), (ii) the necessity of maintaining the high standards of quality contained in each of the benefit programs, and (iii) the financial pressures on said program due to inflation. Therefore, the parties will immediately establish a joint study committee to study and formulate the plans required to support, maintain and/or improve each of the benefit programs.

(2) The parties recognize the significant achievements of the Industry Training Program and the need to maintain the program. Accordingly, the parties agree that the trustees of said program shall at their earliest opportunity study the present conditions of the program, the industry needs and the best method of providing upgrading to the employees employed in the industry. Upon completion of the study the trustees shall adopt a program to meet the needs and requirements of the industry and its employees. In the event the trustees are unable to agree on such a program either party may submit the matter to the Imperial Chairman for decision.

(3) The UNION contends that the earning capacity of front service employees and a la carte servers has been adversely affected as a result of the problems encountered by hotels in servicing guests who are affected by delayed or canceled flights and that therefore the earnings of these employees have been reduced. The UNION has therefore proposed, and the ASSOCIATION has agreed, to the establishment of a joint study committee to conduct a study of the UNION's claim and report its finding to the parties. The committee is empowered to make specific proposals as to how to deal with the results of their study.

(4) The parties hereto agree to convene a joint study committee to examine the advisability of, and the best method of, if so agreed, establishing a program whereby all job openings shall be posted for bids. The purpose of such a program, if same is found to be needed, would be to enable employees to bid on such openings.

Among the issues to be considered by the committee are seniority, ability, the needs of the hotel, the right of part-time employees to have preference over new hires for full time jobs within the classification in which they are employed, and the right of the UNION to file a grievance if a job opening is denied.

The parties recognize the great variety of skills by various groups of employees within the openings and therefore agree that any program adopted shall provide that bidding and filling of job openings may, in the EMPLOYER's discretion, be limited to those employees in the same classification.

(5) The parties agree to meet and revise the grievance machinery in accordance with their mutual agreement, or upon the recommendation of a third party or parties from whom they may request an overall study, review and analysis of this machinery. Pending mutual agreement as to the language, the present machinery shall be continued. In the event the parties fail to agree within one hundred and eighty (180) days, either party shall have the right to submit this matter to the Imperial Chairman, who shall be empowered to make a final and

-45-

binding decision on any and all matters not resolved by the parties not later than forty-five (45) days after submission of this matter.

(6)     This provision shall in no way impair the ability of the parties to convene a joint study committee to study and report on a revision of Section 17 concerning Major Structural Alterations.

(7)     The parties recognize that significant operational distinctions exist between hotels as a result of location, size, market and nature of operation, (i.e., cooperatives, residential, proximity to theaters and shopping). Further, they recognize the need to provide suitable programs for all hotels, which will enable said hotels to remain viable in order to ensure their continued operation and employment of members of the UNION. Therefore, the parties agree to forthwith convene a study committee to determine the nature of such relief, if any, as may be required to accomplish the recognized needs set forth above.

(8)     The parties, in an effort to ensure the continued growth of the industry, and in recognition of the ever changing needs and desires to be provided to clients of the hotels, as well as the continually changing patterns of operations employed by the industry agree to immediately establish a joint committee to study and formulate such programs as might be required to assist the hotels in attaining greater productivity in order to enable the hotels to offer better services to their guests. Among the terms of study are those of the front service, banquet, housekeeping and front office departments. It is understood, however, that either party may add to the departments to be reviewed by the said committee.

(B)     The January 30, 1990 Memorandum of Understanding provided:

The parties shall convene a joint study committee to review the:

1.     Utilization by signatory Employers of Kosher caterers and its effect on the terms and conditions of the Agreement.

2.     Impact, if any, on bell persons and door persons as a result of changes in the "tour party" arrangements

(C)     The July 1, 1995 Memorandum of Understanding provided:

Section 56 of the 1990 Agreement will be amended to provide for the formation of additional Joint Study Committees which will review and decide within one hundred and eighty (180) days after the effective date of the 1995 Agreement the issues of:

1.     Determination of a minimum gratuity payable to tipped category employees for work performed in connection with independent kosher catered functions held on the Employer's premises

2.     From Service Employee gratuity rates and all issues impacting thereon

3.     Modification of the banquet roll-call job referral systems, creation of "C" Lists by banquet hotels and review of current practice of pre-pilting

46

---

4.     Establishment of a Credit Union

5.     Technological changes and productivity

6.     In addition to the above study committees, within forty-eight (48) hours after ratification of this Agreement, the parties agree pursuant to Section 56(A)(7) and (8) to jointly convene the Study Committees, Productivity and Operating Distinctions Between Hotels in and/or job categories set forth in Schedule A and to review the Employer's need, if any, for additional flexibility in the combination of jobs, otherwise limited by Section 22(G). The Employer and the Union agree that no employee shall be laid off or discharged or suffer a loss of wages and/or benefits as a result of any resolution of these foregoing issues by the Study Committee. The Study Committee shall make every effort to resolve the issues set forth in Section 56 (C)(6) by September 30, 1995. At the request of the Association, the Union agrees that it will expeditiously meet with representatives of the Association and representative of the individual HANYC Bargaining Group Hotels or groups of such HANYC Bargaining Group Hotels sharing common operational needs or issues of concern in order to study, review and resolve the mutual satisfaction of the HANYC Bargaining Group Hotels and the Union any such productivity or operational issues.

In the event that any of the foregoing study committees are unable to reach agreement, upon mutual agreement, discussion between the Employer and the Union shall continue until a resolution is reached, i.e., none of the foregoing Study Committee's issues set forth in Section 56(C) (1) – 6 (above, shall be referred to arbitration before the impartial Chairman unless both the Employer and the Union mutually consent thereto, notwithstanding any of the provisions of the 1990 Agreement accruing to the contrary.

## EXPIRATION AND RENEWAL

57.

(A)     This Agreement shall be effective as of July 1, 2001, except as otherwise specified, and shall continue for a period ending midnight on the 30th day of June, 2006. This Agreement shall be renewed from year to year thereafter unless written notice of termination by certified mail, return receipt requested is given by either party to the other not less than sixty (60) days prior to its expiration.

This Agreement may be executed by hotel and concessionaire EMPLOYERS on separate copies hereof, and all copies hereof, although separately signed, shall be deemed and taken together as constituting one agreement.

(B)     Temporary Closing of a Hotel/Concession for Renovations

In the event at any time during the term of this Agreement an EMPLOYER signatory hereto temporarily ceases its business operations in order to undertake a major renovation project which is not completed during the term of this Agreement, the EMPLOYER and UNION agree that in such case, the term of this Agreement shall be automatically extended up to and through the actual completion date of the major renovation project and for an additional one hundred and

47

eighty (180) days thereafter. For example, if this Agreement by its terms expires on June 30, 2006 and the EMPLOYER's major renovation project will not be completed until October 31, 2007, i.e. one hundred and eighty (180) days past the September 30, 2006 completion date of the major renovation project.

The UNION and EMPLOYER agree that for purposes of work practices, upon actual completion of the EMPLOYER's major renovation project, the EMPLOYER shall be treated as a new hotel, motel or concession and none of the EMPLOYER's prior work practices or industry-wide work practices will be deemed to be applicable to the EMPLOYER's operations.

(C). It is agreed that the execution of this within Agreement by the ASSOCIATION and the UNION, and by the UNION and ASSOCIATION members who have not authorized the ASSOCIATION to execute the within Agreement on their behalf, shall be deemed to, immediately supersede, cancel and annul the June 26, 1985, 1990 and 1995 Agreements. It is further agreed that upon execution of this Agreement, the within Agreements shall likewise be immediately superseded, cancelled and annulled as to those members who become parties to this Agreement by specific reference to the June 26, 1985, 1990 or 1995 Agreements.

(D). In the case of all other EMPLOYERS, it is agreed that the execution of the within Agreement, by the EMPLOYER and the UNION, shall be deemed to immediately supersede, cancel and annul the June 26, 1985, 1990 and 1995 Agreements.

**AUTHORITY TO INTERPRET CONTRACT**

58. All rights, benefits, privileges and/or immunities granted or desired by this Agreement to the UNION or any of its affiliates or members can be enforced only by or through the New York Hotel and Motel Trades Council, AFL-CIO, the UNION herein.

**SUCCESSORS AND ASSIGNS**

59. This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provisions, terms, or obligations herein contained shall be affected, modified, altered, or changed in any respect whatsoever by the consolidation, merger, sale, transfer or assignment of either party hereto; or affected, modified, altered or changed in any respect whatsoever by any change of any kind in the legal status, ownership or management of either party hereto; or any successor EMPLOYER shall assume all of the obligations under this Agreement of the hotel or concession to the employees, the UNION or any of the funds to which EMPLOYERS are required to contribute hereunder.

EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel or Concession (such the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement.

---

: Not less than five (5) business days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the transaction between the EMPLOYER and the transferee and the notice to the UNION will provide the full and complete identity of the transferee, together with a duly executed copy of the pertinent portion of the transaction agreement between the EMPLOYER and the transferee pursuant to which the transferee agrees to assume this Agreement.

Said notice will be held by the UNION in strict confidence and the UNION, upon request of the EMPLOYER, will agree to a confidentiality pledge upon terms mutually acceptable to the EMPLOYER and the UNION, provided however that such confidentiality pledge will be ineffective upon the EMPLOYER's violation of this Section 59. If the UNION is provided with a signed copy of the portion of the agreement where the transferee agrees to assume this Agreement, the UNION will not contest the transfer prior to the closing.

The EMPLOYER and UNION agree that if a determination is made by the Imperial Chairman that a violation of Section 59 has occurred, then in such case, the violation will be deemed to be irreparably harmful to the UNION and its membership and in such event, the UNION may seek such relief as is necessary to redress and remedy such violation, including but not limited to the award of monetary damages and/or injunctive relief either form, the Office of the Imperial Chairman, the National Labor Relations Board, a court of competent jurisdiction or such other forum as deemed appropriate by the UNION.

**ACCRETION AND NEUTRALITY/CARD CHECK**

60. (A) Accretion: EMPLOYER agrees to the accretion of any and all hotel or concessionaire properties which come to be owned and/or managed in the New York City area by the bargaining unit(s) presently or hereafter covered by the Industry Wide Agreement or any successor collective bargaining agreement thereto, and that all of the terms and conditions set forth in the Industry Wide Agreement, or its successor shall be immediately applicable to the accreted bargaining unit(s).

The parties acknowledge that they have negotiated and exchanged valuable consideration in reliance upon the lawfulness and validity of their agreement that any accretion and change inherent in the legal doctrine of accretion. Nevertheless, in the event that a competent legal doctrine, should be ruled ineffective, invalid, or unenforceable by competent legal authority, then the parties hereby agree that the neutrality and card count agreement annexed hereto as Addendum IV, shall apply to that hotel or concessionaire. For the purposes of this provision, "competent legal authority" shall mean the Office of the Imperial Chairman, the Regional Director for Region 2 of the National Labor Relations Board ("NLRB"), the United States District Courts for the Southern or Eastern District of New York, or the United States Court of Appeals for the Second Circuit.

The parties agree that they shall meet to review and discuss such particular facts and circumstances as either party may contend warrants mutually agreed upon revisions to the

provisions of the Industry-Wide Agreement, or successor collective bargaining agreement as the case may be.

(B)    Neutrality/Card Check. In addition to and without limiting the other provisions of this Section 60, EMPLOYERs shall abide and be bound by the neutrality and card check provisions annexed hereto as Addendum IV and incorporated herein by reference.

## MAINTENANCE AND ELECTRICAL WORK

61.    It is intended that employees to be classified as in the "Maintenance Department" shall include those engaged in doing plastering, mason work, tile setting, lathing and cement work; carpentry, plumbing and steamfitting, upholstering and mattress-making; painting, furniture varnishing and paperhanging; operating and maintaining house audio systems; mechanical work on elevators; machine work, locksmithing and key work; silversmithing, coppersmithing and tinsmithing; boiler-repair work.

The painting, decorating and paperhanging includes the service of painting, decorating, woodfinishing, paperhanging, and preparatory work incidental to each of the aforementioned as follows:

(1)    The service of painting and decorating means the application of all paint and painting material of every description in and on all parts of the hotel.

(2)    The service of paperhanging includes the application and/or installation of wallpaper, hangings and decorating materials of every kind or description applied directly to any surface in the hotel.

(3)    Woodfinishing and polishing. The removal of all wood surfaces, cleaning, refinishing, varnishing and polishing of furniture and wood fixtures in the hotel.

An Electrician is one who installs, adds to, repairs or maintains any electric conduits, equipment, machines, fixtures, or electrical devices, that carry conditions that will or do carry an electrical current.

## SEPARABILITY

62.    Should any part hereof or any provision herein contained be rendered or declared illegal or an unfair labor practice by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction, or by the decision of any authorized government agency, such invalidation of such part or provision of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation, the parties agree immediately to meet and negotiate substitute provisions for such parts or provisions rendered or declared illegal or an unfair labor practice. The remaining parts or provisions shall remain in full force and effect.

## RATIFICATION OF AGREEMENT

63.    The parties hereto agree that their understanding and agreements as set forth in this Agreement and any attached side letter agreements have been ratified by the Union and by the HANYC Bargaining Group Hotels.

IN WITNESS WHEREOF, the EMPLOYER and the UNION have affixed their hands and seals the day and year first above written.

HOTEL ASSOCIATION OF NEW YORK CITY, INC.
in its own behalf and in behalf of the HANYC Bargaining Group Hotels

By: Joseph E. Spinnato, President, Association

NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO

By: Peter Ward, President, Union

-50-

-51-

**EMPLOYER/OPERATOR**

please print (LEGAL NAME) _____

please print (TRADE NAME) _____

please print (BUSINESS ADDRESS) _____

please print (OFFICE ADDRESS IF DIFFERENT) _____

please print (TELEPHONE NUMBER) _____

please print (FACSIMILE NUMBER) _____

please print (E-MAIL NUMBER) _____

please print (SIGN NAME AND TITLE) _____

(PRINT NAME AND TITLE) _____

(DATE) _____

-52-

**PROPERTY OWNER (if different from Employer/Operator)**

please print (LEGAL NAME) _____

please print (TRADE NAME) _____

please print (BUSINESS ADDRESS) _____

please print (OFFICE ADDRESS IF DIFFERENT) _____

please print (E-MAIL NUMBER) _____

please print (SIGN NAME AND TITLE) _____

(PRINT NAME AND TITLE) _____

(DATE) _____

-53-

## SCHEDULE 1

The following wage increases shall be granted as provided in Section 14 for employees:

Effective:

| | |
|---|---|
| July 1, 2001 | 4.0% |
| July 1, 2002 | 4.0% |
| July 1, 2003 | 4.0% |
| July 1, 2004 | 4.0% |
| July 1, 2005 | 4.0% |

All increases based on the employees' actual rates of pay in effect on that date.

Banquet rates are shown separately in Schedule A-1.

TIP CLASSIFICATIONS INCLUDE THE FOLLOWING:

- Servers (including extra meal servers)*
- Banquet Servers
- Dining Room Attendants
- Turkish Baths-Masseurs/masseuses
  - Attendants
  - Steam Room Attendants
  - Floor Attendants
- Bellpersons and Baggage Porters-T, ST and R
- Working Bell Captains
- Driver/Bellpersons
- Driver/Doorpersons
- Doorpersons
- Package Room Messengers
- Pages
- Valet Runners & Deliverers (this does not include pressers who also deliver)

*The parties will study the matter of service charges in lieu of tips for waiters and waitresses.

## SCHEDULE "A"

July 1, 2001 - June 30, 2006

| Job Title | current | 7/1/01 | 7/1/02 | 7/1/03 | 7/1/04 | 7/1/05 |
|---|---|---|---|---|---|---|
| **DINING ROOM** | | | | | | |
| Captains | $608.70<br>$15.2175 | $633.05<br>$15.8263 | $658.37<br>$16.4593 | $684.70<br>$17.1175 | $712.09<br>$17.8023 | $740.57<br>$18.5143 |
| Scrub Captains* | $360.59<br>$9.0148 | $375.01<br>$9.3753 | $390.01<br>$9.7503 | $405.61<br>$10.1403 | $421.83<br>$10.5458 | $438.70<br>$10.9675 |
| Greeters | $600.84<br>$15.0210 | $624.87<br>$15.6218 | $649.86<br>$16.2465 | $675.85<br>$16.8963 | $702.88<br>$17.5720 | $731.00<br>$18.2750 |
| Food Servers* | $347.21<br>$8.6803 | $361.10<br>$9.0275 | $375.54<br>$9.3885 | $390.56<br>$9.7640 | $406.18<br>$10.1545 | $422.43<br>$10.5608 |
| Bus Attds.* | $372.70<br>$9.3175 | $387.61<br>$9.6903 | $403.11<br>$10.0778 | $419.23<br>$10.4808 | $436.00<br>$10.9000 | $453.44<br>$11.3360 |
| Extra Meal Food Servers - 1 Meal* | $35.56 | $36.98 | $38.46 | $40.00 | $41.60 | $43.26 |
| Extra Meal Food Servers - 1 Day* | $71.12 | $73.96 | $76.92 | $80.00 | $83.20 | $86.53 |
| Banquet Captains | $608.70<br>$15.2175 | $633.05<br>$15.8263 | $658.37<br>$16.4593 | $684.70<br>$17.1175 | $712.09<br>$17.8023 | $740.57<br>$18.5143 |
| **KITCHEN & STEWARD** | | | | | | |
| Sous Chef | $655.98<br>$18.7423 | $682.22<br>$19.4920 | $709.51<br>$20.2717 | $737.89<br>$21.0826 | $767.41<br>$21.9260 | $798.11<br>$22.8031 |
| Night Chef | $645.98<br>$18.4566 | $671.82<br>$19.1949 | $698.69<br>$19.9626 | $726.64<br>$20.7611 | $755.71<br>$21.5917 | $785.94<br>$22.4554 |
| Saucier | $641.69<br>$18.3340 | $667.36<br>$19.0674 | $694.05<br>$19.8300 | $721.81<br>$20.6231 | $750.68<br>$21.4480 | $780.71<br>$22.3060 |
| Garde Manger | $640.26<br>$18.2931 | $665.87<br>$19.0249 | $692.50<br>$19.7857 | $720.20<br>$20.5771 | $749.01<br>$21.4003 | $778.97<br>$22.2563 |
| Tournant | $640.26<br>$18.2931 | $665.87<br>$19.0249 | $692.50<br>$19.7857 | $720.20<br>$20.5771 | $749.01<br>$21.4003 | $778.97<br>$22.2563 |
| Chef de partie & Chef Butcher | $638.85<br>$18.2529 | $664.40<br>$18.9829 | $690.98<br>$19.7423 | $718.62<br>$20.5320 | $747.36<br>$21.3531 | $777.25<br>$22.2071 |
| Banquet Chef | $645.98<br>$18.4566 | $671.82<br>$19.1949 | $698.69<br>$19.9626 | $726.64<br>$20.7611 | $755.71<br>$21.5917 | $785.94<br>$22.4554 |
| First Comis-Garde Manger | $624.55<br>$17.8443 | $649.53<br>$18.5580 | $675.51<br>$19.3003 | $702.53<br>$20.0723 | $730.63<br>$20.8751 | $759.86<br>$21.7103 |
| First Commis-Saucier | $624.55<br>$17.8443 | $649.53<br>$18.5580 | $675.51<br>$19.3003 | $702.53<br>$20.0723 | $730.63<br>$20.8751 | $759.86<br>$21.7103 |
| First Commis-Others<br>Hotels that employ special workers for fish, soup and hors d'oeuvres. These workers are to be classified and receive the minimum wage, the same as the first Comis, in other words, they are not to be classified as Chefs de partie. | $621.69<br>$17.7626 | $646.56<br>$18.4731 | $672.42<br>$19.2120 | $699.32<br>$19.9806 | $727.29<br>$20.7797 | $756.38<br>$21.6109 |
| Working Chef | $638.85<br>$18.2529 | $664.40<br>$18.9829 | $690.98<br>$19.7423 | $718.62<br>$20.5320 | $747.36<br>$21.3531 | $777.25<br>$22.2071 |
| First Asst. | $624.55<br>$17.8443 | $649.53<br>$18.5580 | $675.51<br>$19.3003 | $702.53<br>$20.0723 | $730.63<br>$20.8751 | $759.86<br>$21.7103 |
| All Asst. Cooks-White Jackets | $615.98<br>$17.5994 | $640.62<br>$18.3034 | $666.24<br>$19.0354 | $692.89<br>$19.7969 | $720.61<br>$20.5889 | $749.43<br>$21.4123 |
| Pastry Chef | $648.82<br>$18.5377 | $674.77<br>$19.2791 | $701.78<br>$20.0503 | $729.83<br>$20.8523 | $759.02<br>$21.6863 | $789.38<br>$22.5537 |

* Tipped Classification

SCHEDULE "A"
July 1, 2001 – June 30, 2006

| Job Title | current 7/1/01 | 7/1/02 | 7/1/03 | 7/1/04 | 7/1/05 |
|---|---|---|---|---|---|
| * Tipped Classification | | | | | |
| Fish Asst. | | | | | |
| All Other Assistants | | | | | |
| Ice Cream Chef | | | | | |
| Head Baker | | | | | |
| Night Bakers | | | | | |
| Bakers | | | | | |
| Head Veg. Prep. | | | | | |
| All Other Veg. Prep. | | | | | |
| Chicken and Fish Butchers | | | | | |
| Head Oyster Preparer | | | | | |
| All Other Oyster Prep. | | | | | |
| Head Pantry Persons | | | | | |
| Pantry, Coffee Persons | | | | | |
| Head Silver Cleaner | | | | | |
| Regular Silver Cleaner | | | | | |
| Dishwashers | | | | | |
| Potwashers | | | | | |
| Pool Stewards | | | | | |
| Kitchen Runners | | | | | |

EMPLOYERS' CAFETERIA
SCHEDULE "A"
July 1, 2001 – June 30, 2006

| Job Title | current 7/1/01 | 7/1/02 | 7/1/03 | 7/1/04 | 7/1/05 |
|---|---|---|---|---|---|
| Head Cook | | | | | |
| Assistants | | | | | |

BAR

| Job Title | current 7/1/01 | 7/1/02 | 7/1/03 | 7/1/04 | 7/1/05 |
|---|---|---|---|---|---|
| Bartenders (Public Bars) | | | | | |
| Bartenders (Service Bars) | | | | | |
| Bartender's Helper | | | | | |

HOUSEKEEPING

| Job Title | current 7/1/01 | 7/1/02 | 7/1/03 | 7/1/04 | 7/1/05 |
|---|---|---|---|---|---|
| Floor Helper | | | | | |
| Room Attds. | | | | | |
| Bath Attds. | | | | | |
| Wall Washers | | | | | |
| Furniture Polishers | | | | | |

* Tipped Classification



# EXHIBIT E

3 of 4

SCHEDULE "A"
July 1, 2005 – June 30, 2008

**VALET DEPARTMENT**
- Tailor
- Pressers
- Dry Cleaners
- Runners and Delivery Employees

**PRINT SHOP EMPLOYEE**
- Compositors
- Press Craftsmen/Helpers
- Misc. Employees

**TURKISH BATHS**
- Masseur/Masseuse
- Manicurist
- Steam Room Asst.
- Pool Attendant

SCHEDULE "A"
July 1, 2005 – June 30, 2008

**MISCELLANEOUS**
- Carpet Cleaners
- Coat Checker
- Dishwashers
- Floor Polishers
- F&B Storeroom Attendant
- Furniture Polishers (Union)
- Ice Cutters/Icemakers
- Kitchen Fire Person
- Linen/Nylon/Uniform/Storage
- Linen Room Personnel
- Lobby Room Attendant
- Newspaper Deliverers
- "Pages"
- Sidewalk Cleaners
- Soda Fountain Employees
- Swimming Pool Asst.
- Window Cleaners F.T.
- Verification Empl.

* Tipped Classification

## SCHEDULE A-1

### CLASSIFICATION OF MEALS, HOURS AND WAGES FOR
### BANQUET WAITERS, BANQUET WAITRESSES, BANQUET CAPTAINS

(Wage scales set forth herein shall include meals)

| BANQUET WAGES | Effective July 1, 2000 | Effective July 1, 2000 | Effective July 1, 2001 | Effective July 1, 2002 | Effective July 1, 2003 | Effective July 1, 2004 | Effective July 1, 2005 |
|---|---|---|---|---|---|---|---|
| Breakfast – Starting between 5:00 a.m. and 11:00 a.m., consuming 2 hours | 33.77 | 37.20 | $38.69 | $40.24 | $41.85 | $43.52 | |
| Luncheon – Starting between 11:00 a.m. and 3:00 p.m., consuming 2-1/2 hours | 36.18 | 37.60 | 39.14 | 40.71 | 42.34 | 44.03 | |
| Washington Tea or Cocktail Party – Starting between 3:00 p.m. and 5 p.m., consuming 2 hours | 33.26 | 34.77 | 36.34 | 38.71 | 41.26 | 43.91 | |
| Dinner or Supper – Starting after 6:00 p.m., consuming 4-1/2 hours | 36.97 | 38.45 | 39.99 | 41.59 | 43.25 | 44.98 | |
| Extra (no food) – Starting after 8:00 p.m., consuming 2-1/2 hours | 36.18 | 37.63 | 39.14 | 40.71 | 42.34 | 44.03 | |
| Additional for each setting up and each holding | 22.54 | 24.43 | 25.54 | 26.56 | 27.26 | 28.64 | |
| Holdings | 14.68 | 14.64 | 16.33 | 16.64 | 17.13 | 18.99 | |

In setting forth the stated hours and the time to be consumed by these various functions, it is the intent that overtime compensation will be paid in the event that service exceeds the hours set forth above, in the following amounts:

Overtime compensation for banquet captains shall be paid at one and one-half (1-1/2) times their hourly rate of pay.

It is not the intent of this provision to alter or abrogate any practice now existing that had been agreed upon between the parties hereto.

The hours designated for any function shall be the hours, beginning at the time when the service personnel report on the floor for duty, exclusive of any time consumed for dressing or eating.

---

Committee reception in connection with a dinner, held in a private room; wherein personnel also serve at the dinner—effective July 1, 2000, in addition to regular wages, $22.06; effective July 1, 2004, $25.96; effective July 1, 2002, $24.94; effective July 1, 2003, $25.94.

Buffet, starting before 6:00 P.M., to be paid for at Luncheon Prices.

Buffet, starting after 6:00 P.M., to be paid for at Dinner Prices.

## WORKING CONDITIONS

1. Service personnel shall report one (1) hour before the function is scheduled to begin.

2. Set-up personnel shall report for duty one (1) hour before service personnel report.

3. Clear-off personnel shall remain until function terminates.

4. Fifteen (15) covers shall be considered the standard set-up for breakfast and for supper (except in the case of an elaborate supper, in which case the set-up shall be ten (10)). Ten (10) covers shall be considered the standard set-up for luncheon and dinner.

5. Tables of eleven (11) and twelve (12) will be accepted as a regular set-up in exceptional cases, but not as a regular procedure.

6. Thirteen (13) to seventeen (17) covers will be considered a "split" table for which, for breakfast and luncheon, an extra $22.25 shall be paid effective July 1, 2000, $23.25 effective July 1, 2004, and $24.17 effective July 1, 2005. For dinner, an extra $23.11 shall be paid effective July 1, 2000, $24.03 effective July 1, 2001, $24.99 effective July 1, 2002, $25.99 effective July 1, 2003, $27.03 effective July 1, 2004, and $28.11 effective July 1, 2005.

7. Double tables of twenty (20) to twenty-four (24) shall be considered two (2) tables as far as wages are concerned, except for breakfast where double tables shall be considered a "double split."

8. Set-up and clear-off personnel shall follow the general industry practice of servicing forty covers.

9. In cases where no set-up personnel are provided and waiters/waitresses are required to set up their own tables, each shall be paid extra, in addition to his/her regular pay, as follows: July 1, 2000, $5.98, July 1, 2001, $6.12, July 1, 2002, $6.36, July 1, 2003, $6.61, July 1, 2004, $6.87, and July 1, 2005, $7.14.

10. When food is not provided, due to the late hour or otherwise, waiters/waitresses shall be paid (25¢) twenty-five cents extra in addition to their regular pay.

11. Payment of wages and gratuities shall be made as soon as possible after the termination of service but in no case later than forty-eight (48) hours after the function, except in exceptional cases.

12. Extra Banquet Captains who work on a daily basis instead of a weekly basis shall be paid for breakfast and luncheon $63.09 effective July 1, 2000, $65.61 effective July 1, 2001, $68.23 effective July 1, 2002, $70.96 effective July 1, 2003, $73.80 effective July 1, 2004, and $76.75 effective July 1, 2005. They shall be paid for dinner $63.54 effective July 1, 2000, $66.08 effective July 1, 2001, $68.72 effective July 1, 2002, $71.47 effective July 1, 2003, $74.33 effective July 1, 2004 and $77.30 effective July 1, 2005. It is understood that they will work during the entire period of the function, including the time required for setting up and clearing off.

13. Banquet clear-off servers at dinner dances who are required to remain more than one (1) hour after the service food terminates shall be paid, in addition to their regular clear-off wages, a

... [illegible] $21.87 effective July 1, 2000, $24.82 effective July 1, 2001, $23.81 effective July 1, ... $25.84 effective July 1, 2003, $27.91 effective July 1, 2004 and $29.03 effective July 1, ... overtime after completion of five and one-half (5 1/2) hours from the time they are called for service of the function. (It is understood that this rule will be uniform in all hotels ... dinner dances and the various arrangements now in effect in individual hotels will be ... modified to conform with this procedure, except that any existing arrangements providing greater compensation to employees shall not be reduced.)

14. ... in order to avoid errors and confusion, the UNION shall provide the employer with the ... of the extra personnel referred for a function at least two hours before they report for ... service. (This provision can be effective only in cases where the hotel calls the UNION not later than 3:30 p.m. on the day preceding the date of the function.)

15. Under no circumstances shall Banquet personnel or delegates have the privilege or right to discuss working conditions, wages or gratuities with Banquet Committees or guests. All preferences must be referred to the Headwaiter, and by the Delegate only.

16. It is understood that the hours, wages and working conditions for extra banquet waiters/waitresses and captains provide a minimum standard for all hotels. Any hotel that has already granted and put into effect conditions more favorable for the service of food terminates. Any hotel which has already granted and put into effect conditions more favorable to banquet waiters/waitresses than those listed above shall continue such more favorable practices.

17. Banquet waiters/waitresses, at all functions with music, where the function continues after 2:00 a.m., shall be paid for work performed after 2:00 a.m., at the rate of $13.37 effective July 1, 2000, $13.98 effective July 1, 2001, $14.60 effective July 1, 2002, $17.24 effective July 1, 2003, $17.97 effective July 1, 2004 and $18.69 effective July 1, 2005. This rate shall be paid in addition to the present clear-off rates, as set forth in paragraph 13 above, for banquet clear-off personnel who are required to remain more than one hour after the service of food terminates.

18. On or before October first of each year, a committee of the ASSOCIATION and a committee of the UNION shall meet to determine the wages to be paid employees for the following New Year's Eve. In the event the parties are unable to reach an agreement by November first, the matter may be submitted to arbitration.

19. Banquet waiters and waitresses covered by this Schedule shall receive the following vacation and holiday pay:

**A.**    Eligibility:

(1)    A banquet waiter or waitress shall be eligible for vacation pay in a hotel in any fiscal year if he or she was on the hotel's steady rotation list for at least six (6) months in the previous fiscal year provided that his gross wages earned in the hotel were at least $1,000.

For purposes of this provision the fiscal year shall be the period starting September 1, and ending August 31, of the following year. Vacation pay shall be paid to all eligible employees at the beginning of each fiscal year for the preceding year.

(2)    The number of weeks of vacation pay for which a banquet waiter or banquet waitress shall be eligible under paragraph (1) above, shall be based on hotel's steady or rotation list for at least six (6) months, based on the schedule set forth in Section 28 (A) (3) of the Agreement.

(3)    The amount of vacation pay for employees who have been on the steady or rotation list for six (6) months or more in the preceding year will be calculated by multiplying the amounts arrived at under paragraph (a) or (b) below by the following fractions:

6 months but less than 6½ months - 6/9

6½ months but less than 7½ months - 7/9

7½ months but less than 8¼ months - 8/9

8¼ months or more - full amount

(a)    Gross wages of $1,000 but less than $3,000 -
1.9% of gross wages per week of vacation plus 100%.

(b)    Gross wages of $3,000 or more:

Effective July 1, 2001 - $694.40 per week

Effective July 1, 2002 - $722.18 per week

Effective July 1, 2003 - $751.07 per week

Effective July 1, 2004 - $812.35 per week

Effective July 1, 2005 - $844.84 per week

Gross wages shall mean the sum of the function rate plus the rate for split tables, set-up and clear-off (exclusive of gratuities),

**B.**    Banquet Captains

Banquet captains on a hotel's steady list shall be eligible for vacations in accordance with the foregoing rules, but gross wages shall mean the banquet captain's total straight-time earnings, exclusive of gratuities, received during the preceding calendar year.

**C.**    Roll-call Banquet Waiters and Banquet Waitresses

Effective July 1, 2000, roll-call banquet waiters and waitresses shall be paid $4.39 for each banquet function as vacation and holiday pay. The foregoing payment shall be increased effective July 1, 2002 to $4.67, effective July 1, 2002 to $4.65, effective July 1, 2003 to $4.84, effective July 1, 2004 to $5.03, and effective July 1, 2005 to $5.23. Said payment shall be paid together with their regular earnings.

**C.**    In the event roll-call banquet waiters or roll-call banquet waitresses work on a holiday listed in Section 29(A) of the collective bargaining agreement, they shall receive holiday pay in the same amount payable to a la carte waiters/waitresses under the wage scale as set forth in Schedule A. Said holiday pay shall be in addition to the wages payable for the banquet function or functions.

**D.**    Banquet waiters and banquet waitresses on a hotel's steady rotation list and banquet captains on a hotel's steady list shall receive holiday pay based upon the same eligibility applicable to regular employees. The amount of pay for holiday shall be the amount payable to a la carte waiters/waitresses or a la carte captains under the wage scale set forth in Schedule A.

Should it be necessary for such banquet waiter, banquet waitresses or banquet captains to work on any of the holidays listed in Section 29(A) of the collective bargaining agreement, said holiday pay shall be in addition to the wages payable for the banquet function or functions.

## SCHEDULE A-2

### VACATIONS, CALL-IN PAY AND HOLIDAY PAY
### FOR CHECKROOM AND WASHROOM ATTENDANTS

Checkroom and Washroom Attendants shall receive vacations, holiday benefits and call-in pay as follows:

**A.**    VACATION PAY

(1)    Amount of Vacation Pay:

Upon completion of one (1), two (2), three (3), and four (4) years respectively of continuous employment, each employee shall receive (2%) two, (3%) three, (4%) four, and (5%) five percent respectively of the wages earned during the immediate calendar year preceding the vacation payment.

(2)    Eligibility for vacation pay shall be based upon each employee having been employed for not less than six (6) months during the preceding calendar year.

**B.**    CALL-IN PAY

(1)    An employee called in to work on any given day shall be provided with not less than three and one-half (3 1/2) hours of work.

**C.**    HOLIDAY PAY

A. The following five holidays shall be recognized as paid holidays: Thanksgiving, Christmas, New Year's, Washington's Birthday, and Martin Luther King's Birthday.

(1) All questions concerning eligibility and any other related issues shall be determined in accordance with the terms of the Agreement.

(2) An employee who is eligible to receive holiday pay and who is called in to work on any one of the aforementioned holidays, and does so work, shall be paid at the rate of double-time.

(3) An employee who is eligible to receive holiday pay and does not work on the holiday shall receive as holiday pay three and one-half (3½) hours pay at straight time.

(4) An employee who is eligible to receive holiday pay and who is called in to work on any one of the following holidays: Memorial Day, July 4ᵗʰ and Labor Day, and does so work, shall be paid at the rate of double time.

(5) An employee who is eligible to receive holiday pay and who does not work, shall not be entitled to receive any holiday pay.

## SCHEDULE A-3

## VACATIONS AND HOLIDAYS FOR STEADY EXTRA BANQUET BARTENDERS

Steady extra banquet bartenders shall be eligible for vacation and holiday pay in accordance with the following provisions:

### I. ELIGIBILITY.

A. A steady extra banquet bartender shall be eligible for vacation pay in a hotel in any calendar year if he or she was on the hotel's steady extra list for at least six (6) months in the previous calendar year, provided that his or her gross wages earned in the hotel, exclusive of gratuities, was at least $1,000.00.

B. The number of weeks of vacation pay for which a steady extra bartender shall be eligible under Paragraph "A" above shall be based on the number of consecutive years, in each of which the employee has been on the hotel's steady extra banquet bartenders list for at least six (6) months and shall be in accordance with the schedule set forth in Section 28(A) of the Agreement.

C. The amount of vacation pay for employees who have been on the hotel's steady extra banquet bartenders list for at least six (6) months or more in the preceding years will be calculated as follows:

Each employee in order to be eligible for vacation pay must earn a minimum of $1,000.00 of wages and a maximum of $3,000.00 of wages.

Each employee receiving $3,000.00 or more in wages excluding gratuities should receive a maximum vacation pay of $629.45 per week, effective July 1, 2000, $654.63 effective July 1,

## ADDENDUM I

To Hotel Association of New York City Inc.:

In consideration of your execution of the agreement (hereinafter referred to as the Hotel Association contract) between Green Hotel Association of New York City, Inc., on behalf of itself and its HANYC Bargaining Group Hotels and the New York Hotel and Motel Trades Council, it is understood and agreed that if New York Hotel and Motel Trades Council, it is agreement or other arrangement with another hotel association and/or with an individual hotel owner in the City of New York which does not include the union shop and/or check-off or which contains provisions in lieu thereof or contains other provisions and terms which the Hotel Association on behalf of itself and on behalf of its HANYC Bargaining Group Hotels may consider more favorable than the terms of the Hotel Association contract, whether or not such terms and provisions would be within the meaning of Section 39 of said contract, then, in such event, the Hotel Association on behalf of itself and on behalf of its HANYC Bargaining Group Hotels shall have the right to be released from the Hotel Association contract upon signing such other agreement or if all EMPLOYERS who shall have signed the Hotel Association contract accept the provisions of such other agreement, then the Hotel Association contract shall be deemed modified to the extent of such other agreement, and any provisions of the Hotel Association contract inconsistent therewith shall be of no further force and effect. This Addendum shall constitute an agreement on any party other than the Hotel Association, on behalf of itself and on behalf of the Bargaining Group Hotels, and the New York Hotel and Motel Trades Council.

Dated: June 26, 1985

Faithfully Yours,
By Vito J. Pitta, President

NEW YORK HOTEL AND MOTEL TRADES COUNCIL

## ADDENDUM II

...if the United States Congress promulgates legislation, or the Internal Revenue Service issues a ruling, which, for federal income tax purposes, provides that any portion of Employer paid benefits, be included in the gross income of the Employer's employees, and/or if the United States Congress or the Internal Revenue Service, disallows, for federal income tax purposes, the deductibility of Employer paid wages and fringe benefits provided by this Agreement, then the parties hereto agree that they shall expeditiously convene a study committee to discuss and study the impact of such tax law changes and to propose measures to be implemented by the parties so that no Employer or employee incurs an increased income tax liability solely as a result of the tax law changes.

It is the parties' intention that the foregoing matters be studied, reviewed, discussed and resolved within 90 days after the passage of such legislation. In the event the parties fail to agree within the aforesaid time period, the parties shall, by mutual agreement, have the right to agree this matter to the Impartial Chairman, who shall be empowered to make a final and binding decision on any and all matters not resolved by the parties no later than 45 days after submission of this matter.

In the event that either party fails to agree to submit this matter to the Impartial Chairman, such party may submit the matter to the United States District Court for the Southern District of New York for resolution by the Court.

## ADDENDUM III

**Notice to all Continuing Employees of The New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund.**

The Multi-Employer Pension Plan Amendments Act of 1980 ("the Act") imposes a potential liability upon an employer who "withdraws" as a contributing employer from a pension fund. "Withdrawal" and the sale/conditions/circumstances accounting in which such contributing employer "withdraws" same are defined in the Act. In general, a contributing employee "withdraws" when it ceases to be obligated to make periodic contributions to a pension fund due to a cessation or, in some cases, a diminution of operations, or after a sale, transfer of its business, or after a union is decertified as bargaining agent. All contributing employees are urged to obtain legal advice as to the foregoing withdrawal liability.

## ADDENDUM IV

Company Name
Address

Dear _____:

This letter agreement will confirm the discussions we have had regarding the procedures to be followed by the New York Hotel & Motel Trades Council ("Union") to organize certain employees and have company acquires an ownership, management or control interest and the Union does not have other matters, including the resolution of disputes related to such organizational drive and/or the terms of this letter agreement ("Agreement") and any subsequent collective bargaining agreement.

### 1. Use of Impartial Chairman

The Impartial Chairman of the Hotel Industry of New York City ("Imperial Chairman") will conduct a "card count" to determine whether the Union has obtained valid cards from a majority of full-time and regular part-time employees of the Hotel, employed in job classifications listed in Schedule A to the industry Wide Agreement between the Union and the Hotel Association of New York City Inc. ("IWA"), designating the Union as their representative for purposes of collective bargaining (the "Cards") and to certify the result of his said count, all in accordance with the procedures set forth in Section III below. Full-time and regular part-time employees of the Hotel employed in job classifications listed in Schedule A shall be referred to throughout this Agreement as "Employees".

The Imperial Chairman also will resolve any and all disputes of any kind whatsoever arising out of this Agreement, or concerning the meaning or interpretation of any and all matters discussed herein, including but not limited to the terms and provisions of any collective bargaining agreement entered, or to be entered into, by and between the Hotel and the Union. Any costs incurred by the parties in instituting proceedings before the Imperial Chairman, or defending against the same, shall be the responsibility of the respective party. Costs charged by the Imperial Chairman shall be shared and paid equally by the parties. Any arbitration award or decision issued by the Imperial Chairman, written or otherwise, shall be final and binding upon the parties, and subject to the provisions of Article 75 of the New York Civil Practice Law and Rules ("CPLR") including, but not limited to, the procedures to vacate or modify an award pursuant to Section 7511 of the CPLR, and shall be enforceable in a court of competent jurisdiction.

### 2. Union Access to the Hotel

The Union will begin its organization of the Hotel's employees at any time upon notice to the Hotel's General Manager. The Union will be permitted to have its organizers or representatives enter the Hotel to meet with Employees during the Employees' non-working times (for example, before work, after work, and during shift changes, meals and breaks) and/or during such other periods as shall be mutually agreed upon in writing. The Union may engage in organizing efforts in non-public areas of the Hotel such as the Employee lunchrooms and locker rooms or such other non-public areas as the parties may mutually agree upon.

Within three (3) days following receipt of the above described written notice of intent to organize Employees, the Employer will furnish the Union with a complete list of such Employees, including both full and part-time Employees, showing their job classification, work schedules, wages, and benefits, and the home addresses and telephone numbers of all Employees. Thereafter, the Employer will promptly provide updated lists for the duration of the organizing drive.

There shall be no lockouts of the Employees by the Hotel and the Union shall not cause any disruption of work by the Employees during the organizing activity, including picketing, strikes, slow downs or other work stoppages at the Hotel by the Union for any purpose, including organizing, contract negotiations, dispute publication and protest. The "no lockout no strike" provisions hereof shall not supersede any of the terms of this Agreement. In the event the party fails to abide by an award or decision of the Imperial Chairman within three (3) business days of its issuance. Both the Hotel and the Union agree to respect the National Labor Relations Act (the "Act"), Section 7 rights of employees during the Union's organizing drive, and neither party shall, or be required to, act in contravention of those rights. The Hotel specifically agrees that its supervisory agents and/or its representatives will not act or make any statements that will directly or indirectly imply the Hotel's opinion as to whether or not the employees should support the Union or as to the reputation of the Union or any of its officers and affiliate local unions or as to the reputation of any of the officers of the Union's affiliate local unions and/or their parent unions.

### 3.    Determination of Majority Status

At any time after the commencement date of the Union's organizing effort, the Union may request that a card count be conducted by the Imperial Chairman. The Union shall notify the process by advising the Hotel's General Manager in writing ("Notification Letter") that it represents a majority of the full-time and regular part-time employees employed by the Hotel in the job classifications set forth in IWA Schedule A. The date of the Union's Notification Letter shall be the date ("Notification Date") used for purposes of determining the composition of the list of the names of the Employees to be furnished by the Hotel to the Imperial Chairman, so that all full-time and regular part-time Employees whose names will appear on the list. Notification Date will be the only Employees employed on or before the

Within forty-eight (48) hours of the delivery of the Notification Letter by the Union to the Hotel indicating the majority status, the Union shall notify the Imperial Chairman in writing that his services are requested for purposes of conducting a card count. The Union shall immediately confirm to the Hotel's Genpress of conducting a card count. The Union shall jurisdiction of the card count proceeding. As soonger that the Imperial Chairman has retained later than seven (7) days after the date of the Union's writing court request made to the Imperial Chairman, the Union shall furnish to the Imperial Chairman the list obtaining from the Employees, and the Hotel shall furnish to the Imperial Chairman the list obtaining names, job classifications and social security numbers of Employees employed as of the date of the Union's Notification Letter (with a copy to the Union) together with copies of official employment documents containing the signatures of each of the Employees (e.g. Forms I-9, Form W4 or similar documents), in care of the Office of the Imperial Chairman, 321 West 44th Street, New York, New York 10036.

Within forty-eight (48) hours after his receipt of the documents described above, the Imperial Chairman shall conduct a card count by checking the Cards against the list of Employees and by comparing the Employees' names and signature appearing on the Cards to

the names and signatures appearing on the employment documents supplied to the Imperial Chairman by the Hotel. At the conclusion of the card count, the Imperial Chairman shall inform the parties of the results of his count and shall certify in writing that either the Union has not been selected by a majority of eligible Employees of the Hotel as their Collective bargaining representative. Both the Hotel and the Union agree to abide by the determinations made by the Imperial Chairman regarding any challenges either to the validity of the Cards, the eligibility of Employees, the appropriateness of the unit and/or to the majority status of the Union.

If, after the conduct of the card count, the Imperial Chairman certifies to the Imperial Chairman as the majority representative of the eligible Employees, this Agreement shall be deemed to continue in full force and effect, unless it is otherwise terminated by mutual agreement of the parties. Notwithstanding any of the foregoing seemingly to the contrary, the Hotel and Union also agree that the Imperial Chairman shall be empowered to issue such remedial orders as are consistent with applicable NLRB standards and possessy during and after the pendency of the Union's organization drive to ensure the maintenance of the neutral equipment and/or to penalize the Hotel or the Union for violating their obligations hereunder, including damages to either party.

If the Union is certified as the majority representative of the Employees, the Hotel and recognize the Union and the Hotel and the Union will commence negotiations within seven (7) calendar days of the date of the certification, at a mutually agreeable time and place, for a collective bargaining agreement, covering wages, hours and other terms and conditions of employment (the "Agreement").

I believe that the above correctly describes our discussions on these matters. Please signify your concurrence by signing where indicated below and returning one copy to me, the other being for your files.

Very truly yours,

Peter Ward
President

Executed, Agreed and Accepted
on behalf of Hotel/Company

By: _____

Name:
Title:
Date:

**ADDENDUM V**

**Extra Rooms/Wage Equalization Lawsuit:**

a. Effective August 1, 1990:

(i) Room attendants shall no longer be assigned to make up extra rooms without being compensated for them at the extra room rate specified in this Agreement;

(ii) The base weekly rates of pay for both day and night shift room attendants will be equalized to the base weekly rates of pay of day shift room attendants.

b. In consideration of the foregoing, the parties shall immediately enter into a stipulation of settlement, and the Trades Council shall do everything necessary to make up, in accordance therewith, withdrawing and terminating the various actions in the United States District Court for the Southern District of New York entitled and referenced as...New York Hotel and Motel Trades Council, AFL-CIO, et al. V. Hotel Association of New York City, Inc. et al., 83 Civ. 0216, 0222, 0225, 0226, 0227, 0228, 0229, 0231, 1020 and 9925 and all proceedings relating thereto, including any and all charges or complaints filed with the Equal Employment Opportunity Commission, New York State Division of Human Rights and New York City Commission on Human Rights against any Employer who is a member of the Association and who is also bound by the terms of the 1990 Memorandum of Understanding and the Agreement as thereby modified and extended.

It is agreed that each of the parties hereto hereby release the other from any and all liability arising out of or connected in any way to or with any of the issues associated with the aforesaid actions, proceedings or claims of the Trades Council made, instituted or filed in behalf of itself or its members.

**EMPLOYEE BENEFIT FUNDS**

**SCHEDULE B**

SUPPLEMENTAL AGREEMENT dated the 1st day of July, 2001 between the HOTEL ASSOCIATION OF NEW YORK CITY, INC., hereinafter called the ASSOCIATION, and the operators of hotels who are Bargaining Group Hotels of the ASSOCIATION, and with respect to whom the UNION (as hereinafter designated) has been designated as sole collective bargaining agent for the employees in the hotels and concessionaires covered by this Agreement, and who shall become signatories or otherwise parties hereto, each and every such signatory and/or party hold and concessionaire being hereinafter referred to as the EMPLOYER; and the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its several affiliates and their members, now employed or hereafter to be employed by the EMPLOYER.

WHEREAS, the ASSOCIATION, the EMPLOYER and the UNION have simultaneously herewith executed a Collective Bargaining Agreement; and

WHEREAS, as part of the consideration for the execution of the Collective Bargaining Agreement, the EMPLOYER agreed to contribute sums of money equal to a stated percentage of its payroll or a specific amount to the Funds (as defined below) to be used to provide various medical, accident and sickness, life insurance, pension, legal services and industry training benefits to employees covered by the Collective Bargaining Agreement, and employed by the EMPLOYER, medical and legal services benefits to the families of such employees, health care

B-1

benefits to the enrolled domestic partners of such employees and scholarship benefits to the children of such employees, all as determined by the Trustees; and

WHEREAS, the July 1, 1995 Agreement executed simultaneously herewith and it is desired to continue payments to the Funds to provide the benefits hereinafter set forth.

NOW, THEREFORE, in consideration of the premises, the EMPLOYER and the UNION agree that the Collective Bargaining Agreement shall be supplemented by adding hereto the following provisions:

1. Effective July 1, 2001, the Supplemental Agreement contained in this Schedule B is intended to supersede and replace in their entirety Schedules B, C, D, E, F and G of the July 1, 1995 Agreement.

2. **Definitions.** For purposes of this Supplemental Agreement, the following terms shall have the following meanings:

The term "employees of the Employer" means, unless otherwise provided, all of the employees of the EMPLOYER who are covered by and are entitled to the benefits of the Collective Bargaining Agreement, certain employees of the New York Hotel Trades Council and Hotel Association of New York City, Health Center, Inc. and the New York Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Funds, and certain employees of the UNION and those of its affiliated local unions which have agreed to contribute to the Funds.

B-2

The term "family" means an employee's spouse, unmarried children, step-children, foster children and adopted children under age 19, provided they depend on the employee for more than half of their support, and unmarried children, regardless of age, who are unable to support themselves as a result of a physical, developmental or mental illness or condition which happened the child prior to reaching age 19. Effective no later than July 1, 2003, the term family will also include full-time students who are dependants of covered employees until the last calendar day of the calendar year in which said dependant reaches twenty-three (23) years of age.

The term "domestic partner" means a person who is living with an employee and sharing financial responsibility with the employee for their joint household. Domestic partners of eligible fund participants will be treated as qualified dependents and eligible for Health Benefits Fund benefits.

The term "wages", for purposes of calculating Employer contributions equal to a percentage of employee wages, shall be defined as including vacation pay, overtime pay, holiday pay, sick leave pay, personal day pay, jury duty pay, bereavement pay, value of meals and lodging where such are part of an employee's wages commencing from the first day of employment, whether such employment be permanent, temporary, casual, part-time or extra, and banquet waiters' and waitresses' tips. Notwithstanding the foregoing, an employee's wages in excess of the amount of earnings at which the Employer's FICA contributions are required shall not be taken into account in calculating Employer contributions to the Funds. Further, "wages" are limited as set forth in Section 6(D) of the Collective Bargaining Agreement regarding the

B-3

date as of which contributions must commence to be made to certain of the Funds on behalf of a new employee:

The term "Funds" means the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund, Pension Fund, Pre-Paid Legal Services Fund and Industry Training and Scholarship Fund.

3. The Health Benefits Fund.

(A) Effective January 1, 1999, the New York Hotel Trades Council and Hotel Association of New York City, Inc. Insurance Fund, Union Family Medical Fund and Dental Fund were merged into a single fund renamed the "New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund" (the "Health Benefits Fund"). Said merged fund is the successor to the separate Union Family Medical, Insurance and Dental Funds and, as such, provides multiple plans of benefits, including a medical benefits plan (formerly provided by the Union Family Medical Fund), a hospital and insurance benefits plan and an optical benefits plan (formerly provided by the Dental Fund). Effective July 1, 2001, the EMPLOYER shall make a single, aggregate monthly contribution to the Trustees of the Health Benefits Fund for all benefit plans within that Fund covering the employees of the EMPLOYER equal to the following amounts (or such amounts as may be agreed upon from time to time by the UNION and the ASSOCIATION):

B-4

| Contribution Rate | Benefit Coverage |
|---|---|
| (a) For the first six months after the EMPLOYER's adoption of the Collective Bargaining Agreement - 17.25% of employee wages | Combined Medical and Insurance (Hospital, Life, Accidental Death and Dismemberment, Short-Term Disability) |
| (b) After the period specified in (a) above and from July 1, 2000 to January 1, 2003 - 14.5% of employee wages | |
| (c) After the period specified in (a) above and on and after January 1, 2003 - 15.5% of employee wages | |
| (d) $1.50 per employee per month | Optical Benefits |
| (e) 2.00% of employee wages | Dental Benefits |

Notwithstanding the foregoing, the Trustees shall maintain the projected liquid assets of the Health Benefits Fund at the end of each calendar year at not less than forty-five percent (45%) of the following year's expenses of the Fund. Those contributions expressed as a percentage of wages shall be computed with respect to wages payable to the employees of the EMPLOYER for the preceding pay period. All contributions to the Health Benefits Fund shall be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of providing medical, accident and sickness and

---

1. Such contributions will be due with respect to each employee of the EMPLOYER from the initial date of employment

2. Such contributions will be due with respect to each employee to be employed on the 1st day of each month.

3. Such contributions will be due with respect to each employee of the EMPLOYER immediately after the completion of time (6) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement.

B-5

insurance benefits to the employees of the EMPLOYER and medical benefits to the families and enrolled domestic partners of such employees, all as determined by the Trustees.

(B)    In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of medical, life, health and accident, or hospitalization insurance benefits under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited against the sums otherwise payable hereunder for each pay period with the amount of such tax or exaction payable by it for such pay period.

(C)    Effective no later than July 1, 2003, the Health Benefits Fund will provide up to thirty (30) days of in-patient psychiatric coverage. It is understood that in the event that legislation is enacted which requires modification of this benefit, the parties agree to meet to discuss the impact of such mandated modification of this benefit in order to maintain the then current contribution rate.

4.    The Pension Fund

(A)    Effective July 1, 2001 the EMPLOYER shall increase its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund from five and one-half percent (5-1/2%) to seven percent (7%) (or such percentage as may be agreed upon from time to time by the UNION and the ASSOCIATION) of the wages payable to the employees of the EMPLOYER for the preceding pay period, to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of providing pensions to the employees employed by the EMPLOYER. Such contributions will be due with respect to each employee of the EMPLOYER

B-6

immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the employee's Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B)    The EMPLOYER and the UNION agree that, subject to all of the terms and conditions set forth in the Pension Fund's Rules and Regulations, the following increases in monthly pension benefit payments will be implemented in accordance with the following table for employees in active covered employment who are not Pensioners as of the effective dates set forth below:

| Effective Date | Regular Maximum Monthly Benefit | Age and Service Pension (25 yrs of service and age 55) |
| --- | --- | --- |
| July 1, 2003 | $850 per month | $800 per month |
| July 1, 2004 | $950 per month | $850 per month |
| July 1, 2005 | $1,000 per month | $875 per month |

In addition, effective July 1, 2001, as approved by the Trustees, Participants in Covered Employment on June 30, 2001 whose Pension Effective Date occurs thereafter shall accrue an additional Regular Pension benefit of $20 per Pension Credit for each Pension Credit in excess of 25, up to a maximum of 40 Pension Credits. This additional accrual does not apply to Participants retiring on an Age and Service Pension.

B-7

(C)  The EMPLOYER and the UNION agree that, subject to all of the terms and conditions set forth in the Pension Fund's Rules and Regulations, the following increases in monthly pension benefit payments will be implemented in accordance with the following table for Pensioners and beneficiaries in pay status on the effective dates set forth below:

| Effective Date | % Increase |
|---|---|
| July 1, 2002 | 2.0% |
| July 1, 2003 | 2.0% |
| July 1, 2004 | 2.0% |
| July 1, 2005 | 2.0% |

(D)  The EMPLOYER agrees to increase its contribution to the Pension Fund in order to meet the requirements of the Employee Retirement Income Security Act of 1974, as amended, by such amount as is finally determined upon completion of an actuarial valuation.

5.  **The Pre-Paid Legal Fund**

(A) Effective July 1, 2001, the EMPLOYER shall change its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City Inc. Pre-Paid Legal Services Fund from five cents (5¢) per hour (to a maximum of 35 and 40 hours per week for non-tip and tip employees, respectively) to one-half of one percent (0.50%) (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) of the wages payable to the employees for the preceding pay period, to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for

B-8

the purpose of making available certain legal services benefits to employees of the EMPLOYER and their dependents.  Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment.  The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B)  In the event that legislation is enacted by the Federal, State or Municipal Government levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of prepaid legal insurance under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period with the amount of such tax or exaction payable by it for such pay period.

(C)  Contributions to the Fund shall continue only so long as the Fund retains its tax exempt status.

6.  **Industry Training and Scholarship Fund.**

(A)  The Employer shall continue to pay the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund the sum of one dollar and fifty cents ($1.50) per month for each employee on the EMPLOYER'S payroll on the 15th day of each month (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) to be administered and expended by the Trustees pursuant

B-9

to the provisions of the Fund's trust instrument (identified below) for the purpose of establishing and maintaining programs to train employees for promotion and advancement. Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER, signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B). The Employer shall continue to pay the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund the sum of one dollar ($1.00) per month for each employee on the EMPLOYER'S payroll on the 15th day of each month (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument and to provide educational scholarship and tuition aid to dependents of the EMPLOYER'S employees. Such contributions will be due with respect to each employee of the EMPLOYER from the employee's initial date of employment.

(C) In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of job training and scholarship insurance under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period with the amount of such tax or exaction payable by it for such pay period.

B-10

7. The 401(k) Savings Plan and Trust. Effective July 1, 2001 the EMPLOYER shall report remitting employee contributions to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. 401(k) Savings Plan and Trust solely on behalf of each of its employees who has elected to defer a portion of his or her wages on a pre-tax basis to such Plan and Trust. The employee contributions remitted by the EMPLOYER shall be the aggregate amount of the wage deferral deducted by the EMPLOYER in accordance with employees' elections for each pay period. The EMPLOYER shall, as required by law, remit such contributions to the Trustees as of the earliest date on which such contributions can reasonably be segregated from the EMPLOYER'S general assets. Any and all costs attendant to the establishment, implementation and administration of the 401(k) Plan, other than costs of deducting and withholding from employee wages and transmitting same to the Plan, shall be paid out of the employee elective deferral contributions.

8. Provisions Common to All Funds. The following provisions shall apply to all of the foregoing Funds:

(A) The terms and provisions of each Fund's trust instrument are specifically incorporated herein by reference.*

Health Benefits Fund - Agreement and Restated Declaration of Trust dated January 1, 1999.
Pension Fund - Restated Agreement and Declaration of Trust dated January 1, 1976 and amended March 1, 1988.
Pre-Paid Legal Fund - Agreement and Declaration of Trust dated November 1, 1997.
Training and Scholarship Fund - Restated Agreement and Declaration of Trust dated July 29, 1987.

B-11

(B)    If the Trustees shall complain that any EMPLOYER has not made full payment of contributions to the Trustees of any of the foregoing Funds, such complaint shall be filed with the Impartial Chairman named in the Collective Bargaining Agreement and the Impartial Chairman shall make the necessary findings and award and his decision shall be final and binding on the parties. Any EMPLOYER delinquent in contributions shall be required to pay said contributions and any audit or accounting fees in connection therewith if said delinquent contributions are paid prior to the institution of legal or arbitration proceedings. Any EMPLOYER against whom legal or arbitration proceedings are instituted shall be required to pay in addition to the amount of the delinquency, interest at the then legal rate, audit fees, liquidated damages in the amount of twenty percent (20%) of the amount of the delinquency, attorneys fees and costs.

(C)    No employee of an EMPLOYER and no member of any such employee's family shall have the option to receive instead of the foregoing benefits any part of any contribution of the EMPLOYER. No employee or family member shall have the right to assign the benefits to which he or she may be or become entitled hereunder or under the trust instruments pertaining to each of the foregoing Funds, except as may otherwise be provided by law and the express provisions of a benefit plan, or to receive a cash consideration in lieu of such benefits either upon termination of the trust therein created, or through severance of employment or otherwise.

(D)    During the term of this Supplemental Agreement, the UNION obligates itself to enter into no contract or agreement whereby any EMPLOYER engaged in the hotel business in the City of New York will not be obligated to pay the amount required to be paid to the Trustees

401/01 Savings Plan and Trust - Agreement and Declaration of Trust dated July 1, 2001.

B-12

---

as set forth above. During the term of this Supplemental Agreement, the UNION agrees to insert a clause in all of its Collective Bargaining Agreements with hotel-employing members of the UNION engaged in the hotel business in the City of New York to the effect that the hotel shall pay to the Trustees under the trust instruments pertaining to each of the Funds the applicable sums set forth above (as the same may from time to time be modified according to the terms hereof), to be applied under the said trust instruments. This paragraph (D) may be waived by an instrument in writing executed by the Board of Directors of the HOTEL ASSOCIATION OF NEW YORK CITY, INC. and the UNION.

(E)    This Supplemental Agreement and the Collective Bargaining Agreement and each of the trust instruments pertaining to each of the Funds shall be construed as a single document, and all the provisions of the Collective Bargaining Agreement relating to the administration and enforcement thereof (including provisions for arbitration) shall apply to the administration and enforcement of this Supplemental Agreement; provided, however, that any controversy, claim, complaint, grievance or dispute arising out of or relating to the provisions of this Supplemental Agreement or the interpretation, breach, application or performance thereof, shall be referred by the UNION, the Trustees or the EMPLOYER, for arbitration and determination to the Impartial Chairman provided for in the Collective Bargaining Agreement.

(F)    The Trustees, in their names as Trustees, may institute or intervene in any proceedings, at law, in equity, or in bankruptcy for the purpose of effectuating the collection of any sums due to them from the EMPLOYER under the provisions of this Supplemental Agreement.

(G). The Trustees shall have the right to make such periodic audits of the EMPLOYER'S payroll records as they deem necessary. For purposes of this provision, payroll records shall include, but not be limited to, employee time cards, individual employee earnings records, Federal quarterly withholding and FICA tax returns (Form 941), State unemployment tax returns and Employer cash disbursement records.

(H) In the event of a dispute between the Trustees and the EMPLOYER, either party may submit same directly to the Impartial Chairman for determination.

(I) The provisions of this Supplemental Agreement shall remain in full force and effect for the full term of the Collective Bargaining Agreement, but shall terminate and come to an end with the Collective Bargaining Agreement, or prior thereto by an instrument in writing executed by the Board of Directors of the HOTEL ASSOCIATION OF NEW YORK CITY, INC. and the UNION or, in the case of a non-ASSOCIATION hotel or concessionaire, EMPLOYER, by an instrument in writing executed by the non-ASSOCIATION hotel or concessionaire EMPLOYER and the UNION.

(J) All contributions made prior to the date of this Supplemental Agreement by the EMPLOYER, or due from the EMPLOYER, under prior collective bargaining agreements and in the hands of the Trustees as of the date of this Supplemental Agreement (and not as of the date of this Supplemental Agreement, already applied to the purchase of insurance benefits for employees) and in whatever form or investments such contributions shall be, shall be deemed to be covered and controlled by, and embraced in and applied under, the terms of the within Supplemental Agreement and the trust instruments pertaining to each of the Funds, free from all rights and claims therein and hereto on the part of any EMPLOYER or of the UNION, with the

B-14

and effect as if such contributions, in whatever form the same may be, had been made under the EMPLOYER immediately after the execution of the within Supplemental Agreement.

(K) The primary purpose of this Supplemental Agreement and the trust instruments pertaining to each of the Funds being to provide a comprehensive range of benefits designed to promote the health and well-being of the employees of the EMPLOYER and their families, it is understood that the form of the benefit plans funded by each of their respective Funds and of this Supplemental Agreement and of each of the trust instruments pertaining to the Funds, shall not give rise to a literal or formal interpretation or construction such interpretation or construction shall be placed on this Supplemental Agreement and the trust instruments as will assist in the functioning of the plans for the benefit of employees and their families regardless of form.

(L) In no event will the EMPLOYER be entitled to the return of any part of any contribution hereafter made hereunder, or heretofore made under any prior collective bargaining agreement, provided, however, that, effective July 1, 2004, an EMPLOYER who has made an overpayment of contributions as the result of mistake or arithmetical error and who notified the Fund Trustees of such overpayment in writing within sixty (60) days of the due date to which such overpayment relates may receive a credit against future contributions due in the amount of the overpayment. The Fund Trustees shall have the sole discretion to determine the existence and amount of any claimed overpayment and whether, under the circumstances, the EMPLOYER is eligible for such credit.

B-15

(M)   Regardless of the date on which the within Supplemental Agreement shall be executed, the within Supplemental Agreement shall be effective as of July 1, 2001 with the same force and effect as if it had been actually executed on that date.

(N)   Neither the execution of this Supplemental Agreement, nor any provisions herein contained or contained in any other agreement affecting the same, shall be deemed to release the EMPLOYER from any contribution or contributions provided for in a prior Supplemental Agreement or any collective bargaining agreement and not yet paid to the Trustees under the terms of the Supplemental Agreement.

(O)   In the event that the obligation of the EMPLOYERS to make Employer contributions shall terminate, or upon the liquidation of the one or more trust estates, the Trustees shall continue to apply the trust estate affected to the purposes set forth in its related trust instrument and described in the foregoing and none other, and upon the disbursement of the entire trust estate affected, such Trust shall terminate.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Agreement to be executed by their duly authorized representatives on the day and year first written above.

Peter Ward,
President, New York Hotel
Trades Council, AFL-CIO

Joseph E. Spinnato,
President, Hotel Association
of New York City, Inc.

# EXHIBIT E

4 of 4

## 2006 MEMORANDUM OF UNDERSTANDING

Memorandum of Understanding entered into as to be effective July 1, 2006 between the Hotel Association of New York City, Inc. in its own behalf and in behalf of the HANYC Bargaining Group Hotels[1] (hereinafter collectively referred to as the "Employer") and the New York Hotel and Motel Trades Council, AFL-CIO in its own behalf and in behalf of its members, now employed or hereafter to be employed by the Employer (hereinafter referred to as "Union").

WHEREAS, the Employer and the Union are signatories to a Collective Bargaining Agreement entered into as to be effective July1, 2001 (hereinafter referred to as the "2001 Agreement"), which Agreement by its terms, expires on June 30, 2006;

WHEREAS, the Employer and the Union desire to modify and extend the 2001 Agreement as now restated in this Memorandum of Understanding, signed June 15, 2006 (hereinafter referred to as "2006 Agreement" or "this Agreement"),

NOW, THEREFORE, it is mutually agreed as follows:

1.   Duration
Except as expressly provided for herein, the 2001 Agreement is renewed and extended from July 1, 2006 until midnight June 30, 2012.

2.   Wages
   a.   Effective July 1, 2006, each employee on the Employer's payroll on that date shall receive a wage increase of 4% of the employees' actual rate of pay in effect on that date.
   b.   Effective July 1, 2007, each employee on the Employer's payroll on that date shall receive a wage increase of 4% of the employees' actual rate of pay in effect on that date.
   c.   Effective July 1, 2008, each employee on the Employer's payroll on that date shall receive a wage increase of 4% of the employees' actual rate of pay in effect on that date.
   d.   Effective July 1, 2009, each employee on the Employer's payroll on that date shall receive a wage increase of 3.5% of the employees' actual rate of pay in effect on that date.
   e.   Effective July 1, 2010, each employee on the Employer's payroll on that date shall receive a wage increase of 3.5% of the employees' actual rate of pay in effect on that date.
   f.   Effective July 1, 2011, each employee on the Employer's payroll on that date shall receive a wage increase of 3.5% of the employees' actual rate of pay in effect on that date.
   g.   The Employer and the Union agree that in accordance with past practice the rate of the aforesaid wage increases shall be applicable to all wage-related items contained in this Agreement, e.g., extra room rates, night shift differential rates, banquet rates, etc.
   h.   The minimum weekly rates set forth in Schedule A of the 2001 Agreement shall be increased by the wage increases provided for in paragraphs 2(a), 2(b), 2(c), 2(d), 2(e) and 2(f) above.

---

[1]   A list of HANYC Bargaining Group Hotels is attached hereto as Exhibit 1. The aforesaid list is current as of June 15, 2006 and is expected to increase on a continuing basis.

3. Pension Fund: Effective July 1, 2006, the contribution rate shall increase by 2.0% to 9.0%. The parties agree that the Trustees of the Pension Fund shall have the authority to determine when, and to what extent, the regular maximum monthly benefit shall be increased. At no time shall the Trustees permit the Pension Fund to subject contributing Employers to excise tax, or any other penalties.

4. Health Benefit Fund: The parties acknowledge that the contribution rate, effective as of January 1, 2006, is 20.5%

5. Article 6(C) of the Agreement shall be amended to provide that employees, newly hired as of July 1, 2006, shall not be paid less than 75% of the wage rate for their job classification set forth in Schedule A for the first two years from their date of hire and 85% of the wage rate for their third and fourth years of employment.

6. A. Article 8(D) Extra Banquet Housekeeping Attendants and Banquet Cooks
   (1) The Employer shall be entitled to hire "extra" banquet housekeeping attendants provided that the number of "extra" banquet housekeeping attendants permitted to be employed hereunder shall not exceed fifteen percent (15%) of the then current number of full-time housekeeping attendants who only work as banquet housekeeping attendants. Extra banquet housekeeping attendants may only be utilized after the Employer has offered the relevant shifts to all regular full and part time banquet housekeeping attendants, even if it entails overtime work, and after doing so, shifts are still available.
   (2) The Employer shall be entitled to hire "extra" banquet cooks provided that the number of "extra" banquet cooks permitted to be employed hereunder shall not exceed fifteen percent (15%) of the then current number of full-time cooks who only work as banquet cooks. Extra banquet cooks may only be utilized after the Employer has offered the relevant shifts to all regular full and part time cooks (including non-banquet cooks) even if it entails overtime work, and after doing so, shifts are still available.

   B. Article 8(D)(2) shall be amended to provided that the number of "extra" employees within each of the aforementioned job classifications shall not exceed fifteen percent (15%) of the then current number of full time employees in the aforementioned job classifications or one, whichever is greater.

   C. Article 8(D)(5): Add the following sentence: "Notwithstanding the foregoing, "extra" employees may work on a day in a week in which an employee in the aforementioned classification is on reduced work week if: (i) all employees regularly scheduled to work on such day have been properly scheduled, in accordance with Article 11(C), to work on such day, and (ii) any other employee who is on reduced work week during such week is offered, with five (5) days notice in accordance with Article 11(C), to work on such day."

7. Article 10: Housing – Meals: Amend Article 10 to replace the fourth paragraph with the following: "If an Employer, who has heretofore furnished meals or housing accommodations, or both, as part of compensation, shall desire to discontinue same, it shall be obligated to negotiate with the Union. Failing an agreement, either party may submit the issue to the Office of the Impartial Chairperson for final and binding resolution."

2



3. General

   i.   "Serious offenses" shall be defined to be fighting, theft, threats of violence, workplace violence, harassment, use or possession of drugs or alcohol on the job.

   ii.   Discipline for a serious offense shall not be subject to the provisions of paragraph i hereof.

   iii.   The failure of the Union to challenge a warning at the time it is issued shall not preclude it from challenging same if the warning is later relied upon by the Employer to justify subsequent discipline, provided that the Union must, within a reasonable time after the issuance of a written warning to the affected employee, notify the Employer in writing of a basis for its contest of, or disagreement with, a written warning.

C. Article 27(B)(1): Amend end of second sentence to read: "the delegate or assistant delegate shall remain on the job in all cases except theft, physical fighting, workplace violence or on the job drug/alcohol abuse, or such related charges."

D. Add to the end of Article 27(B)(1): "Unless mutually agreed to by the parties, if there is no meeting at the Hotel Association mediation within fourteen (14) days after requested, the matter may be filed at the Office of the Impartial Chairperson, which shall hear the matter on an expedited basis."

16. Scheduling Vacations: The following shall be added to Article 28(D): "such schedule must provide for sufficient vacation periods to accommodate every employee's full vacation entitlement pursuant to the following conditions:

Vacation requests received prior to January 15th of each year will be scheduled in accordance with seniority and approved or denied within two (2) weeks after the January 15th deadline. Employees who have not handed in a request by January 15th will have a final opportunity to turn in a vacation request by May 1st for any remaining weeks available and will be scheduled in accordance with seniority and approved or denied within two (2) weeks after the May 1st deadline. Vacation requests received after the May 1st deadline will be scheduled by the Hotel on a "first come, first served" basis for any remaining vacation weeks available. All vacation requests must be submitted in writing and will be responded to in writing and shall be determined by the Hotel based on business demands.

Any request for unpaid leave shall be made in writing by the employee and will be responded to as soon as practicable.

17. Article 28(A) of the Agreement shall be amended to provide that, effective July 1, 2007, all employees covered by the Agreement who have been employed continuously for twenty (20) or more years shall receive five (5) weeks vacation with pay.

18. Article 29: Holidays: Change "Washington's Birthday" to "Presidents Day."

19. Article 32: Bereavement Pay: Section (A)(2): Shall be replaced with: "The term "immediate family" is defined as the employee's father, mother, sister, brother, spouse, domestic partner (as verified by the Health Benefit Fund), or children."
Section (B)(1): Add reference to domestic partner to parenthetical.

20. Article 44: Cost of living: The dates shall be changed from June 30, 2005 to June 30, 2011.

8. Article 11(G)(6): Overtime: (G)(6) should be replaced with the following: "No employee shall receive overtime pay unless such overtime work has been authorized or was performed with the actual or constructive knowledge of the Employer."

9. Article 21: Hiring: Modify to provide:

    A. The Employer shall post all permanent job openings in the Hotel in order to permit current employees to apply.

    B. The Employer shall notify the Union of the name, date of hire, and position of each person hired when requested and with the monthly submission of electronic information to the Union.

    C. The Employer shall promptly notify the Union of all job openings for any job category covered by this Agreement and of the cancellation of any job openings.

    D. Study Committee: The parties acknowledge their mutual interest in creating a computerized system for all employees where job openings are posted electronically and applicants from closed shops and other Employers (as said term is defined in Article 1 of the Agreement) will be able to apply electronically when a job is electronically posted. The parties also acknowledge their mutual interest in establishing a uniform system of referrals and compliance monitoring. The parties agree to convene, within sixty (60) days of the effective date of this Agreement, a Study Committee consisting of an equal number of representatives of the Union and of the Association to negotiate over the foregoing. The recommendations of the Study Committee shall only be adopted with the agreement of both the Union and the Association, and shall not be subject to arbitration.

10. Article 22(B): Add: "Employees shall be paid the combination rate for an entire week, except where the combination job results from an employee having to cover for another employee who fails to report to work as scheduled with no or less than twelve (12) hours notice prior to the shift, the combination pay shall be the higher rate for the day, in addition to any applicable premium."

11. Article 23(A): Recall Notices: Add another sentence after the penultimate sentence of Article 23(A) as follows: Each week, the Employer shall further provide the Union written notice of any employees who were recalled from layoff in the previous pay week.

12. A. Article 23(B)(2): Add to the end of the first sentence: "Notwithstanding the previous sentence, when a recall for a particular shift on a given day is occasioned by ten percent (10%) or more of the employees in a classification scheduled to work such shift failing to report to work with no or less than twelve (12) hours notice prior to the shift ("called out"), the Employer need give two (2) rather than three (3) calendar days prior written notice of a second layoff for those employees recalled to replace employees who called out. Within three (3) business days of the recall referred to in the previous sentence, the Employer must provide the Union, in writing, with the following: the date of the recall, the number of employees scheduled to work such shift, the names of the employees who called out, and the names of the employees recalled. In addition, when ten percent (10%) or more of the employees in a classification scheduled to work a particular shift on a given day call out, the Employer may use "extra" employees pursuant to Article 8 during such shift, if each employee who is on reduced work week or layoff either works such shift or declines to be recalled and there are still an insufficient number of employees in the classification, provided such "extra" employees must be provided with two (2) consecutive days of work."

    B. Article 23(B)(3): Seniority: Article 23(B)(3) shall be clarified as follows: "The Union and the Employer further agree that the Employer may not layoff an employee more than three (3)

3

times in any one calendar month and further, the Employer shall, during any such recall, pay premium pay to the affected employee(s) in accordance with the provisions of Article 8."

C.   Article 23(A): Seniority: Add another sentence after the penultimate sentence of Article 23(A) as follows: Each week, the Employer shall further provide the Union written notice of any employees who were recalled from layoff in the previous pay week.

13. A. Article 26: References to Impartial Chairperson: All references to the "Impartial Chairman"shall be replaced by "Impartial Chairperson."

B. Article 26: Add: Effective for instances which arise after the effective date of this Agreement, an Employer found by the Impartial Chairperson to have (1) shown a pattern of repeated violations of a similar type and nature which supports a finding of an intentional and bad faith contractual violation; or (2) willfully violated a clearly defined contractual provision or hotel-specific established practice relating to scheduling, layoff, recall, wage or a wage-related provision and that in either case above, i.e. (1) or (2), where such violation has resulted in a monetary award to the affected employees the IC shall award to such employees an additional amount equal to fifteen percent (15%) of the awarded amount. It is understood that this provision shall not apply to situations where the IC finds that the Employer has relied upon a reasonable good faith interpretation of the Agreement(s).

14. Article 27: Discharges: Add "or discipline" following discharge throughout Subdivision A of Article 27. Change title of Article to "Discharge and Discipline."

15. A. Article 27: Discharges: Add: The Impartial Chairperson shall not require that an employee who is discharged or suspended mitigate his/her damages where said employee registers with the Article 21 job referral office for his/her same or similar position and shift, within seven (7) days following termination or suspension and applies within forty-eight (48) hours for positions referred by the Article 21 job referral office which are the same or similar to the position held by the employee. In the absence of compliance with the foregoing by the employee, the Impartial Chairperson shall require mitigation of the employee. The job referral office and the employee shall provide the Employer with any relevant information in connection with the foregoing upon request.

B. Sunset

1. Discipline other than Attendance Discipline:

Any discipline for a "non-serious offense," i.e. an offense other than a "serious offense" (defined below), shall be deemed null and void for disciplinary purposes after a twenty-four (24) month period, provided the employee has not received any further discipline during such twenty-four (24) month period.

2. Discipline Related to Attendance, Tardiness, or Absence

Any discipline issued as the result of attendance, tardiness or absence ("Attendance Discipline"), shall not be considered discipline for purposes of paragraph 1 hereof. Any Attendance Discipline shall be deemed null and void for disciplinary purposes after a twenty-four (24) month period, provided the employee has not received any further Attendance Discipline during such twenty-four (24) month period.

4

21. Article 49: Uniforms and Employee Facilities: Add the following sentence after the first section: "Uniforms shall be designed and maintained in such a manner as to account for the conditions in which employees work, the tasks they perform, and safety and health issues." Replace the second sentence of the second paragraph of Article 49: "The Employer shall provide safe, clean and sanitary places for eating and changing clothes and washroom facilities."

22. Article 50: Change name of Article to "Groups and Porterage"

    A.    For all tour parties and groups ("Groups"), as hereinafter defined, which are booked after the effective date of this Agreement, the Employer shall be required to pay porterage fees pursuant to Paragraph B of this Article for groups which satisfy all of the following criteria:

        1.)    The Group includes a minimum of ten (10) room reservations;
        2.)    There is a common arrival date and time and a common departure date;
        3.)    The entire Group is a "group booking" on a master account; and
        4.)    Bellpersons shall be available to receive and take charge of Group luggage and deliver luggage directly to the rooms on arrival.

    B.    In case of Groups, bellpersons shall be paid porterage fees in the amount of two dollars ($2.00) per bag in and two dollars ($2.00) per bag out and doorpersons shall be paid a porterage fee equal to one dollar ($1.00) per bag in and one dollar ($1.00) per bag out, provided that no porterage will be paid on any bags in excess of two (2) for any one guest. Doorpersons will assist in the handling of the baggage and those hotels not employing doorpersons will not be subject to this porterage payment to doorpersons.

    C.    Bellpersons shall receive one dollar ($1.00) for each person coming into a hotel to occupy a room which is one of a block of rooms rented or set aside on a permanent basis to an airline or trucking company. Bellpersons shall receive, in addition, one dollar ($1.00) for each such person on leaving the hotel.

    D.    The rates set forth in this Article shall be subject to annual contractual wage increases.

    E.    No existing rates, terms, or conditions shall be reduced as a result of this Article.

    F.    Change phrase "tour parties" to "Groups."

    G.    [No Change]

    H.    [Delete]

23. Article 54 of the Agreement shall be amended to provide that, effective July 1, 2010, the number of paid sick days to which employees shall be entitled shall be increased to eight (8) paid sick days.

24. Article 59: Successors and Assigns: In the first sentence of the third paragraph change "five (5)" to ten (10)". Add: In the event an Owner of a Hotel is not the Employer of the Hotel's employees nor otherwise bound by the IWA, the Owner shall be bound by the Successor and Assigns provision of the IWA and the arbitration provisions thereof as they relate to any dispute regarding



21. Article 49: Uniforms and Employee Facilities: Add the following sentence after the first section: "Uniforms shall be designed and maintained in such a manner as to account for the conditions in which employees work, the tasks they perform, and safety and health issues."
Replace the second sentence of the second paragraph of Article 49: "The Employer shall provide safe, clean and sanitary places for eating and changing clothes and washroom facilities."

22. Article 50: Change name of Article to "Groups and Porterage"

    A.    For all tour parties and groups ("Groups"), as hereinafter defined, which are booked after the effective date of this Agreement, the Employer shall be required to pay porterage fees pursuant to Paragraph B of this Article for groups which satisfy all of the following criteria:

        1.)    The Group includes a minimum of ten (10) room reservations;
        2.)    There is a common arrival date and time and a common departure date;
        3.)    The entire Group is a "group booking" on a master account; and
        4.)    Bellpersons shall be available to receive and take charge of Group luggage and deliver luggage directly to the rooms on arrival.

    B.    In case of Groups, bellpersons shall be paid porterage fees in the amount of two dollars ($2.00) per bag in and two dollars ($2.00) per bag out and doorpersons shall be paid a porterage fee equal to one dollar ($1.00) per bag in and one dollar ($1.00) per bag out, provided that no porterage will be paid on any bags in excess of two (2) for any one guest. Doorpersons will assist in the handling of the baggage and those hotels not employing doorpersons will not be subject to this porterage payment to doorpersons.

    C.    Bellpersons shall receive one dollar ($1.00) for each person coming into a hotel to occupy a room which is one of a block of rooms rented or set aside on a permanent basis to an airline or trucking company. Bellpersons shall receive, in addition, one dollar ($1.00) for each such person on leaving the hotel.

    D.    The rates set forth in this Article shall be subject to annual contractual wage increases.

    E.    No existing rates, terms, or conditions shall be reduced as a result of this Article.

    F.    Change phrase "tour parties" to "Groups."

    G.    [No Change]

    H.    [Delete]

23. Article 54 of the Agreement shall be amended to provide that, effective July 1, 2010, the number of paid sick days to which employees shall be entitled shall be increased to eight (8) paid sick days.

24. Article 59: Successors and Assigns: In the first sentence of the third paragraph change "five (5)" to ten (10)". Add: In the event an Owner of a Hotel is not the Employer of the Hotel's employees nor otherwise bound by the IWA, the Owner shall be bound by the Successor and Assigns provision of the IWA and the arbitration provisions thereof as they relate to any dispute regarding



the Successor and Assigns provisions. Such Owner shall be required to sign an agreement with the Union reaffirming such, including the obligation to retain all bargaining unit employees, whose employment will continue uninterrupted without loss of seniority, compensation, benefits, or other terms and conditions of employment subject to the IWA and applicable law.

25. Schedule A: Delete the following job titles from Schedule A: Bottlers, Assistant Bottlers, Coal Passers, Exterminators, and Ice Cutters/Handlers.

26. Inclusion of new classifications in Schedule A: The following new departments/classifications will be added to Schedule A, under the Miscellaneous bold heading:
    Minibar Attendant: paid at the Housekeeping Attendant rate
    Audio Visual Technician: paid at the Electrician rate
    No current employee shall suffer any reduction in weekly or hourly wages or other benefits as a result of this provision.

NEW ARTICLES:

27. A. Union Training: Each Delegate, Assistant Delegate and a reasonable number of such other employees as may be selected by the Union shall be granted two (2) days unpaid leave each year to attend Union training, provided that the Employer is provided with a minimum of ten (10) days advance written notice and further provided that the absence of such employee(s) shall not cause undue disruption to the operations of the Employer.

B. Spotters

   1. In cases where the Employer's investigation of an employee's performance or conduct may lead to suspension or discharge based upon a spotter's report, the Employer shall:

      a. Notify the employee as soon as practicable, but in no event later than 72 hours of the close of his/her shift in question, that he/she is the subject of a spotter inspection; or, if the employee is not working during such period, at any time prior to the close of his/her next scheduled shift. The Employer shall specify the shift which is at issue.

      b. Within fourteen (14) days following the notification set forth in a. above, the Employer shall effectuate the discipline of the employee, if any.

      c. Upon such notice to the employee that he/she is being suspended or discharged based upon a spotter's report, the Employer shall provide the Union with all reports, notes, video or audio recordings, or other documents relied upon by the Employer which relate to the discipline of the employee.

   2. In cases where the Employer's investigation of an employee's performance or conduct based upon a spotter's report results in a verbal warning or a written warning, the Employer shall effectuate the verbal warning or written warning within thirty (30) days of the Employer's receipt of the spotter's report and shall provide the Union with the information specified in 1.c. above.

   3. The foregoing times and dates shall be exclusive of Saturdays, Sundays, and Holidays.

   4. The foregoing shall not apply where information obtained from a spotter is used for non-disciplinary purposes (i.e., retraining). 

7

5. Nothing in this paragraph shall be construed to restrict the Union's right to request relevant information.

C. Hidden surveillance cameras

1.  Under no circumstances shall the Employer install or use hidden surveillance equipment in employee restrooms; locker rooms; changing rooms; in places when and where, with prior consent of the Employer, employees have been given access to areas of the Hotel to conduct religious prayer or services or to administer lawful medications; or where and when Union meetings are occurring.

2.

a.  Hidden surveillance equipment shall only be used for a limited time not to exceed sixty (60) calendar days. If the Employer intends to utilize any evidence gathered by use of such equipment as a basis to discipline an employee, the Employer shall timely notify the Union in writing of the type of the equipment installed or used, the location of the equipment, the purpose of the installation or use, the duration and dates of the installment and use, and a detailed description of any allegations the Employer intends to make of employee misconduct based on the evidence gathered.

b.  Every six (6) months, i.e. on January 15th and July 15th of each year, the Employer shall provide the Union with the following information relating to the installation and use of hidden surveillance equipment completed during the previous six (6) month period: the type of equipment installed or used, the location of the equipment, the purpose of the installation or use, the duration and dates of the installment and use.

3.  Evidence gathered by such hidden surveillance equipment shall not be admissible in arbitration to support disciplinary action against an employee under any of the following circumstances:

a.  The equipment was installed or used without a reasonable good faith belief that theft, vandalism, drug or alcohol use, criminal activity, workplace violence or other serious employee misconduct has or would occur in the area surveilled during the period of the installation or use or such reasonable good faith belief was not the sole reason for installation of the camera.

b.  The Employer failed to preserve all evidence gathered by the equipment, unexpurgated, including exculpatory evidence, relevant to the disciplinary case.

c.  The Employer shall furnish the Union, upon request, with any evidence gathered by such hidden surveillance equipment which is relevant to the grievance, or possible grievance, being investigated by the Union which is connected with the misconduct which is the subject of the hidden surveillance.

d.  Since the Employer has the right to use the surveillance evidence gathered on issues or instances of misconduct which were not the subject of the original reasonable good faith belief, then, upon timely request, the Union has the right to



8

view the surveillance evidence for the grievance being investigated or any possible grievance.

4. For purposes of this Article, the term "hidden surveillance equipment" shall only include cameras or video equipment but shall not include equipment where the camera or video equipment, or a camera "dome" casing is visible to the naked eye.

5. The above terms and conditions may not be varied except by mutual agreement of the parties.

D. Bankruptcy: The Employer shall advise the Union, in writing by electronic mail or telefacsimile, as soon as reasonably practicable of, and in any event immediately upon the Employer's knowledge or receipt of notice of, the filing of any bankruptcy, state court receivership or similar proceeding which would affect bargaining unit employees or this Agreement. The Employer shall provide electronic copies of any papers filed in connection with any such proceeding, in addition to any other relevant information requested by the Union.

E. Electronic Information:

1. The Employer shall electronically transmit to the Union any information to which the Union is entitled in a mutually agreed upon electronically searchable and importable form and format, except where such information is not available in electronic format.

2. Effective January 1, 2008, such information transmittals shall be in electronic format unless an Employer has a valid claim that to do so would be unreasonably costly or technologically infeasible. Disagreements as to the application of this Article shall be decided by the Impartial Chairperson.

F. Immigrants Rights

1. Union Notification: In the event that a post-probationary employee has a problem with his or her right to work in the United States, or in the event the Citizenship and Immigration Services or other agency specifically notifies the Employer of its intent to conduct an audit or investigation or serves a warrant relating to employees' authorization to work, the Employer shall notify the Union in writing as soon as the problem is known. Upon the Union's request, the Employer shall meet with the Union to discuss the nature of the problem. Whenever possible, and to the extent permitted by law, the meeting shall take place before any action is taken by the Employer, but the Employer shall not be required to postpone such audits or meetings with agencies.

2. Unpaid Leave: Upon request, employees shall be released for a total of five (5) unpaid working days per each rolling twelve (12) month period, in order to attend Bureau of Citizenship and Immigration Services (BCIS) proceedings and any related matters for the employee only. The employee shall submit proof of such proceedings and attendance by the employee to the Employer.

3. Reinstatement:

(a) A post-probationary employee who is not authorized to work in the United States and whose employment has been terminated for this reason shall be immediately reinstated to the next week's schedule to his or her former classification without loss of prior seniority provided the employee produces proper work authorization within

9

twelve (12) months of the date of termination. Employees shall not accrue vacation or other benefits during such absence.

(b) If the employee needs additional time, the Employer will rehire the employee into the next available opening in the employee's former classification, as a new hire without retaining seniority, upon the former employee providing proper work authorization within a maximum of twelve (12) additional months from the time noted in (i) above. The Union may grieve and arbitrate any subsequent failure to complete probation if arbitrary or capricious or an abuse of this provision.

4. No-Match Letters: The Employer who receives a "No-Match" letter agrees to take any and all reasonable steps necessary to resolve the discrepancy prior to effectuating any adverse employment action in order to be consistent with applicable federal law, regulations, or enforcement guidelines.

5. No Discrimination: The Employer may not discriminate against or harass any employee based on his or her national origin or citizenship status. [Move to Article 25.]

6. New Legislation: The parties acknowledge that federal legislation, regulations or enforcement guidelines ("law") is currently being considered pertaining to the rights of immigrants. The parties agree that they will meet and negotiate if changes in the law materially impact the rights and obligations outlined in paragraphs A through D herein. If the parties are unable to resolve issues pertaining to any such changes in the federal law, the issue shall then be submitted for resolution to the Office of the Impartial Chairperson. The Impartial Chairperson will have the right to consider expert testimony.

G. Translations: In meetings involving discipline, except in situations where an employee is being suspended pending investigation, an employee who clearly needs language assistance or who cannot fully understand the issues relevant to his/her discipline and requests language assistance shall be provided by the Employer with an individual capable of assisting in the communication. Any reasonable delay in interviewing or effectuating discipline as a result of the need for such shall not affect the timeliness of any grievance or discipline. In all other matters, the Employer shall make a good faith effort to provide appropriate language assistance when an employee clearly needs such assistance or when the employee cannot fully understand what is being said and requests language assistance.

H. Safety and Health

(1) General: The Employer and Union agree that the safety and health of employees is of paramount concern. Accordingly, the Employer agrees to provide a safe and healthy work environment. The Employer further agrees to provide such training and equipment, adopt procedures and safeguards, and make repairs or modifications to its facility as required by law or this Article in order to provide a safe and healthy work environment.

(2) Ventilation: The Employer shall provide sufficient ventilation and air temperature for a safe and healthy working environment.

(3) Safety Equipment: The Employer shall provide and maintain personal protective equipment and devices required under this Article at the Employer's expense, (e.g., respirators, goggles, etc.).



10

(4) Right to Refuse Unsafe Assignment: An employee may refuse a work assignment if s/he has a reasonable good faith belief that such assignment subjects him/her to unusually dangerous conditions which are not normally part of the job. Prior to exercising his/her rights under this section, the employee shall promptly notify management of the perceived unsafe condition. The Employer may not discriminate or retaliate against an employee for exercising his/her right hereunder.

(5) Investigation by Expert:

    (a) If the Union has a reasonable basis to conclude that a potential specific violation of this Article exists which could endanger employee safety or health and is appropriately subject to investigation by a safety and health consultant ("consultant"), absent agreement by the parties, on the request of the Union, such a consultant shall be appointed by the Office of the Impartial Chairperson on an expedited basis to investigate and report on the conditions at the Hotel.

    (b) Such consultant shall be selected from a list of consultants mutually agreed upon between the Association and the Union, who will meet within thirty (30) days of the Effective Date of this Agreement to compile such list. Absent agreement on such list the selection of consultants shall be submitted to the Impartial Chairperson for final and binding resolution.

    (c) The expense of such consultant shall be borne by the Employer.

    (d) The consultant's investigation shall be limited to the issue(s) covered in subparagraph 5(a) hereof.

    (e) The Employer will fully cooperate with the consultant, providing same with any requested information relevant to the issue(s) covered in subparagraph 5(a) hereof and allow unfettered access to those area(s) of the Employer's premises where it is alleged the potential specific violation(s) exist(s) (subject to subparagraphs 5(f) and 5(h) hereof) and personnel with relevant information.

    (f) The consultant shall follow reasonable security rules maintained by the Employer regarding access to the premises, but such rules shall not be applied to delay or interfere with the consultant in its review or its unfettered access to those specific area(s) of the Employer's premises in accordance with Subparagraph 5(e) hereof.

    (g) Union and Employer representatives will be permitted to accompany the consultant during any investigation, provided that Employer and Union representatives will not be permitted to attend bargaining unit employee interviews absent mutual agreement. Neither the Union nor Employer representatives may delay or interfere with the investigation. Any documents provided by either party to the consultant shall simultaneously be provided to the other party. Any documents provided by the consultant to one party shall be provided simultaneously to the other.

    (h) The consultant shall provide the Employer and Union with twenty-four (24) hours notice of its visits, except in the case of an emergency (i.e., an incident or occurrence that presents an imminent or present threat to the safety or health of employees), in which case the consultant shall give the Union and Employer as much notice as practicable.



11

(i) Notwithstanding anything herein to the contrary, the consultant shall have the authority to issue a specific "stop work" order and/or to close areas of the Employer's premises if the consultant deems employee working conditions to pose a clear and present danger to the safety or health of employees due to the specific violation(s) or remediation efforts with respect to those specific violation(s) and to rescind such order if it deems the unsafe or unhealthy condition to have been cured. After complying with any such order issued by the consultant, the Employer shall have the right to contest such order at the Office of the Impartial Chairperson on an expedited basis, with the matter submitted to and heard by the Impartial Chairperson within twenty-four (24) hours. Telephonic hearings conducted by the Office of the Impartial Chairperson are permissible on weekends and holidays.

(j) At the conclusion of the investigation, the consultant shall issue a written report, detailing the results of the investigation and recommendations for correcting violations or hazards, to both the Employer and Union.

(k) The Employer shall promptly comply with any uncontested recommendations made by the consultant. Should the Employer or Union disagree with any such recommendation, it must apply for relief before the Impartial Chairperson within forty-eight (48) hours of the issuance of the report or recommendation, and the Impartial Chairperson shall hold a hearing within five (5) business days thereafter.

I. <u>Adequate Supplies</u>: Adequate Supplies: The Employer shall provide employees supplies or equipment needed for the timely, safe, efficient and effective performance of their duties.

J.   1. <u>Culinary Training</u>

    a.    The ITP shall establish a training course to help employees/applicants who are eligible to enroll in ITP to acquire the culinary skills necessary to obtain eligibility for employment.

    b.    Training opportunities shall be provided in the order of "first come, first serve" basis. Applicants who successfully complete the ITP culinary training course and obtain certification shall be permitted to apply for culinary job openings.

    c.    The Employer shall immediately notify the Union of, and post in a visible location, any culinary job openings.

    d.    The Union shall transmit to the Employer all applications for its job opening which were submitted by employees/applicants who are ITP certified as eligible.

    e.    The Employer shall interview every employee/applicant certified as eligible who is referred for a job opening. The Employer shall decide which applicant to hire and shall notify the Union in writing of the identity of the person hired, three (3) days prior to hiring said applicant. Once an Employer interviews an employee/applicant ITP certified as eligible, the Employer is not required to re-interview said person for future job openings for twelve (12) months.

    f.    The ITP shall promptly notify Employers of the identity of applicants who are ITP certified as eligible to be utilized as banquet culinary.

2. The parties agree to form a joint study committee to review advancement opportunities in the New York City Hotel Industry for employees in other classifications who attain ITP certification.

## K. Conversion to Residential Use

    1.    If, during the term of this Agreement, a signatory Hotel is converted to residential use (e.g. a condominium or co-operative use of the building, apartment rental units, etc.) the Employer shall pay to the affected employees, i.e. those who suffer a permanent loss of employment due to such conversion, severance under the following terms: fifteen (15) days for each year of service, calculated and paid under the procedures of Article 52(B). The benefit funds shall receive a payment, calculated in accordance with Article 52(B), for each affected employee.

    2.    In the event that the Hotel's entire premises are affected by the conversion to residential use, then employees eligible for the enhanced severance above shall, as a condition of receiving such severance payment, execute a separation document releasing the parties to this Agreement from any liability and future obligations, such as recall rights, under this Agreement.

    3.    In cases of a partial conversion of the Hotel's premises to residential use, then the enhanced severance provisions contained herein shall only apply to employees affected by such conversion.

28. The parties hereto agree that their understanding and agreements as set forth in this Agreement are subject to ratification by the Union and by the Board of Directors of the Association.

IN WITNESS WHEREOF, the Employer and the Union had offered their hands and seals the day and year first above written.

THE HOTEL ASSOCIATION OF NEW YORK CITY, INC.


By: _Joseph R. Marimonto_  6/16/06


THE NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO


By: _Peter Ward_                6-16-06


13

# Exhibit 3

CALABRO & ASSOCIATES, P.C.
1412 Broadway, Suite 1504
New York, New York 10018
(646) 688-6095
*Attorneys for Plaintiff/Third Party Defendant*

Gregory G. Calabro, Esq.  (GGC 7169)
Cathy O'Donnell, Esq.      (COD 0973)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TRAN DINH TRUONG, individually and on behalf of    Case No.: 1:07-Civ-11383(RJH)
ALPHONSE HOTEL CORP. d/b/a
THE HOTEL CARTER,

<div align="center">Plaintiff,</div>

    -against-                                                    REPLY TO
                                                                COUNTERCLAIMS

NEW YORK HOTEL & MOTEL TRADES COUNCIL,
AFL-CIO, THE OFFICE OF THE IMPARTIAL
CHAIRMAN, and PETER WARD,

<div align="center">Defendants.</div>
-----------------------------------------------------------------X

Plaintiff hereby responds to the counterclaims interposed by Defendants New York

Hotel & Motel Trades Council, AFL-CIO and Peter Ward, as follows:

1.     Plaintiff lacks knowledge and information sufficient to form a belief as to the

truth of the averments contained in paragraph 40 of the First Counterclaim set forth in the

"Answer and Counterclaims."

2.     Plaintiff admits the averments contained in paragraph 41 of the First

Counterclaim set forth in the "Answer and Counterclaims," but lacks knowledge and

information sufficient to form a belief to the extent that it avers that Plaintiff Troung is an

owner of the Hotel wihtin the meaning of federal law.

3.     Plaintiff lacks knowledge and information sufficient to form a belief as to the

truth of the averments contained in paragraph 42 of the First Counterclaim set forth in the "Answer and Counterclaims."

4.      No response is required to the averments of Paragraph 43 of the First Counterclaim set forth in the "Answer and Counterclaims."

5.      Plaintiff admits the averments contained in paragraph 44 of the First Counterclaim set forth in the "Answer and Counterclaims."

6.      Plaintiff admits the averments contained in paragraph 45 of the First Counterclaim set forth in the "Answer and Counterclaims."

7.      Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averments contained in paragraph 46 of the First Counterclaim set forth in the "Answer and Counterclaims."

8.      Plaintiff denies the truth of the averments contained in paragraph 47 of the First Counterclaim set forth in the "Answer and Counterclaims."

9.      Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averments contained in paragraph 48 of the First Counterclaim set forth in the "Answer and Counterclaims."

10.     No response is required to the averments of Paragraph 49 of the First Counterclaim set forth in the "Answer and Counterclaims," as the caselaw speaks for itself.

11.     Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averment contained in paragraph 50 of the First Counterclaim set forth in the "Answer and Counterclaims," with regard to the allegation that there was a demand by the Defendants.

12.     No response is required to the averments of Paragraph 51 of the First

Counterclaim set forth in the "Answer and Counterclaims."

13.     Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averments contained in paragraph 52 of the Second Counterclaim set forth in the "Answer and Counterclaims."

14.     Plaintiff admits the averments contained in paragraph 53 of the Second Counterclaim set forth in the "Answer and Counterclaims."

15.     Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averments contained in paragraph 54 of the Second Counterclaim set forth in the "Answer and Counterclaims."

16.     Plaintiff denies the truth of the averments contained in Paragraph 55 of the Second Counterclaim set forth in the "Answer and Counterclaims."

17.     Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averments contained in paragraph 56 of the Second Counterclaim set forth in the "Answer and Counterclaims."

18.     No response is required to the averments of Paragraph 57 of the Second Counterclaim set forth in the "Answer and Counterclaims," as the caselaw speaks for itself.

19.     Plaintiff lacks knowledge and information sufficient to form a belief as to the truth of the averments contained in paragraph 58 of the Second Counterclaim set forth in the "Answer and Counterclaims," with regard to the allegation that there was a demand by the Defendants.

20.     No response is required to the averments of Paragraph 59 of the Second Counterclaim set forth in the "Answer and Counterclaims."

21.     Plaintiff lacks knowledge and information sufficient to form a belief as to the

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

31.    Defendants' counterclaims are barred by the doctrine of laches.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

32.    Defendants' counterclaims are barred by their unclean hands.


WHEREFORE, the Plaintiff/Third Party Defendant requests that this Court dismiss

the counterclaims with prejudice.


Date:  New York, New York                    Respectfully,
       January 18, 2008

                                             _____
                                             Cathy O'Donnell, Esq. (COD 0973)
                                             Calabro & Associates, P.C.
                                             1412 Broadway
                                             Suite 1504
                                             New York, NY 10018
                                             Phone: (646) 688-6095
                                             Fax:   (646) 688-6096


To:    Pitta & Dreier LLP
       Attn.: Barry N. Saltzman, Esq.
       499 Park Avenue
       New York, New York 10022
       (212) 652-3827

       Tarter Krinsky & Drogin LLP
       Attn.: Laurent S. Drogin, Esq.
       1350 Broadway, 11th Floor
       New York, New York 10018
       (212) 216-8000

# Exhibit 4

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 414836 (S.D.N.Y.), 174 L.R.R.M. (BNA) 2690
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**Alphonse Hotel Corp. v. New York Hotel & Motel Trades Council, AFL-CIO
S.D.N.Y.,2004.

United States District Court,S.D. New York.
ALPHONSE HOTEL CORP. et al., Plaintiffs,
v.
NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO, Defendant.
**No. 03 Civ.1992(DC).**

March 5, 2004.

Levy, Boonshoft & Lichtenberg, LLP, By: David M. Levy, New York, New York, for Plaintiffs.
Pryor Cashman Sherman and Flynn, By: Barry N. Saltzman, New York, New York, for Defendant.

*MEMORANDUM DECISION*

CHIN, J.
*1 In this action brought under Sections 8 and 303 of the Labor Relations Management Act of 1947, 29 U.S.C. § 158(b) and § 187 (the "LMRA"), plaintiffs Alphonse Hotel Corp., doing business as the Hotel Carter (the "Hotel"), Tran Dinh Truong ("Truong"),[FN1] and Elaine Nguyen ("Nguyen") allege that defendant New York Hotel & Motel Trades Council, AFL-CIO (the "Union"), engaged in unfair labor practices and intentional infliction of emotional distress and seek rescission of a "Me Too" agreement binding the Hotel to the terms of an industry-wide collective bargaining agreement. The Union moves for judgment on the pleadings dismissing the complaint, pursuant to Fed.R.Civ.P. 12(c) on the grounds of lack of subject matter jurisdiction and failure to state a claim. For the reasons set forth below, the motion is granted.

> FN1. The motion papers and pleadings refer to Tran Dinh Truong as both "Tran" and "Truong." I will refer to him as "Truong" in this Memorandum Decision.

*BACKGROUND*

I. *The Facts*

The facts alleged in the complaint are assumed to be true for purposes of this motion.

A. *The Collective Bargaining Agreement (the "CBA")*

Alphonse Hotel Corporation operates and does business as the Hotel Carter.[FN2] (Compl.¶ 7). Truong is the "principal owner and general manager" of the Hotel. (*Id.* ¶ 8). Nguyen is the front desk coordinator of the Hotel.(*Id.* ¶ 13). The Union is a labor organization representing employees in the New York City hotel and restaurant industry. (*Id.* ¶ 14). From 1985 through 1994, the Hotel was a member of the Hotel Association of New York City, Inc., which was a party to an industry-wide CBA with the Union. (*Id.* ¶ 7). In 1995, on behalf of the Hotel, Truong signed a "Me Too" agreement binding the Hotel to the CBA. (Ans.¶¶ 7, 54, Exh. B2). The parties agree that the Hotel was bound by the CBA from 1995 until December 21, 2001, when another "Me Too" agreement was signed, binding the Hotel to the CBA through June 30, 2006.(*Id.* ¶ 6; Ans. ¶¶ 7, 54, Exh. A, B1).

> FN2. Plaintiff refers to the hotel as the "Hotel Carter" in the caption but refers to it as the "Carter Hotel" in the complaint.

Section 26 of the CBA contains an arbitration clause providing that:
All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts conduct [sic] or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire to be known as the Impartial Chairman, and his decision shall be final and binding upon the parties hereto.

(Ans.¶ 55, Exh. A).

B. *The Unfair Labor Practices Claim*

Beginning in 1999, the Union began a "campaign to

Not Reported in F.Supp.2d                                                                                                              Page 4
Not Reported in F.Supp.2d, 2004 WL 414836 (S.D.N.Y.), 174 L.R.R.M. (BNA) 2690
(Cite as: Not Reported in F.Supp.2d)

The Court has supplemental jurisdiction over plaintiffs' claims for rescission and intentional infliction of emotional distress. See 28 U.S.C. § 1367(a).

## II. Arbitration

Although this Court has subject matter jurisdiction over plaintiffs' claims, the complaint must be dismissed because Section 26 of the CBA, incorporated by reference in the "Me Too" agreement, requires plaintiffs to arbitrate these claims.

### A. Unfair Labor Practices

Plaintiffs allege that the Union violated 29 U.S.C. § 158(b)(1) and (b)(4) by engaging in unfair labor practices. It is conceded that during the relevant time period from late 1996 through 2003, the Hotel was bound by the terms of the industry-wide CBA. (Compl. ¶¶ 6, 7; Ans. ¶¶ 7, 54, Exhs. A, B1, B2). The CBA includes a provision requiring the parties to submit to arbitration, inter alia, "[a]ll complaints, disputes or grievances arising between the parties hereto involving ... any acts conduct [sic] or relations between the parties, directly or indirectly."(Ans.¶ 55, Exh. A).

**\*5** The provision's broad language clearly applies to plaintiffs' claims pursuant to 29 U.S.C. § 158(b)(1) and (b)(4). In Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machs., Local Union No. 550, 167 F.3d 764, 766-68 (2d Cir.1999), the Second Circuit held that claims pursuant to 29 U.S.C. § 158(b) were subject to arbitration based on a collective bargaining agreement provision nearly identical to the one in this action.[FN3] In addition to requiring arbitration of disputes "involving questions of interpretation or application" of the agreement, the clause required arbitration of "any act or conduct or relation between the parties ... directly or indirectly."Id. at 765.The arbitration clause in the instant action, nearly identical in its breadth, also requires arbitration of plaintiffs' unfair labor practices claims.

> FN3. The collective bargaining agreement clause in Interstate required the parties to arbitrate:
> all complaints, disputes or grievances arising between

them involving questions of interpretation or application of any clause or matter covered by this Agreement, or any act or conduct or relation between the parties hereto, directly or indirectly.
Interstate, 167 F.3d at 765.

### B. Rescission

Plaintiffs also seek rescission of the "Me Too" agreement binding them to the CBA, on the grounds that their execution of the agreement was fraudulently induced. The Union argues that the claim for rescission is subject to arbitration because the rescission claim is based on interpretation of the CBA's terms and, alternatively, because the claim falls within the arbitration clause's broad scope.

Without deciding whether the rescission claim is based on the CBA, I conclude that the claim is subject to arbitration because it clearly falls within the arbitration clause's purview. The arbitration clause clearly applies to disputes other than those involving the CBA's terms, including plaintiffs' claim for rescission of the "Me Too" agreement based on fraudulent inducement. See Interstate, 167 F.3d at 766-68 (applying identical arbitration clause to non-contractual claim). Accordingly, this claim is also subject to arbitration, pursuant to the CBA.

### C. Intentional Infliction of Emotional Distress

Truong and Nguyen further allege intentional infliction of emotional distress based on the events underlying their unfair labor practices claim, pursuant to 29 U.S.C. § 158(b).

Like the rescission claim, the claim for intentional infliction of emotional distress plainly falls within the broad scope of the CBA's arbitration clause. As discussed above, that the claim is extra-contractual does not vitiate the clear language of the arbitration provision. Interstate, 167 F.3d at 766-68. Moreover, the Second Circuit has held that tort claims are arbitrable. Collins & Aikman Products Co. v. Building Sys., Inc., 58 F.3d 16, 23 (2d Cir.1995); Interstate Brands Corp. v. Bakery Drivers & Bakers Goods Vending Machs., Local Union No. 550, No. 96 Civ. 4454(SJ), 1998 WL 19974, at \*8 (E.D.N.Y. Jan. 20, 1998) (holding that tort claim pursuant to LMRA § 303 is arbitrable).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 5

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2001 WL 959005 (S.D.N.Y.), 168 L.R.R.M. (BNA) 2154
**(Cite as: Not Reported in F.Supp.2d)**

**C**New York Hotel & Motel Trades Council, AFL-
CIO v. Alphone Hotel Corp.
S.D.N.Y.,2001.

United States District Court, S.D. New York.
NEW YORK HOTEL & MOTEL TRADES
COUNCIL, AFL-CIO, Petitioner,
v.
ALPHONSE HOTEL CORP. d/b/a Hotel Carter d/b/a
Carter Hotel, Respondent.
**No. 01 CV 0712(RCC).**

Aug. 21, 2001.

*Opinion and Order*

CASEY, J.

I. Introduction

**\*1** Petitioner New York Hotel & Motel Trades
Council, AFL-CIO ("Union" or "Petitioner"), brings
this action pursuant to Section 301 of the Labor
Management Relations Act and Section 9 of the
Federal Arbitration Act seeking to confirm an
arbitration award ("Award") issued by the Office of
the Impartial Chairman, Arbitrator Elliot Shriftman
("Impartial Chairman"). Petitioner also seeks to
enjoin the Alphonse Hotel Corp d/b/a Hotel Carter
d/b/a Carter Hotel ("Hotel") from pursuing a lawsuit
seeking back rent and the dispossession of Xuan
Nguyen ("Nguyen"), a Union member and employee
of the Hotel, and his family from their residence in
the Hotel in the New York City Civil Court, Housing
Part ("Housing Court") or any other forum. The
Union also seeks costs and any other relief the Court
deems appropriate.

The Hotel agreed by stipulation dated February 9,
2001 to adjourn the Housing Court proceeding until
the Court issued a ruling on Petitioner's motion.
Therefore, the question of the temporary restraining
order and the preliminary injunction have been
rendered moot. Before the Court is Petitioner's
motion to confirm the Award. For the reasons set
forth below, the Court grants the Union's motion to
confirm.

II. Background

Nguyen is a Vietnamese immigrant who came to the
United States in 1991 with the help of his brother-in-
law, Tran Truong ("Truong"), who is also a
Vietnamese immigrant and who is the owner of the
Hotel. In 1992, Truong offered Nguyen and his
family a residence in the Hotel. Nguyen accepted the
offer and he and his family have maintained a
residence at the Hotel since such time. (Pet'r Mem. at
3; Resp't Mem. at 3)

Nguyen began working for the Hotel as a bellboy at
some point between 1993 and 1996. The Hotel claims
that it has only employed Nguyen since 1996. (Resp't
Mem. at 3). The Union claims that the Hotel has
employed Nguyen since 1993, but paid him in cash
up until 1996. (Pet'r Reply Mem. at 2).

As a bellboy, Nguyen was a Union member and was
eligible for Union benefits. One of these benefits was
Union representation in employer-employee
grievances. At all relevant times, the Union and the
Hotel were bound by the terms of a collective
bargaining agreement between the Hotel and the
Union (the "Agreement") entered into on June 26,
and extended on January 30, 1990 and July 3, 1995.
The Agreement includes an arbitration clause
("Arbitration Clause") which provides:
All complaints, disputes or grievances arising
between the parties hereto involving questions or
interpretation or application of any clause of this
Agreement, or any acts conduct or relations between
the parties, directly or indirectly, which shall not
have been adjusted by and between the parties
involved shall be referred to a permanent umpire
known as the Impartial Chairman and his decision
shall be final and binding upon the parties hereto.
In the event of a willful default by either party in
appearing before the Impartial Chairman, after due
written notice shall have been given to the said party,
the Impartial Chairman is hereby authorized to render
a decision upon the testimony of the party appearing.

**\*2** (Agreement, § 26). The Agreement also includes a
provision covering a situation in which the Hotel

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2001 WL 959005 (S.D.N.Y.), 168 L.R.R.M. (BNA) 2154
(Cite as: Not Reported in F.Supp.2d)

provides housing to its employees. Such section provides that "[i]n cases where the employer furnishes housing accommodations to its employees, it shall be allowed $2.50 per week for such housing accommodations."(Agreement, § 10).

On October 12, 1999, the Union demanded an arbitration hearing in accordance with Section 26 of the Agreement to resolve a dispute over wages and benefits the Hotel allegedly had not paid Nguyen and that the Union felt were mandated under the agreement. The Union alleged that the Hotel had forced Nguyen "to work twelve (12) hours a day, seven days a week, without paying him for all hours worked."(Pet'r Mem. at 3). The Hotel disputed the issue and the Union requested an arbitration hearing.

Several hearings were scheduled and adjourned because the Hotel "was allegedly not prepared to proceed."(Pet'r Mem. at 3). On December 27, 2000, the Hotel served upon Nguyen a Notice of Petition and Petition-Non-Payment Dwelling ("Petition"), made returnable to the Housing Court, seeking to evict him and his family from the Hotel and to recover $76,000 in back rent for the time period beginning with February 1993. The Union sent a letter to the Hotel's attorney's on January 3, 2001 informing them that if the Hotel did not cease and desist from attempting to evict Nguyen from the Hotel, the Union would request an emergency hearing pursuant to its rights under the Agreement. The Hotel responded by letter on January 5, 2001, indicating that it would not attend an emergency hearing on the eviction issue. In response, the Union requested an emergency hearing.

On January 8, 2001, the Impartial Chairman notified the Hotel's attorneys that he scheduled an emergency hearing requested by the Union to discuss the eviction issue. Both the emergency hearing and the wage issue hearing were scheduled for January 17, 2001. Upon being informed, the Hotel submitted a letter dated January 8, 2001 to the Impartial Chairman, indicating that it would not appear at the emergency hearing on the eviction issue.

On January 17, 2001, the Hotel's attorneys attended the wage issue hearing before the Impartial Chairman but declined to take part in the eviction issue hearing in accordance with their intention as expressed in their January 8, 2001 letter. The Impartial Chairman

proceeded with the hearing pursuant to the power granted him in the Arbitration Clause, and issued the Award directing the Hotel to cease and desist from taking any action in the Housing Court pending the Impartial Chairman's decision on the underlying grievances.

The Union seeks to confirm the Award of the Impartial Chairman. The Hotel argues that the housing dispute does not fall within the scope of the Impartial Chairman's authority and that the Court should set aside the Award as unauthorized.

III. Discussion

The first issue the Court must decide is whether the Agreement requires the Hotel and the Union to arbitrate disputes of the kind at issue in this case. If so, the Supreme Court and the circuit courts have made clear that the federal judicial system is limited in its ability to intervene in an arbitrator's decision. "It is familiar law that the Federal Arbitration Act, 9 U.S.C. § 1 etseq. (1994) (Arbitration Act), expresses 'a liberal federal policy favoring arbitration agreements' and that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." ' *Louis Dreyfus Negoce S.A. v. Blystad Shipping and Trading Inc.*, 252 F.3d 218, 223 (2d Cir.2001) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)); seealso*Service Employees International Union v. Local 1199 N.E.*, 70 F.3d 647, 651 (1 st Cir.1995). In *AT & T Techs., Inc. v. Communications Workers of Am ., 475 U.S. 643 (1986)* the Supreme Court established a four part test to determine whether parties are required to arbitrate their dispute and clarified the principles set forth in the *Steelworkers Trilogy: Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960), *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960) and *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960). First, even though arbitration is favored by federal policy, it is a contractual issue and a party cannot be compelled to arbitrate unless it has agreed to do so. *AT & T Techs.*, 475 U.S. at 648 (1986) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (quoting *Steelworkers*, 363 U.S. at 582);see*Louis Dreyfus Negoce S.A.*, 252 F.3d at 223 ("While federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a creature of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 959005 (S.D.N.Y.), 168 L.R.R.M. (BNA) 2154
(Cite as: Not Reported in F.Supp.2d)

contract.").

*3 Second, unless an agreement expressly states otherwise, the question of arbitrability is to be decided by the Court and not by the arbitrator. *AT & T Techs., 475 U.S. at 647.* Third, when determining whether an agreement requires the parties to arbitrate, the Court may not consider or rule on the potential merits of the underlying claim. *Id.* at 649-650 ("[T]he union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator."); *Am. Mfg. Co.,* 363 U.S. at 568, (footnote omitted) ("The courts, therefore, have no business weighing the merits of the grievance ... [T]he agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."). Fourth, the presumption of arbitrability requires that a court confirm an arbitrator's award unless the court finds with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."*Warrior & Gulf,* 363 U.S. at 582-583.

In order to determine arbitrability, the Court must first determine whether the arbitration clause is "broad" or "narrow." *SeeMehler v. Terminix Int'l Co.,* 205 F.3d 44, 49 (2d Cir.2000); *Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One,* 903 F.2d 924, 927 (2d Cir.1990); *McDonnell Douglas Fin. Corp. v. Pa. Power Light Co.,* 858 F.2d 825, 832 (2d. Cir.1988). If the clause is narrowly drawn, "the Court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that contains the arbitration clause."*Louis Dreyfus Negoce S.A.,* 252 F.3d at 223 (quoting *Rochdale Vill., Inc. v. Pub. Serv. Employees Union,* 605 f.2d 1290, 1295 (2d Cir.1979)). However, "where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or parties' rights and obligations under it.' " *Louis Dreyfus Negoce S.A.,* 252 F.3d at 223 (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,* 58 F.3d 16, 23 (2d Cir.1995).

In *AT & T Techs., Inc.,* the Supreme Court analyzed an arbitration clause that covered "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder ...," and held that such clause was broad and that in such a case the presumption of arbitrability was warranted, recognizing that "the greater institutional competence of arbitrators in interpreting collective-bargaining agreements, 'furthers the national policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining.'*AT & T Techs.* 475 U.S. at 649-651, (quoting *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 371-372 (1984) (citation omitted)). The Supreme Court further held that "in the absence of any express provision excluding a particular grievance from arbitration ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."*Id.* at 649 (quoting *Warrior & Gulf,* 363 U.S. at 584-585). Here, the Arbitration Clause covers "[a]ll complaints, disputes or grievances arising between the parties ... involving questions or interpretation or application of any clause of [the] Agreement, or any acts, conduct or relations between the parties...." (Agreement, § 26). The Court finds that the Arbitration Clause in the instant action is broad.

*4 Here, because Nguyen is an employee and the Hotel furnishes him with housing accommodations, Section 10 clearly applies to him. Furthermore, as the housing dispute arises out of the application and interpretation of Section 10 of the Agreement and clearly involves relations between the parties, the dispute at issue must be submitted to arbitration in accordance with the Arbitration Clause. Accordingly, the Court may only deny Petitioner's motion to confirm the Award if there is clear evidence that the arbitrator overstepped his bounds in its issuance.

With respect to an arbitrator's authority, Title IX of the United States Code Service Section 10(a)(4) provides that an arbitrators award may be vacated "[w]here the [arbitrator] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."9 U .S.C.S. § 10(a)(4)(2001). The Second Circuit has held that a court should "ask only 'whether the arbitrator's award draws its essence from the collective bargaining agreement, since the arbitrator is not free merely to dispense his own brand of industrial justice.' " *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 959005 (S.D.N.Y.), 168 L.R.R.M. (BNA) 2154
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

*Hollywood Heating & Cooling, Inc.,* 242 F.3d 366, 366 (2d Cir.2001) (quoting *Wackenhut Corp. v. Amalgamated Local 515,* 126 F.3d 29, 31 (2d Cir.1997)) (quotation marks and citation omitted). A court should "uphold arbitration awards as long as they have 'even barely colorable justification'... Courts must confirm even those awards it views as incorrect as long as they are 'plausibly grounded' in the parties' contract." *Local Union No. 38,* 242 F.3d at 366 (quoting *Local 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.,* 196 F.3d 117, 125 (2d. Cir.1999) (quotation marks and citation omitted). Accordingly, the Court must defer to the arbitrator in favor of coverage, particularly in a case such as this, which involves a broad arbitration clause.

Applying this highly deferential standard to the facts of this case, the Court finds that the Impartial Chairman did not exceed his authority in issuing the Award. Here the collective-bargaining agreement leaves no room for ambiguity. The Arbitration Clause clearly provides that the Impartial Chairman is entitled to issue an award upon the testimony of the appearing party if the opposing party willfully defaults its appearance. (Agreement, § 26). The Hotel's January 8, 2001 letter to the Impartial Chairman and failure to appear at the eviction issue hearing certainly demonstrates its willful default on the eviction issue hearing.

Applying the Second Circuit's "barely colorable" rule to determine whether the Impartial Chairman overstepped his bounds in issuing the Award, *Local Union No. 38,* 242 F.3d at 366, the Court finds that the Arbitration Clause clearly authorizes the Impartial Chairman to issue the Award in this situation. Accordingly, the Court finds that the Impartial Chairman did not overextend his authority in issuing the Award, and therefore grants the Union's motion to confirm the Award.

Conclusion

**\*5** For the reasons stated above, Petitioner's motion to confirm the Award is granted.

S.D.N.Y.,2001.
New York Hotel & Motel Trades Council, AFL-CIO v. Alphone Hotel Corp.
Not Reported in F.Supp.2d, 2001 WL 959005 (S.D.N.Y.), 168 L.R.R.M. (BNA) 2154

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6

# PITTA & DREIER LLP

ATTORNEYS AT LAW

Michael J. D'Angelo
Direct Dial 212 652 3833
mdangelo@pittadreier.com

March 11, 2008

***Via* Facsimile**

Hon. Richard J. Holwell, U.S.D.J.
United States District Court
500 Pearl Street
New York, New York  10007

> Re:   ***Tran Dinh Truong, Alphonse Hotel Corp. d/b/a The Hotel
> Carter v. New York Hotel & Motel Trades Council, AFL-CIO,
> the Office of the Impartial Chairman and Peter Ward***
> **SDNY Case No.: 07-CV-11383(RJH)**

Dear Judge Holwell:

This firm represents defendants New York Hotel & Motel Trades Council, AFL-CIO ("Union") and Peter Ward ("Ward", included in "Union" unless otherwise specified) in the above referenced matter.  In anticipation of the March 14, 2008 Initial Conference, enclosed herewith please find a fully executed Joint Scheduling Order.

Respectfully,

Michael J. D'Angelo

MJD/pc

encl.

cc:    Hon. Herbert Stern (Ret.) (*Via Facsimile*)
       Joel M. Silverstein, Esq. (*Via Facsimile*)
       Gregory G. Calabro, Esq. (*Via Facsimile*)
       Cathy Anne O'Donnell, Esq. (*Via Facsimile*)
       Barry N. Saltzman, Esq.

PITTA & DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 652-3890
*Attorneys for Defendants/Counterclaim Plaintiffs*
*New York Hotel and Motel Trades Council, AFL-CIO*
*and Peter Ward*

Barry N. Saltzman (BS 6533)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – – X

|  |  |  |
|---|---|---|
| TRAN DINH TRUONG, individually and of Behalf of ALPHONSE HOTEL CORP. d/b/a HOTEL CARTER, | : : : | Case No. 1:07-Civ-11383 (RJH) |
|  | : |  |
| Plaintiff, | : : |  |
|  | : |  |
| -against- | : : |  |
|  | : | **JOINT SCHEDULING ORDER** |
| NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO, and THE OFFICE OF THE IMPARTIAL CHAIRMAN and PETER WARD, | : : : : : |  |
|  | : |  |
| Defendants. | : : |  |

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

The parties by their respective undersigned attorneys of record, hereby submit this proposed Joint Scheduling Order for the above-referenced case in accordance with Rules 16 and 26 of the of the Federal Rules of Civil Procedure and this Court's local rules.

1.    Case Description

    (a)    Attorneys

        (1)    For Plaintiffs - Gregory G. Calabro, Esq.
                                 Cathy O'Donnell, Esq.
                                 Calabro & Associates, P.C.

        (2)    For Defendants New York Hotel & Motel Trade Council
              AFL-CIO and Peter Ward ("Union")
                        Barry N. Saltzman, Esq.
                        Michael J. D'Angelo, Esq.

      (3)     For Defendant Office of the Impartial Chairperson ("OIC")
                        Herbert J. Stern, Esq.
                        Joel M. Silverstein , Esq.

    (b)     Federal Jurisdiction - Section 301 of the Labor Management
Relations Act, 29 USC § 185.

    (c)     Claims and Counterclaims

        Plaintiffs allege in Counts I and II that Defendants have violated the State and New York City Human Rights laws by discriminating against the employer hotel in enforcement of the collective bargaining agreement ("IWA") between the Union and the Alphonse Hotel Corporation d/b/a the Hotel Carter ("Hotel"), because the Hotel owner Tran Dinh Truong is Vietnamese. Plaintiffs allege in Count III that the Union's discriminatory enforcement of the IWA in arbitration at the OIC against the Hotel has intentionally inflicted emotional distress on Mr. Truong. Plaintiffs demand damages of $5 million for each count.

        Defendant Union denies the gist of the Complaint.  The Union also asserts various affirmative defenses it has requested leave to pursue in a motion for judgment on the pleadings under Federal Rule Civil Procedure 12(c).  Thus, the Union asserts that the action fails to state a claim under the Human Rights laws which protect employees from employers, not employers from unions; fails to plead authorization or ratification of the Union's by all 25,000 Union members as required by *Martin V. Curan, 303 NY 276 (1951)*; fails to even remotely allege conduct so outrageous in character beyond all bounds of decency; and that the issues must be arbitrated under Section 301 of the LMRA in any event.  Finally, the Union has counterclaimed to confirm three arbitration awards against the Hotel on the grounds the time to vacate the awards has passed; Local 802, *Associated Musicians v. the Parker Meridian Hotel, 145 F.d 85 (2d cir. 1998)* and there is no substantive basis for vacatur. The awards order the Hotel to reinstate employees Pena, Santiago and Castillo with back pay and to cease threatening and retaliating against employees for demanding their contractual wages/rights

        Defendant the OIC also denies the gist of the complaint and asserts a number of affirmative defenses. Most immediately, OIC asserts that plaintiffs' claims against OIC are untenable because the face of the Verified Complaint establishes that all of those claims are barred by OIC's arbitral immunity. *Austern v. Chicago Board Options Exchange Inc.*, 898 F.2d 882, 886 (2d Cir.), cert. denied, 111 S.Ct. 141 (1990).

    2.    Proposed Case Management Plan

        (a)     Motions - All Defendants have requested leave to move for judgment on the pleadings.  The Court has directed Plaintiff to respond to Defendant's letters by February 28, 2008 and has scheduled Defendant's requests for conference on March 14, 2008.

            In light of the above, Defendant's counsel respectfully suggest that no discovery dates be scheduled and request instead that the motions be scheduled as follows:

        (1)     motions by March 31, 2008;

       (2)     opposition by April 14, 2008;

       (3)     replies by April 24, 2008.

(b) - (g) - Deferred per above.  Alternatively or jointly as the Court prefers:

  (b)     Cut-off for Joinder - March 28, 2008

  (c)     Cut-off for Amendments - March 28, 2008

  (d)     Cut-off for Discovery - March 28, 2008

       (i)     Rule 26(a)(1) disclosures - March 21, 2008

       (ii)     Fact discovery - September 15, 2008

       (iii)    Expert Disclosure - August 15, 2008*

       (iv)    Expert Report - September 12, 2008

       (v)     Expert Cut-off - October 13, 2008

*Defendants do not believe an expert will be needed.

  (e)     Dispositive Motions - October 16, 2008

  (f)     Pretrial Order - November 25, 2008

  (g)     Trial - December 8, 2008, non-jury, approximately four days.

3.     The parties do not consent to proceed before a Magistrate Judge.

4.     Settlement - No settlement discussion have occurred.  Defendants' counsel have requested that Plaintiffs withdraw the Complaint under Federal Rule Civil Procedure 11.

Dated: New York New York
      March 11, 2008                          Respectfully,

CALABRO & ASSOCIATES, P.C.          PITTA & DREIER LLP
Attorneys for Plaintiffs                    Attorneys for Defendant, Union
1412 Broadway, Suite 1504                499 Park Avenue, 15th Floor
New York, New York 10018              New York, New York 10022
(646) 688-6095                        (212) 652-3890

By: _____       By: _____

STERN & KILCULLEN, LLC
Attorneys for Defendant, OIC
75 Livingston Avenue
Roseland, New Jersey 07068

By: _____

# Exhibit 6

# PITTA & DREIER LLP

ATTORNEYS AT LAW

Michael J. D'Angelo
Direct Dial 212 652 3833
mdangelo@pittadreier.com

March 11, 2008

*Via* Facsimile

Hon. Richard J. Holwell, U.S.D.J.
United States District Court
500 Pearl Street
New York, New York  10007

Re:  *Tran Dinh Truong, Alphonse Hotel Corp. d/b/a The Hotel
Carter v. New York Hotel & Motel Trades Council, AFL-CIO,
the Office of the Impartial Chairman and Peter Ward*
SDNY Case No.: 07-CV-11383(RJH)

Dear Judge Holwell:

This firm represents defendants New York Hotel & Motel Trades Council, AFL-CIO ("Union") and Peter Ward ("Ward", included in "Union" unless otherwise specified) in the above referenced matter.  In anticipation of the March 14, 2008 Initial Conference, enclosed herewith please find a fully executed Joint Scheduling Order.

Respectfully,

Michael J. D'Angelo

MJD/pc

encl.

cc:   Hon. Herbert Stern (Ret.) (*Via Facsimile*)
Joel M. Silverstein, Esq. (*Via Facsimile*)
Gregory G. Calabro, Esq. (*Via Facsimile*)
Cathy Anne O'Donnell, Esq. (*Via Facsimile*)
Barry N. Saltzman, Esq.

499 Park Avenue  New York, New York 10022
Telephone 212 652 3890  Facsimile 212 652 3891

111 Washington Avenue  Suite 401  Albany, New York 12210
Telephone 518 449 3320  Facsimile 518 449 5812

{00336872.DOC;}

www.pittadreier.com

PITTA & DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 652-3890
*Attorneys for Defendants/Counterclaim Plaintiffs*
*New York Hotel and Motel Trades Council, AFL-CIO*
*and Peter Ward*

Barry N. Saltzman (BS 6533)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

TRAN DINH TRUONG, individually and of
Behalf of ALPHONSE HOTEL CORP. d/b/a
HOTEL CARTER,

              Plaintiff,

    -against-

NEW YORK HOTEL & MOTEL
TRADES COUNCIL, AFL-CIO, and
THE OFFICE OF THE IMPARTIAL
CHAIRMAN and PETER WARD,

              Defendants.

------------------------------------ X

Case No. 1:07-Civ-11383 (RJH)

**JOINT SCHEDULING ORDER**

    The parties by their respective undersigned attorneys of record, hereby submit this proposed
Joint Scheduling Order for the above-referenced case in accordance with Rules 16 and 26 of the of
the Federal Rules of Civil Procedure and this Court's local rules.

    1.    <u>Case Description</u>

        (a)    Attorneys

            (1)    For Plaintiffs - Gregory G. Calabro, Esq.
                             Cathy O'Donnell, Esq.
                             Calabro & Associates, P.C.

            (2)    For Defendants New York Hotel & Motel Trade Council
                   AFL-CIO and Peter Ward ("Union")
                         Barry N. Saltzman, Esq.
                         Michael J. D'Angelo, Esq.

{00336220.DOC;}

(3)    For Defendant Office of the Impartial Chairperson ("OIC")
Herbert J. Stern, Esq.
Joel M. Silverstein , Esq.

(b)    Federal Jurisdiction - Section 301 of the Labor Management
Relations Act, 29 USC § 185.

(c)    Claims and Counterclaims

Plaintiffs allege in Counts I and II that Defendants have violated the State and New York City Human Rights laws by discriminating against the employer hotel in enforcement of the collective bargaining agreement ("IWA") between the Union and the Alphonse Hotel Corporation d/b/a the Hotel Carter ("Hotel"), because the Hotel owner Tran Dinh Truong is Vietnamese. Plaintiffs allege in Count III that the Union's discriminatory enforcement of the IWA in arbitration at the OIC against the Hotel has intentionally inflicted emotional distress on Mr. Truong. Plaintiffs demand damages of $5 million for each count.

Defendant Union denies the gist of the Complaint. The Union also asserts various affirmative defenses it has requested leave to pursue in a motion for judgment on the pleadings under Federal Rule Civil Procedure 12(c). Thus, the Union asserts that the action fails to state a claim under the Human Rights laws which protect employees from employers, not employers from unions; fails to plead authorization or ratification of the Union's by all 25,000 Union members as required by *Martin V. Curan, 303 NY 276 (1951)*; fails to even remotely allege conduct so outrageous in character beyond all bounds of decency; and that the issues must be arbitrated under Section 301 of the LMRA in any event. Finally, the Union has counterclaimed to confirm three arbitration awards against the Hotel on the grounds the time to vacate the awards has passed; Local 802, *Associated Musicians v. the Parker Meridian Hotel, 145 F.d 85 (2d cir. 1998)* and there is no substantive basis for vacatur. The awards order the Hotel to reinstate employees Pena, Santiago and Castillo with back pay and to cease threatening and retaliating against employees for demanding their contractual wages/rights

Defendant the OIC also denies the gist of the complaint and asserts a number of affirmative defenses. Most immediately, OIC asserts that plaintiffs' claims against OIC are untenable because the face of the Verified Complaint establishes that all of those claims are barred by OIC's arbitral immunity. *Austern v. Chicago Board Options Exchange Inc.*, 898 F.2d 882, 886 (2d Cir.), cert. denied, 111 S.Ct. 141 (1990).

2.    Proposed Case Management Plan

(a)    Motions - All Defendants have requested leave to move for judgment on the pleadings. The Court has directed Plaintiff to respond to Defendant's letters by February 28, 2008 and has scheduled Defendant's requests for conference on March 14, 2008.

In light of the above, Defendant's counsel respectfully suggest that no discovery dates be scheduled and request instead that the motions be scheduled as follows:

(1)    motions by March 31, 2008;

        (2)     opposition by April 14, 2008;
        (3)     replies by April 24, 2008.

(b) - (g) - Deferred per above.  Alternatively or jointly as the Court prefers:

    (b)     Cut-off for Joinder - March 28, 2008
    (c)     Cut-off for Amendments - March 28, 2008
    (d)     Cut-off for Discovery - March 28, 2008
            (i)     Rule 26(a)(1) disclosures - March 21, 2008
            (ii)    Fact discovery - September 15, 2008
            (iii)   Expert Disclosure - August 15, 2008*
            (iv)   Expert Report - September 12, 2008
            (v)    Expert Cut-off - October 13, 2008
*Defendants do not believe an expert will be needed.
    (e)     Dispositive Motions - October 16, 2008
    (f)     Pretrial Order - November 25, 2008
    (g)     Trial - December 8, 2008, non-jury, approximately four days.

3.     The parties do not consent to proceed before a Magistrate Judge.

4.     Settlement - No settlement discussion have occurred.  Defendants' counsel have requested that Plaintiffs withdraw the Complaint under Federal Rule Civil Procedure 11.

Dated: New York New York
       March 11, 2008                          Respectfully,


CALABRO & ASSOCIATES, P.C.          PITTA & DREIER LLP
Attorneys for Plaintiffs                     Attorneys for Defendant, Union
1412 Broadway, Suite 1504              499 Park Avenue, 15th Floor
New York, New York 10018             New York, New York 10022
(646) 688-6095                            (212) 652-3890

By: _Cathy O'Donnell_                 By: _____

STERN & KILCULLEN, LLC
Attorneys for Defendant, OIC
75 Livingston Avenue
Roseland, New Jersey 07068

By: _____

# Exhibit 7

01/25/2008 13:26 FAX

☑001

```
         **********************
    ***    TX REPORT    ***
         **********************

   TRANSMISSION OK

   TX/RX NO              2431
   RECIPIENT ADDRESS     916466886096
   DESTINATION ID
   ST. TIME              01/25 13:25
   TIME USE              01'40
   PAGES SENT            4
   RESULT                OK
```



# PITTA & DREIER LLP

ATTORNEYS AT LAW

499 PARK AVENUE
NEW YORK, NEW YORK 10022
TEL: (212) 652-3890
DIRECT FACSIMILE: (212) 652-3891

## FAX COVER SHEET

Date: January 25, 2008

| NAME | COMPANY | FAX NO. | PHONE NO. |
|------|---------|---------|-----------|
| Gregory Calabro, Esq. | | 646 688-6096 | 646 688-6095 |

**FROM:** **Barry N. Saltzman, Esq.**
**DIRECT DIAL:** **212-652-3827**

Message:.

See enclosed.

No. of Pages (including cover sheet):    4

# PITTA & DREIER LLP

**ATTORNEYS AT LAW**

Barry N. Saltzman  *Partner*
Direct Dial 212 652 3827
bsaltzman@pittadreier.com

January 25, 2008

**Via Fax and Regular Mail**
Gregory Calabro, Esq.
Calabro & Associates, P.C.
1412 Broadway
Suite 1504
New York, New York  10018

Re:    **Tran Dinh Truong, Alphonse Hotel Corp. d/b/a The Hotel Carter v.**
       **New York Hotel & Motel Trades Council, AFL-CIO, the Office of the**
       **Impartial Chairman and Peter Ward, SDNY No. 07-CV-11383(RJH)**

Dear Mr. Calabro:

As you know, this firm represents defendants New York Hotel & Motel Trades Council, AFL-CIO ("Union") and Peter Ward ("Ward", included in "Union" unless otherwise specified) in the above referenced matter.  The Union has removed this action to federal court, answered and counterclaimed.

A review of the facts and circumstances establishes that the claims of Tran Dinh Truong and Alphonse Hotel Corp. d/b/a The Hotel Carter (jointly "Hotel") against the Union are completely devoid of merit on their face.  As such, we hereby demand that you withdraw all claims against the Union.  To the extent that the Hotel fails to withdraw its claims against the Union within twenty one (21) days of this letter, we will request a pre-motion conference seeking permission to move for judgment pursuant to Fed. R. Civ. P. Rule 12(c) and for sanctions and attorney's fees against the Hotel and you for the continuation of abusive and frivolous litigation.

As you know, under Rule 11 of the Fed. R. Civ. P., by presenting a pleading to the court, an attorney certifies that, to the best of his knowledge, information and belief, formed after reasonable inquiry, the claims, defenses and legal contentions are warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that the pleading is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.  The standard for triggering sanctions under Rule 11 is objective unreasonableness, not based on the subjective beliefs of the person

499 Park Avenue  New York, New York 10022
Telephone 212 652 3890  Facsimile 212 652 3891

111 Washington Avenue  Suite 401  Albany, New York 12210
Telephone 518 449 3320  Facsimile 518 449 5812

Gregory G. Calabro, Esq.
January 25, 2008
Page 2

making the statement. *See Levine v. FDIC*, 2 F.3d 476, 479 (2d Cir. 1993); *Mareno v. Rowe*, 910 F.2d 1043 1047 (2d Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991). An examination of your clients' claims demonstrates that they have absolutely no merit and were interposed for an improper purpose.

The three separate claims of the Complaint dated November 21, 2007 are based upon the same factual allegations -- that the Union has violated the collective bargaining agreement ("CBA") between it and the Hotel by enforcing the CBA wrongfully, discriminately and with the intent to cause emotional distress. The first two claims are styled as claims under the State and City human rights laws for discriminatory application of the CBA because of Mr. Tran's Vietnamese origins, the gravamen thereof requiring application and analysis of a broad range of CBA provisions. The third claim for intentional infliction of emotional distress similarly relies on the CBA terms and application at its core.

These claims are frivolous and subject to dismissal because they all allege violations of the CBA which are subject to the mandatory arbitration procedures contained in Article 26 of the CBA for all disputes involving "any acts, conduct or relations between the parties, directly or indirectly …" This extremely broad arbitration provision encompasses the claims of the Complaint. *Alphonse Hotel Corp. v. New York Hotel & Motel Trades Council, AFL-CIO*, 2004 WL 414836 (SDNY 3/5/04) (the "2004 Case") *aff'd w/o Opin.* 117 Fed. Appx. 803 (2d Cir. 2005) Arbitration is mandatory under the CBA, and the Hotel may not under well-settled law skip the process to which it has contractually bound itself. . In addition, to the extent that the complaint purports to allege state law tort claims, they are preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1998). *Dougherty v. American Tel. & Tel. Co.*, 902 F.2d 201 (2d Cir. 1990). When preempted by section 301, "state claims must either be treated as § 301 claims, or be dismissed." *Dittman v. General Motors Corp-Delco Chassis Div.*, 941 F. Supp. 284 (D. Conn. 1996), *aff'd w'out op.*, 116 F.3d 465 (2d Cir. 1997). Both you and your client are deemed aware of this governing law by virtue of the fact that your client made identical or parallel allegations in the 2004 Case.

Furthermore, all such claims must be dismissed as they fail to allege authorization or ratification by all members of the Union as required by *Martin v. Curan*, 303 NY 276 (1951). *See also, Building Industry Fund v. Local Union No. 3 IBEW*, 992 F.Supp. 192, 194 (E.D.N.Y. 1996). Inasmuch as the Hotel has not and cannot truthfully plead that every member of the Union authorized or ratified the conduct alleged in the Complaint, the action should never have been brought. Moreover, the allegations fail to remotely approach the sort of conduct deemed actionable under common law tort. *See, e.g. Stuto v. Fleishman*, 164 F.3d 820 (2d Cir. 1999) (conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, atrocious and intolerable in civilized society).

Aside from the procedural barriers barring the claims, the Complaint also fails to state a claim upon which relief can be granted. The State and City discrimination laws protect employees from discrimination by employers; we are aware of no case nor construction allowing an employer to sue a labor union for alleged discrimination against the employer under these

Gregory G. Calabro, Esq.
January 25, 2008
Page 3

alleged facts. *See, In the Matter of Joseph A. Gomez v. New York State, Executive Dept., Div. of Human Rights,* 122 A.D.2d 337, 5045 N.Y.S.2d 307 (3d Dept. 1986). Furthermore, you cannot prove discrimination. In 2007 alone, the Union filed over 500 grievances against various hotels, none known to be Vietnamese owned, the vast majority relating to discipline, discharge and wage claims.     The Hotel therefore receives the same treatment as hundreds of other non-Vietnamese owned hotels and cannot claim disparate treatment. Moreover, the grievances were tried at arbitration and found meritorious after full hearing at which your client appeared by counsel, argued, presented evidence and cross-examined witnesses.     Similarly, the Diallo grievance is proceeding according to the Order of the Hon. Loretta A. Preska, USDJ, attached to the Union's Answer, and, therefore, cannot be the basis of a claim of discrimination or tort against the Union. As to Mr. Peter Ward, the Complaint fails to allege any individual liability or actions. Indeed, although Mr. Ward serves as Union President, Mr. Tran knows that Mr. Ward was not directly involved in these matters.

In light of the above law and facts, known or which should be known to you and your clients, the claims of the Complaint cannot be warranted. Such claims can only be explained as attempts to abuse legal process by threatening the Union with costly, baseless litigation unless it abandons vigorously representing the Hotel's aggrieved employees. You know or should know that your clients have pursued this tactical pattern of suing the Union and individual employees in the past in order to discourage enforcement of the labor laws. *See, the 2004 Case; New York Hotel & Motel Trades Council, AFL-CIO v. Alphonse Hotel Corp.,* 2001 WL 959005 (SDNY). Such misconduct did not work then, and will not be tolerated now.

Nothing in this correspondence should be construed as a waiver of any rights, claims or defenses of the Union, all of which are hereby specifically reserved. We urge you to review this matter with your clients and to withdraw the Complaint with prejudice immediately.

Very truly yours,

Barry N. Saltzman

BNS/seg

cc:     Hon. Herbert Stern (Ret.)
        Joel M. Silverstein, Esq.
        Mr. Peter Ward
        Mr. Michael Simo
        V. Pitta, Esq.
        R. Maroko, Esq.
        M. D'Angelo, Esq.
        J. Farelli, Esq.

PITTA & DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 652-3890
*Attorneys for Defendants*
*New York Hotel and Motel Trades Council, AFL-CIO*

Barry N. Saltzman (BS 6533)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – –X

TRAN DINH TRUONG, individually and of          :
Behalf of ALPHONSE HOTEL CORP. d/b/a           :    Case No. 1:07-Civ-11383 (RJH)
HOTEL CARTER,                                   :
                                                :
                    Plaintiff,                  :
                                                :
        -against-                               :
                                                :    **AFFIDAVIT OF SERVICE**
NEW YORK HOTEL & MOTEL                          :
TRADES COUNCIL, AFL-CIO, and                    :
THE OFFICE OF THE IMPARTIAL                     :
CHAIRMAN and PETER WARD,                        :
                                                :
                    Defendants.                 :
– – – – – – – – – – – – – – – – – – – – – – – – – – –:X

STATE OF NEW YORK      )
                            s.s.
COUNTY OF NEW YORK  )

        Susan Gempler, being duly sworn, deposes and says:

        That deponent is not a party to this action, is over eighteen years of age and resides in Rutherford, New Jersey.

        That on the 8th day of April, 2008 deponent served by regular mail and email the within **NOTICE OF MOTION, MEMORANDUM OF LAW OF THE NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO IN SUPPORT OF ITS MOTION FOR SANCTIONS PURSUANT TO FRCP 11 and AFFIRMATION OF BARRY N. SALTZMAN IN SUPPORT OF THE UNION'S MOTION FOR SANCTIONS PURSUANT TO FRCP 11** upon:

1

{00315743.DOC;3}

**Gregory G. Calabro, Esq.**
Attorneys for Plaintiffs
1412 Broadway, Suite 1504
New York, New York 10018

**Herbert J. Stern, Esq.**
**and Joel M. Silverstein, Esq.**
Attorneys for the Office of the Impartial
Chairperson
Stern & Kilcullen, LLC
75 Livingston Avenue
Roseland, New Jersey 07068

Susan Gempler

Sworn to before me this
8th day of April, 2008

Notary Public

DEBORAH J. BOBB
NOTARY PUBLIC, State of New York
No. 02BO4955367
Qualified in Queens County
Commission Expires Aug. 28, 20 2009

2

{00315743.DOC;3}